FIN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED ) <br> TRADES INDUSTRY PENSION FUND ) <br> ) <br> Plaintiff, ) <br> v. ) <br> ) <br> MIDWEST DRYWALL CO., INC. ) <br> ) <br> Defendant. ) <br> ) | Civil Action No. 06-131 (GK) <br> Next-Scheduled Court Deadline <br> Filing Dispositive Motions: <br> January 30, 2008 |

## DECLARATION OF STEVEN A. NIENKE

I, Steven A. Nienke, hereby certify under the penalties of perjury that the following is true and correct to the best of my personal knowledge and belief:

1. I am president of Midwest Drywall Co., Inc., and, in this position, have familiarity with the events which are the subject matter of the above-captioned lawsuit.

2. Midwest Drywall Co., Inc. is a drywall specialty contractor headquartered in Wichita, Kansas with its employees engaged in construction work in and outside the State of Kansas and with local offices in other states.

3. Midwest Drywall's collective bargaining relationship with Painters District Council 3 dates back to 1986. Initially, Midwest Drywall and Painters District Council 3 entered into collective bargaining agreements permitted by Section 8(f) of the National Labor Relations Act (NLRA). In May, 1993, the National Labor Relations Board (NLRB) held an election and on November 24, 1993, certified Painters District Council 3 as the exclusive bargaining representative for Midwest Drywall employees performing specified work in a specified area in Missouri and Kansas under Section 9(a)

1

of the NLRA. After that, Midwest Drywall and Painters District Council 3 entered into collective bargaining agreements. The collective bargaining agreement entered into by Midwest Drywall (through the Builders' Association) and Painters District Council No. 3 did not contain any basis upon which payments were to be made to the Pension Fund, but did provide that Midwest Drywall was required to make contributions for its employees working within the jurisdiction of the agreement to the Labor Management Cooperative Fund (LMCF) and Midwest Drywall made contributions as specified in said collective bargaining agreement.

      4.      Midwest Drywall's collective bargaining relationship with Painters Local 76 dates back to 1984. Initially, Midwest Drywall and Painters Local 76 entered into collective bargaining agreements permitted under Section 8(f) of the NLRA. In May, 2003, the NLRB held an election and thereafter certified Painters Local 76 as the exclusive bargaining representative for Midwest Drywall employees performing specified work in a specified area in Kansas under Section 9(a) of the NLRA. After that, Midwest Drywall and Painters Local 76 have entered into collective bargaining agreements. The collective bargaining agreements entered into between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades LMCF and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered

into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement.

5.  In April, 1998, Midwest Drywall and Painters Local 159 established a collective bargaining relationship and entered into a collective bargaining agreement permitted under Section 8(f) of the NLRA covering Midwest Drywall employees performing certain work including drywall painting, taping, and finishing in an area extending to certain counties in Nevada including the city of Las Vegas. The collective bargaining agreement entered into by Midwest Drywall and Painters Local 159 contains detailed basis, as to each employee engaged in work covered by said agreement, on which contributions are to be made to the Pension Fund. Midwest Drywall has complied with said provisions. In the collective bargaining agreement entered into by Midwest Drywall and Painters Local 159, Midwest Drywall also agreed to make contributions for employees covered by said agreement to the LMCF, to honor authorizations for check-off of political contributions from employees who are union members to the Political Action Together – Political Committee (PAT-PC). Midwest Drywall has complied with said provisions.

6.  In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159 during the time period of the Pension Fund's claims, none of these employees were brought by Midwest Drywall to work in an outside jurisdiction.

7.  In 1998, Midwest Drywall established collective bargaining relationships with other construction industry trade unions as to work in the Las Vegas, Nevada area.

Midwest Drywall entered into collective bargaining agreements in 1998 that included the Las Vegas, Nevada jurisdiction with the Southern California-Nevada Regional Council of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, Labors International Union of North America, Local Union No. 872, and Operative Plasters and Cement Masons International Association, Local Union 797.

