IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND ) ) ) ) Plaintiff, ) v. ) ) MIDWEST DRYWALL CO., INC. ) ) Defendant. ) | Civil Action No. 06-131(GK)<br>**Next – Scheduled Court Deadline**<br>**Dispositive Motions: January 30, 2008** |

### PLAINTIFF'S STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, International Painters and Allied Trades Industry Pension Fund ("Fund", "Pension Fund"), by and through its legal counsel, Jennings Sigmond, P.C., pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of Civil Procedure for the United States District Court for the District of Columbia, submits this Statement Of Material Facts As To Which There Is No Genuine Issue in support of its Motion for Summary Judgment.

1. The Pension Fund is a trust fund and an employee benefit plan under 29 U.S.C. §§ 186(c)(5) and 1002(37)(2) and (3) (Declaration of Gary J. Meyers ("Meyers Decl."), Exhibit 1, at ¶ 2).

2. The Finishing Trades Institute f/k/a the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund ("FTI") is a jointly administered trust fund established under 29 U.S.C. § 186(c)(6) and was created to provide, promote and advance education, instruction, materials and assistance to individuals and apprentice training funds in the industry throughout the United States and Canada (Meyers Decl. at ¶ 6; Exhibit 4).

3. Painters and Allied Trades Labor Management Cooperation Initiative ("LMCI")

192906

is a trust fund established under 29 U.S.C. § 186(c)(9) and was created to advance the interests of labor/management relationships, industry promotion, training, and other approved purposes consistent with the Labor Management Cooperation Act in industries encompassed by the jurisdiction of the International Union of Painters and Allied Trades ("IUPAT"). (Meyers Decl. at ¶ 7; Exhibit 8).

4. The Pension Fund is the authorized collection agent for LMCI and FTI (jointly "Ancillary Funds", and together with Pension Fund, "Funds") pursuant to an agreement by and among the Funds (Meyers Decl. at ¶ 5).

5. The Pension Fund provides retirement and disability benefits to eligible participants, their spouses and families. The Pension Fund currently has over seventy-four thousand (74,000) participants including over twenty-four thousand two hundred (24,200) retirees and beneficiaries who receive benefits (Meyers Decl. at ¶¶ 3, 8).

6. The benefits provided by the Funds are funded by contributions paid by employers who have an obligation under a collective bargaining agreement(s) to make contributions based on hours of covered employment worked or paid to their employees and through earnings from the investment of those contributions (Meyers Decl. at ¶ 9).

7. Midwest Drywall Co., Inc. ("Midwest Drywall," "Company," "Midwest," or "Defendant") is a Kansas corporation with its principal place of business located at 1351 S. Reca Ct., Wichita, KS 67209 and is an employer engaged in commerce within the meaning of 29 U.S.C. § 152(2) and (6) and 1002(11) (Complaint at ¶ 5; Answer at ¶ 5 ).

8. Midwest Drywall is a large drywall contractor that operates throughout the midwest, generally in geographic areas west of the Mississippi River (Declaration of Robert E. Moore ("Moore Decl."), Exhibit 2 at ¶ 5).

9. On April 15, 1998, Midwest became signatory to a collective bargaining agreement with the International Union of Painters and Allied Trades, AFL-CIO, CLC, District Council 15 ("DC 15"), which includes the International Union of Painters and Allied Trades Local 159 ("Local 159") (Declaration of John Smirk ("Smirk Decl."), Exhibit 3 at ¶ 5; Exhibit 5(a)). Midwest subsequently became bound to three successor collective bargaining agreements for the periods July 1, 2001 through June 30, 2004, July 1, 2004 through June 30, 2007, and July 1, 2007 through June 30, 2011. (Smirk Decl. at ¶5; Exhibits 5(a) – 5(d)).