8.      In July, 1999, Midwest Drywall established a collective bargaining relationship and entered into a collective bargaining agreement titled "Memorandum of Understanding and Area Contract" with Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job. Midwest Drywall has paid all contributions to funds as specified in the Memorandum of Understanding, including contributions to the Pension Fund.

9.      Painters Local 159 did not and has not expressly or impliedly represented itself to be the collective bargaining agent for Midwest Drywall's employees who work solely in locations outside the jurisdiction of Painters Local 159.

10.     Painters Local 159 did not and has not expressly or impliedly represented itself to be the authorized agent for foreign Painters District Councils and/or Painters Local Unions.

11.     Painters District Council 3, Painters District Council 80, and Painters Local Union 76 have not represented to Midwest Drywall that Painters Local 159 was or is the collective bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or was or is their authorized agent for collective bargaining.

12.     Midwest Drywall is not signatory to and has not entered into any national agreement with the International Painters and Allied Trades Union.

13.     In reference to District Councils and Local Unions affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters Local 159/District Council 15.

14.     In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, I met with Painters Local 109 representative, Pat Stoysich, and his boss for about an hour. We talked about a proposed Painters Local 109 collective bargaining agreement including jurisdiction; what it would cover and what it would require. Painters Local 109 gave me a copy of a proposed Agreement. I told Painters Local 109 that I didn't have a problem with the painting work part of the proposed Agreement, but I did have a problem with the EIFS-exterior insulating finish system; where Midwest Drywall did EIFS work, that work was under the jurisdiction of plasters; it was not painters work; and to have EIFS work added to painting work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat Stoysich said EIFS work was the way the Agreement was written and he would not negotiate it out. I told Painters Local 109 that I was there to negotiate an Agreement as to painting work; I had no problem signing an Agreement that day only as to painting work. Pat Stoysich said he would check with the Painters Local 109's attorney and telephone me later that day. Later, Pat Stoysich telephoned me and said that there was no way Painters Local 109 would change its proposed Agreement, it

5

had to cover EIFS work too. No Agreement was agreed to between Midwest Drywall and Painters Local 109.

15.    Midwest Drywall received a letter dated September 28, 1999, from Leonard Wittman, representative of Painters Local 159, that stated to Midwest Drywall that: "It has been brought to my attention that your company was engaged in contracting work covered by the collective bargaining agreement between Midwest Drywall and Painters Local 159 and that Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV 50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this oversight has been rectified by close of business October 8, 1999 to avoid further action by Local 159."

16.    By letter dated October 4, 1999, to Leonard Wittman, on behalf of Midwest Drywall I stated that: "Midwest Drywall Co., Inc. denies that it has violated any lawful terms of and/or intent of the collective bargaining agreement with Painters Local No. 159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a violation of that agreement and when it claimed the violation had occurred and requested a prompt response.

17.    By letter dated November 3, 1999, Leonard Wittman, representative of Painters Local 159, stated to Midwest Drywall that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who states he has spoken to your company about becoming signatory to his Local. As you can see our Article IV, clearly states that your company agrees to abide by the Agreement in place, in the 'outside the geographical area.' Please understand it is not the position of Local 159 or that of Local 109 to 'hammer' a contractor into becoming signatory. I am confident that if you or your representative would meet with Mr. Stoysich both sides would come to an agreement."

18.  By letter dated November 8, 1999, to Leonard Wittman, on behalf of Midwest Drywall I stated to Painters Local 159:

> "For your information purpose, prior to your recent correspondence, Midwest Drywall met with Local 109 representatives in Omaha, Nebraska for collective bargaining. Midwest Drywall offered to sign a collective bargaining agreement with Local 109 including lawful clauses of an Agreement. Its offer is still there for Local 109 to accept."

19.  In March, 2000, Midwest Drywall was notified that charges had been brought against it for violation of the collective bargaining agreement between Midwest Drywall and Painters Local 159, Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement between Midwest Drywall and Painters Local 159 in Article XXV, Section 6, vests in the Joint Committee the power to adjust all disputes and grievances that may arise out of the application or interpretation of the Agreement and that the decisions of the Joint Committee shall be final and binding on both parties to the Agreement.