10. Under the labor agreements, the Company agreed to abide by the terms of the Restated Agreement and Declaration of Trust Establishing the International Painters And Allied Trades Industry Pension Fund ("Pension Trust Agreement") and the International Painters and Allied Trades Industry Pension Plan Rules and Regulations ("Plan"). Article VIII, Section 1(d) of the labor agreement states that "[t]he Employer . . . agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he actually signed same" (Meyers Decl. at ¶ 11; Exhibit 5(a), Art. VIII; *see also,* Exhibits 5(b)-5(d)). The labor agreements contain similar commitments to abide by the Ancillary Funds' trust agreements and rules and regulations (Exhibit 5(a), Art. XIV; *see also,* Exhibits (b)-(d), Art. XIII; Exhibit 5(a), Art. IX, *see also* Exhibits 5(b)-(d)).

11. The Funds' labor agreements, trust agreements and the Plan document require Company to timely prepare and submit monthly remittance reports and contributions where owing (Meyers Decl. at ¶ 9; Exhibit 4, Art. IV; Exhibit 5, Art. VIII; Exhibit 6, Art. VI; Exhibit 7, Art. 10, §10.12, Exhibit 8, Art. 5). Similar language appears in relation to contributions owing to the FTI and the LMCI (Exhibit 5(a), Art. XIV; *see also,* Exhibits (b)-(d), Art. XIII; Exhibit 5(a), Art. IX, *see also* Exhibits 5(b)-(d)).

12. Article VIII of the labor agreement specifically provides that "[f]or each hour or portion thereof, for which an employee received pay, the employer shall make a contribution to the above named Pension Fund..." (Exhibit 5(a), Art. VIII; *see also* 5(b) – 5(d) Art. VIII)

13. Article XIV of the labor agreement further requires that "[c]ontributions . . . be made monthly and shall be recorded on forms supplied by the International Union of Painters and Allied Trades Union and Industry National Pension Fund office . . ." (Exhibit 5(a), Art. XIV; *see also* Exhibits 5(b) - 5(d), Art. XIV).

14. Article VI, Section 1 of the Pension Trust Agreement provides:

> In order to effectuate the purpose hereof, each Employer shall contribute to the Pension Fund the amount required by the Collective Bargaining Agreement between the Union and Employer. The rate of contribution shall at all times be covered by the aforesaid Collective Bargaining Agreement then in force and effect, together with any amendments, supplements or modification thereto. . .

(Exhibit 6). Similar provisions are set forth in the trust agreements for the LMCI and the FTI(Exhibit 5(a), Art. XIV; *see also* Exhibits 5(b) - 5(d), Art. XIV).

15. Under the Plan "[a]n employer will pay contributions to the Plan or Trust, for allocation to the Plan as directed by the Trustees, as required by law, a collective bargaining agreement, a Participation Agreement, or the Trust Agreement . . . " (Exhibit 7, Art. 10, Sec. 10.07).

16. Under the labor agreements, contributions are due for work performed within the jurisdiction of the signatory local union and, when the signatory employer performs work outside the geographic jurisdiction of the signatory local union, in areas where there is a collective bargaining agreement in effect between any local union or district council of the International Union of Painters and Allied Trades and employers of the industry. Article IV of the labor agreement includes the following provision, known as an "out-of-area" clause:

>   (b) The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographic jurisdiction and executed by the employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided however, that as to employees employed by such employer from within the geographic jurisdiction of the Union party to this agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents. This provision is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable collective bargaining agreement and through the courts, and is also enforceable by the Union party to this agreement, both through the procedure for settlement of grievances set forth in this agreement and through the courts.

(Exhibit 5(a), Art. IV(b); *see also* Exhibits 5(b) – 5(d), Art. IV; Meyers Decl. at ¶ 12).

17. The Pension Fund maintains copies of collective bargaining agreements on file for each jurisdiction that requires contributions to be made to the Pension Fund (Meyers Decl. at ¶ 17).

18. In April 2000, in accord with the grievance procedure in its collective bargaining agreement with Midwest, Local 159 filed a claim with the Joint Trade Board of the Painters and Decorators Joint Committee, Inc. ("Board") asserting Midwest's violation of Article IV of the labor agreement (hereinafter "out-of-area" clause) (Smirk Decl. at ¶ 6).