20.  On April 10, 2000, a hearing was held before the Joint Committee and Midwest Drywall was informed that Painters Local 159 asserted a violation of the collective bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest Drywall's continuing failure to enter into a collective bargaining agreement with Painters Local 109 in Omaha, Nebraska. On behalf of Midwest Drywall, I provided facts at the hearing as to the negotiations in the summer of 1999 with Painters Local 109, that we had not reached an agreement, and that Midwest Drywall had not signed an agreement with Painters Local 109. The Joint Committee stated at the close of the hearing that it determined that Midwest Drywall had violated the 50-50 Clause because it

7

had not signed an agreement in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local 109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve the continuing violation. After the Hearing, Leonard Wittman said to me that the Union was "not going to enforce the finding."

21. After receipt of the Decision and Order of the Joint Committee dated April 14, 2000, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109.

22. Since April, 2000, Midwest Drywall has received numerous written confirmations from the Joint Committee that Midwest Drywall is current in its payments of fringe benefits.

23. Midwest Drywall has relied upon Painters Local 159's promise and representations concerning the application of Article IV, 50-50 Clause. Midwest Drywall, in 1999, established a collective bargaining relationship with and entered into a collective bargaining agreement as permitted by Section 8(f) of the NLRA with the Heartland Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters and Joiners of America (Carpenters Local Union No. 444) covering work performed in specified counties in Iowa and Nebraska that included the city of Omaha,

Nebraska. In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers. Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain work, including drywall taping, finishing and sanding in a defined geographical area in Nebraska and Iowa.

24. During the term of its collective bargaining agreements with Carpenters Local Union Nos. 444 and 1055, Midwest Drywall made contributions for employees performing work covered by the agreements including drywall finishers and tapers, to the Omaha Construction Industry Pension Fund in accord with the negotiated and signed collective bargaining agreements. After the termination of the collective bargaining agreement, Midwest Drywall reached an agreement with the Omaha Construction Industry Pension Fund as to assessment of withdrawal liability and paid an additional $490,000.00 into said Pension Fund.

25. Midwest Drywall has had collective bargaining relationships with other affiliated District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and Joiners of America dating back to 1973. After elections conducted by the NLRB and the NLRB's certification of the unions as the exclusive representative for employees in appropriate bargaining units including drywall finishing, Midwest Drywall entered into collective bargaining agreements as permitted by Section 9(a) of the NLRA with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918, #1445, and #2279

covering work performed by its employees including drywall finishing in specified counties in north central and eastern Kansas (outside of Kansas City).

26.    On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Midwest Drywall's representative for negotiations, Thomas G. Pfundstein (Senior Executive Director, Southern Nevada PDCA), for a Memorandum of Understanding Between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. Painters District Council 15 represented to Mr. Pfundstein that the proposed Memorandum of Understanding would be re-established with the new July 1, 2007 Agreement.

27.    Painters District Council 15 and Midwest Drywall entered into a Memorandum of Understanding that provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

28.    In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the Southern Nevada Chapter of The Painting and Decorating Contractors of America to represent it in negotiations in 2007 with Painters Local 159.

29.    On July 12, 2007, after the new July 1, 2007, Master Agreement was reached with Painters Local 159, Thomas Pfundstein informed Midwest Drywall that

Painters Local 159 and Painters District Council 15's representative, John Smirk, stated that he would re-issue a new Memorandum of Understanding for the new agreement.

30.     In spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall established a collective bargaining relationship with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the Union proposed an International Agreement to Midwest Drywall.

31.     On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding where in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the UBCJA, including but not limited to drywall hanging, drywall finishing and wet wall finish work (plastering), said provision regarding drywall finish and plastering does not apply in those areas where Midwest Drywall is already signed to an agreement with another labor organization as long as such an agreement remains in effect. Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on July 1, 2007.

_____
Steven A. Nienke

Dated: _____1-15-08_____