19. On April 14, 2000, the Board, after conducting a hearing, rendered a Decision and Order concluding that Midwest was bound by the terms of the labor agreement, including the out-of-area clause "governing work performed by Midwest outside the area jurisdiction of the [labor] Agreement." The Board determined that Midwest is obligated, under the out-of-area clause, to pay wages and fringe benefit contributions on all hours worked by its employees, even

when Midwest performed work outside of Local 159's geographic jurisdiction (Smirk Decl. at ¶ 7; Exhibit 9). This Order was not appealed by Midwest.

20. On February 8, 2007, Midwest and DC 15 entered into a Memorandum of Understanding ("MOU") (Smirk Decl. at ¶ 8; Exhibit 10).

21. The MOU constituted a limited waiver of the out-of-area clause contained in the labor agreement for the period February 8, 2007 through June 30, 2007. That waiver expired on June 30, 2007 (Smirk Decl. at ¶ 9; Exhibit 10).

22. On March 16, 2007, Midwest executed an Assignment of Bargaining Rights ("Assignment") wherein Midwest assigned its bargaining rights to the Negotiation Committee of the Southern Nevada Chapter of the Painting and Decorating Contractors of America ("PDCA") (Smirk Decl. at ¶ 10; Exhibit 11).

23. Effective July 1, 2007, the PDCA negotiated a new labor agreement with Local 159 (Smirk Decl. at ¶ 11; Exhibit 5(d)). This new labor agreement is binding on Midwest pursuant to the assignment of its bargaining rights to the PDCA. This agreement is currently in effect and does not contain a waiver of Article IV (Smirk Decl. at ¶ 11; Exhibit 5(d)).

24. As with all the labor agreements related to Midwest, the current labor agreement contains an out-of-area clause obligating all contractors represented by the PDCA to make contributions for work performed by their employees in jurisdictions where there is a collective bargaining agreement in effect between any Local Union or District Council of the International Unions of Painters and Allied Trades and employers of the industry (Smirk Decl. at ¶ 12; Exhibit 5(d), Art. IV, Section 1(b)).

25. When an employer fails to make the required contributions or remit remittance Reports as required under the collective bargaining agreement, the labor agreements, trust

agreements and Plan provide the Funds with remedies (Exhibit 4, Art. 4, Section 4.07; Exhibit 5(a), Art. 10; Exhibit 6, Art. VI; Exhibit 7, Art. 10, § 10.12, Exhibit 8, Art. V, Section 7).

    26.    Article VI, Section 4 of the Pension Trust Agreement provides:

> Non-payment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payment. In addition to any other remedies to which the parties may be entitled, an Employer in default for twenty days may be required at the discretion of the Trustees to pay such reasonable rate of interest as the Trustees may fix on the money due to the Trustees from the date when the payment was due to the date when payment is made, together with all expenses of collection (including attorneys fees) incurred by the Trustees and such liquidated damages or penalties as may be assessed by the Trustees . . .

(Exhibit 6, Art. VI, Section 4).

    27.    Article VI, Section 6 of the Pension Trust Agreement also provides for audits. Specifically:

> The Trustees may at any time have an audit made by certified public accounts of the payroll, wage, and cash disbursement records, general ledger, and other financial records, including but not limited to tax returns, of any Employer in connection with the said contributions and/or reports.... If the Employer fails to cooperate with a scheduled audit, the Trustees may require that the Employer pay to the Fund all costs incurred as a result of the Employer's failure. Any Employer found delinquent or in violation of the Rules of Regulations of the Pension Plan...as a result of an audit may be required by the Trustees to pay to the Fund the cost of the audit.

(Exhibit 6, Art. VI).

    28.    The Plan provides, at Section 10.12, as follows:

**Section 10.12 Collection of Delinquent Contributions.**

    (a)    In the case of a Contributing Employer that fails to make the contributions to the Plan for which it is obligated, in accordance with the terms and conditions of a collective bargaining agreement, the Trustees may bring an action on behalf of the Plan pursuant to Sections 502(g)(2) of ERISA to enforce the Contributing Employer's obligation.

 (b) In any action in which judgment is awarded in favor of the Plan, the Contributing Employer shall pay to the Plan, in accordance with the court's award:

  (1) the unpaid contributions.

  (2) interest on the unpaid contributions, determined at the rate prescribed under Section 6621 of the Internal Revenue Code of 1954, as amended,

  (3) liquidated damages equal to the greater of

   (A) the amount of interest charges on the unpaid contributions, or

   B) 20 percent (higher percentage, if permitted by Federal or State law) of the unpaid contributions.

  (4) reasonable attorneys' fees and costs of the action, and

  (5) such other legal or equitable relief as the court deems appropriate.

 (c) Nothing in this section shall be construed as a waiver or limitation on the Plan's or the Trustees' right to enforce a Contributing Employer's contribution obligation in any other type of proceeding.

(Exhibit 7, Art. 10, § 10.12).

29. On March 10, 2004, the Funds informed Midwest Drywall of their intent to perform an audit in accordance with the terms and provisions of the Funds' trust agreements (Meyers Decl. at ¶ 14; Exhibit 12).

30. The Funds' auditor conducted an audit of the payroll books and related records of Midwest Drywall covering the period January 1, 2001 through June 30, 2004 (Moore Decl. at ¶ 4; Exhibit 13).

31. In preparing the audit report, the Auditor determined (1) the geographic areas in which Midwest worked, (2) whether there were collective bargaining agreements in effect

between a local union or district councils of the IUPAT, and (3) if the employers in those areas were bound to those agreements and required to make contributions to the Funds. In preparing the audit report, the auditor reviewed records, provided by Midwest and the Funds, of all work performed in the geographical jurisdiction of the Union as well as those jurisdictions covered by the "out of area" clause. (Moore Decl. at ¶ 7).

32. The audit revealed an aggregate shortage through June 30, 2004 in the amount of $619,325.96, which resulted, in part, (1) from Midwest's failure to make contributions for all hours of covered work performed in areas where there is a collective bargaining agreement in effect between the Local Unions or District Councils of the International Union of Painters & Allied Trades and (2) Company's use of non-signatory contractors, a violation of the subcontracting provision in the labor agreement which, in turn, requires that contributions to the Funds are owed for those hours worked (Moore Decl., ¶ 8; Exhibits 5(a), Art. XVI; *see also,* Exhibit 5(b)-(d), Art. XV; Exhibit 13).

33. The delinquency amount uncovered by the audit is allocated between the Funds as follows: FTI - $12,722.30; LMCI - $3,233.40; Pension Fund - $603,370.43 (Exhibit 13).

34. Midwest owes additional contribution amounts to each of the Funds for the period of July 1, 2004 to the present date (except for the period of February 8, 2007 through June 30, 2007) as a result of Midwest's continuing violations of the labor agreements. The amounts of these additional obligations have not yet been liquidated as additional audits will need to be performed (Meyers Decl. at ¶ 15).

35. Midwest owes interest on all delinquent contribution amounts as required by the Funds' rules and regulations (Meyers Decl. at ¶ 18).

36. The Company owes $123,865.19 in liquidated damages based on known delinquent contributions in the amount of $619,325.96 (Meyers Decl. at ¶ 19).

37. As a signatory to the labor agreements, the Company is obligated to reimburse the Fund for the cost of a compliance audit. The Company also owes audit costs in the amount of $3,484.57 (Meyers Decl. at ¶ 18).

                            JENNINGS SIGMOND, P.C.

                            BY: /s/ Richard B. Sigmond
                                 RICHARD B. SIGMOND, ESQUIRE
                                 (I.D. NO. 446969)
                                 The Penn Mutual Towers, 16th Floor
                                 510 Walnut Street, Independence Square
                                 Philadelphia, PA 19106-3683
                                 (215) 351-0609/0615

Date: January 30, 2008              Attorney for Plaintiff