# Exhibit 15

FILED

MAR 21 1997

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----ooOoo----

| | |
|---|---|
| HARRIS & RUTH PAINTING CONTRACTING, INC., | No. Civ. S-96-1030 WBS/JFM |
| Plaintiff, | MEMORANDUM AND ORDER |
| v. | |
| PAINTERS & TAPERS LOCAL UNION 487 OF THE BROTHERHOOD OF PAINTERS AND ALLIED TRADES, an unincorporated association; and DISTRICT COUNCIL OF PAINTERS NO. 16 OF THE INTERNATIONAL BROTHERHOOD OF PAINTERS AND ALLIED TRADES, an unincorporated association, | |
| Defendants. | |

----ooOoo----

Plaintiff brought this action pursuant to section 301 of th Labor Management Relations Act, 29 U.S.C. § 185, seeking to vacate an arbitration award against it. Plaintiff contends that because it was not a signatory to any collective bargaining agreement with defendant Local 487, the Local 487 had no standing to bring a grievance against it or to enforce any award obtained. The court must now decide to what extent an "extraterritorial clause" in one collective bargaining agreement signed by an employer confers benefits on out-of-area union employees covered by a separate collective bargaining agreement to which the employer is not a signatory.

///

24

1  Both plaintiff and defendant move for summary judgment.
2  Fed. R. Civ. P. 56. For the reasons stated below, the court will
3  deny the plaintiff's motion and grant the defendant's motion.

## BACKGROUND

This suit involves one employer, plaintiff Harris & Ruth Painting Contracting, Inc. ("Harris & Ruth"), and two unions, the International Brotherhood of Painters & Allied Trades Union, Local 487 ("Local 487") and the International Brotherhood of Painters & Allied Trades Union, Local 567 ("Local 567"). The Local 487 represents painters in the Sacramento area, and the Local 567 represents painters in the Reno area.

The dispute centers around the interpretation of two collective bargaining agreements, each covering a different geographical jurisdiction. In 1994, plaintiff negotiated and signed an agreement with Local 567 in Reno (hereinafter the "Reno Agreement") for work performed in that area. The territory of Local 487 is covered by a separate collective bargaining agreement negotiated between a multi-employer group known as the Painting and Decorating Contractors Association of Sacramento, Inc. ("PDCA") and the Local 487 (hereinafter the "Sacramento Agreement"). Plaintiff was a member of the PDCA.

Plaintiff signed the Sacramento Agreement in July 1995, but purported to exercise its right to withdraw from the agreement in December 1995. Thereafter, plaintiff ceased abiding by the Sacramento Agreement and began hiring non-union painters to work in Local 487's territory.

On January 10 and 22, 1996, Local 487 filed grievances against Harris & Ruth pursuant to the grievance provisions of the

2

Sacramento Agreement. The grievances alleged that Harris & Ruth was in violation of the Sacramento Agreement because (1) it did not effectively terminate the Sacramento Agreement, and (2) the Reno agreement obligated Harris & Ruth to comply with the Sacramento Agreement when doing work in that area.

A grievance hearing before the Painters-Decorators Joint Committee of Sacramento ("Joint Committee"), a committee created pursuant to the Sacramento Agreement, was set for February 15, 1996. Plaintiff gave notice that it would not be appearing at the hearing, stating that the Joint Committee had no jurisdiction over it following its withdrawal from the Sacramento Agreement. The hearing before the Joint Committee proceeded despite plaintiff's absence.

The Joint Committee unanimously found that plaintiff violated the Reno Agreement by not complying with the Sacramento Agreement when hiring painters in Local 487's area. It therefore declared that plaintiff owed backpay and trust fund fringe benefits to all Local 487 employees who were replaced by non-union employees from January 2, 1996 until the time plaintiff reinstated them. On the issue of whether plaintiff effectively withdrew from the Sacramento Agreement, however, the Joint Committee deadlocked and did not resolve the issue.

Plaintiff subsequently brought this action seeking to overturn the Joint Committee's award, and now moves for summary judgment on that claim. Local 487 also moves for summary judgment, seeking to enforce the award.

///
///

3

## STANDARD OF REVIEW

Summary judgment is appropriate if the record, read in the light most favorable to the non-moving party, demonstrates no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Material facts are those necessary to the proof or defense of a claim, and are determined by reference to the substantive law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). At the summary judgment stage the question before the court is whether there are genuine issues for trial. The court does not weigh evidence or assess credibility. Id.

## DISCUSSION

Plaintiff makes the following three principal arguments in support of its motion: (1) because it effectively withdrew from the Sacramento Agreement, it was not bound by that agreement after January 1, 1996 and was not subject to the jurisdiction of the Joint Committee; (2) the Reno Agreement's extraterritorial clause does not re-obligate it under the Sacramento Agreement; and (3) even if it was bound by the Sacramento Agreement and subject to the jurisdiction of the Joint Committee, the Joint Committee's arbitration award was fundamentally unfair and must be vacated.

### A. Effect of Plaintiff's Signing of the Reno Agreement

Even if plaintiff effectively withdrew from the Sacramento Agreement, it was still obligated to comply with portions of that agreement pursuant to the terms of the Reno Agreement. For purposes of this analysis, the court assumes that

4

plaintiff effectively withdrew from the Sacramento Agreement and analyzes this dispute as one between parties who are not signatories to the same agreement -- plaintiff is not a signatory to the Sacramento Agreement, and Local 487 is not a signatory to the Reno Agreement. Accordingly, before the presumption of arbitrability of the dispute can apply, Local 487, as the nonsignatory party, must show that the plaintiff, the signatory party, intended Local 487 to derive benefits from the Reno Agreement. McKinstry v. Sheet Metal Workers Int'l Assoc., 859 F.2d 1382, 1384 (9th Cir. 1988). If such intent is shown, and if the arbitration clause can reasonably be interpreted as granting Local 487 the right to enforce these benefits, then the arbitration before the Joint Committee was proper. Id. at 1384-85.[1]

The Ninth Circuit has held that a collective bargaining agreement has "extraterritorial effect," so that a nonsignatory has the right to enforce the provisions of that agreement, where "[t]he Agreement as a whole was clearly intended to extend certain direct and indirect benefits to workers other than those represented by [the signatory local union]." Id. at 1386. Such extraterritorial application of a collective bargaining agreement "fosters the goals of the labor relations laws by promoting comity among locals in the same trade and by reducing

---

[1] This case is unlike the typical case where the dispute is between signatories. In such a case, the court will generally defer to the arbitrator and avoid looking into the merits of the dispute. McKinstry, 859 F.2d at 1384-85 n.2. But because the present action, at least for purposes of the court's analysis, is between nonsignatories, the court must inquire into the merits of the dispute. Id.

5

fragmentation in construction industry collective bargaining." Id. at 1389.

In McKinstry, the Ninth Circuit was required to determine whether a collective bargaining agreement between the employer and Sheet Metal Workers' Local 99 had extraterritorial effects that conferred benefits on Sheet Metal Workers' Local 16. The operative clause in the collective bargaining agreement stated, in pertinent part:

> ... Journeymen sheet metal workers covered by this Agreement who are sent outside of the area covered by this Agreement shall be paid at least the established minimum wage scale specified in Section 1 of this Article but in no case less than the established wage scale of the local Agreement covering the territory in which such work is performed or supervised plus all necessary transportation, travel time, board and expenses while employed in that area, <u>and the Employer shall be otherwise governed by the established working conditions of that local Agreement</u>.

Id. at 1385 (emphasis added).

The Ninth Circuit noted that this clause was ambiguous because it could be interpreted to only confer benefits on workers from the Local 99 area who were sent to a job site in another area, but also could be interpreted to confer benefits on workers from the "visited" area as well. Id. at 1386. The court therefore drew from other sections of the agreement to reach the conclusion that the agreement as a whole "was clearly intended to extend certain direct and indirect benefits to workers other than those represented by Local 99." Id.; see also Sheet Metal Workers' Int'l v. Atlas Air Conditioning Co., 926 F.2d 770, 772-73 (8th Cir. 1991)(interpreting the identical language "as saying what it obviously means" -- that the agreement to which the employer was a signatory requires it to comply with the

collective bargaining agreement of the union in the area where the employer was working).

The present case falls squarely within the holding of McKinstry. The provisions of the Reno Agreement show that the parties to that agreement intended to confer third-party beneficiary rights on Local 487. Plaintiff does not dispute that it was at all relevant times a signatory to the Reno Agreement, which provides in pertinent part:

> The Employer or Contractor when engaged in work outside the geographical jurisdiction of this Agreement, <u>shall comply with all of the lawful clauses of the Collective Bargaining Agreement [in] effect in said or other geographical jurisdiction</u> and executed by the Employer of the Industry and the Local Unions in that jurisdiction, including, but not limited to, the provisions of the wages, hours, working conditions, and all fringe benefits therein provided, including all provisions relating to the settlement of grievances provided . . . .

(Caster Decl. Ex. 1 at 4, Article IV, Section 2 of the Reno Agreement (emphasis added).)

Plaintiff contends that nothing in this clause specifically identifies Local 487 as the beneficiary of the clause, and, in fact, the most likely intent of the parties negotiating this clause was to benefit the Local 567 members who worked for plaintiff outside the geographical jurisdiction of the Reno Agreement. The plain language of the clause, however, compels the opposite interpretation. Unlike the relevant clause in McKinstry, the extraterritorial clause in the Reno Agreement is unambiguous. It plainly states that the employer "shall comply" with the collective bargaining agreement in effect in other areas when it performs work in such areas.

///

7

The other relevant provisions of the Reno Agreement reinforce this interpretation. Article III, entitled "Recognition and Bargaining Unit," provides:

> SECTION 2 -- It being understood that the principal place of business and employment of the Employer or Contractor is in the jurisdictional area of this Agreement, but that such Employer on occasions undertakes painting work in other cities and areas, on which occasions such Employer employs such additional employees, resident of such other city or area as the needs of the work require.
>
> SECTION 3 -- The Agreement shall embrace ... all the employees employed by such Employer or Contractor wherever and whenever employed during the terms of this Agreement . . . .

(Caster Decl. Ex. 1, at 3.) Moreover, Article IV, entitled "Joint Ventures," provides:

> SECTION 3 -- The Employer, party hereto, shall not attempt to engage in any work covered by the Agreement in any areas through the use or device of another Business or Corporation which such Employer controls or through the use or device of a Joint Venture with another Employer or Contractor in any area . . . for the purpose of taking advantage of lower wages or conditions that are in effect in the area where such work is being performed.

(Id. at 4.)

The extraterritorial provision, when read in conjunction with the above quoted provisions, unquestionably reflects the parties' intent to confer benefits on out-of-area unions, such as Local 467, by requiring that plaintiff comply with "all of the lawful clauses of the Collective Bargaining Agreement in effect in said or other geographical jurisdiction. . . ." Thus, the Reno Agreement obligated plaintiff to comply with the terms of the Sacramento Agreement when doing work in that area. Plaintiff, however, admits it ceased complying with the Sacramento Agreement in January 1996.

8

1       Plaintiff nevertheless attempts to distinguish McKinstry by arguing that: (1) to the extent it was ever bound to the Sacramento Agreement by virtue of the extraterritorial clause in the Reno Agreement, plaintiff was entitled to <u>all</u> the benefits and burdens of the Sacramento Agreement, including the absolute right to withdraw from that Agreement; and (2) in any event, Local 487 could not bring a grievance on its own behalf since only the signatory, Local 567, had access to the grievance procedure under the Reno Agreement.

      Plaintiff's attempts to distinguish <u>McKinstry</u> fail for two reasons. First, the Reno Agreement does not evidence an intent to incorporate the withdrawal provisions of any out-of-area agreement, including the Sacramento Agreement. Indeed, incorporation of such provisions would be contrary to both the spirit and the plain language of the extraterritorial clause.

      As stated above, the extraterritorial clause states that the "Employer or Contractor ... shall comply" with the provisions of out-of-area collective bargaining agreements, including, but not limited to, provisions relating to wages, hours, working conditions, and fringe benefits. In <u>McKinstry</u>, the Ninth Circuit construed similar language as "merely granting the visited-area local the benefit of the rights it has under the local agreement, made enforceable against [the employer] by means of the provision" in the agreement to which the employer was a signatory. <u>McKinstry</u>, 859 F.2d at 1386 n.5. In doing so, the court relied heavily on the fact that the language provided that "the <u>Employer</u> shall be otherwise governed," not that "the <u>union</u> shall be otherwise governed." <u>Id.</u>

The clause in the present case must be similarly interpreted since it expressly states that "[t]he **Employer** or Contractor ... shall comply" with the provisions of the out-of-area collective bargaining agreement. (Caster Decl. Ex. 1, at 4 (emphasis added).) Significantly, the clause indicates that the employer must comply with provisions relating to wages, hours, working conditions, and fringe benefits, all of which are provisions that directly benefit out-of-area employees. To allow plaintiff to utilize the withdrawal provision in the Sacramento Agreement would therefore allow plaintiff to circumvent the parties' intent, as expressed in the extraterritorial provision in the Reno Agreement, to benefit out-of-area local unions.

Second, the plain language of the collective bargaining agreements indicate that Local 487 had standing to bring its grievance on its own behalf. The Reno Agreement's extraterritorial clause specifically incorporates the Sacramento Agreement's grievance procedure by requiring the plaintiff to comply with "all provisions relating to the settlement of grievance" provided in the collective bargaining agreement in effect in the jurisdiction where it engages in work. See McKinstry, 859 F.2d at 1388 n.8 (recognizing that an extraterritorial clause may incorporate other grievance procedures in some instances). Thus, by signing the Reno Agreement and subsequently working in the area covered by the Sacramento Agreement, plaintiff subjected itself to the grievance procedure set forth in the Sacramento Agreement. Because Local 487 has standing to utilize the grievance procedure under the Sacramento Agreement and did so in the present case, it properly

1  brought its grievance against plaintiff on its own behalf. <u>See</u>
2  <u>also</u> <u>Sheet Metal Workers' Int'l</u>, 926 F.2d at 772-73 (enforcing,
3  under similar circumstances, an arbitration award pursuant to a
4  grievance mechanism in an agreement to which the employer was not
5  a signatory).
6  **B. Fundamental Fairness of the Joint Committee Hearing**
7          Plaintiff finally argues that, in any event, the Joint
8  Committee's award must be overturned because the process was
9  fundamentally unfair. Plaintiff makes two arguments in support
10 of its contention. First, it asserts that the Joint Committee
11 should not have proceeded in its absence, effectively denying it
12 the right to introduce evidence on its own behalf. Second,
13 plaintiff contends the Joint Committee was biased against it.
14         Plaintiff's contentions lack merit. Even though the
15 Joint Committee did not receive any evidence on plaintiff's
16 behalf, plaintiff does not in any way indicate what evidence it
17 could have introduced to change the result. The only evidence
18 introduced before the Joint Committee was the Reno Agreement,
19 Sacramento Agreement, and the testimony that plaintiff was no
20 longer complying with the Sacramento Agreement. Indeed,
21 plaintiff admits it ceased complying with the Sacramento
22 Agreement as of January 1996, and relies exclusively on the
23 language of the two agreements in seeking to have the award
24 overturned.
25         Moreover, when the parties have agreed upon a
26 particular method of dispute resolution, an arbitrator may issue
27 an enforceable award even when one party fails to attend the
28 hearing. <u>Sheet Metal Workers Int'l Assoc. v. Jason Mfg., Inc.</u>,

1  900 F.2d 1392, 1398 (9th Cir. 1990). Plaintiff agreed to the
2  procedures set forth in the Sacramento Agreement pursuant to the
3  extraterritorial clause in the Reno Agreement.
4        Finally, the appearance of impropriety, standing alone,
5  is insufficient to vacate the Joint Committee's award. Id. Even
6  if plaintiff has shown an appearance of impartiality, it has
7  failed to offer any evidence that the Joint Committee's result
8  was based on improper motives. The party alleging impartiality
9  must establish "specific facts" which indicate improper motives
10 on behalf of the grievance panel. Id. Here, plaintiff argues
11 that the Joint Committee was biased because it consisted of two
12 members appointed by Local 487 and two members appointed by the
13 PDCA. The PDCA members were biased against it, plaintiff
14 asserts, because the PDCA had just revoked plaintiff's membership
15 in the Association at the urging of Local 487. Plaintiff,
16 however, offers no additional evidence that the Joint Committee's
17 decision was based on improper motives. In fact, because the
18 plaintiff admits it was a signatory to the Reno Agreement and yet
19 ceased complying with the Sacramento Agreement, the court cannot
20 envision any procedure under which the arbitration result would
21 have been different. The Joint Committee's award will therefore
22 be affirmed.
23 ///
24 ///
25 ///
26 ///
27 ///
28 ///

IT IS THEREFORE ORDERED that plaintiff's motion for summary judgment be, and the same hereby is, DENIED, and that defendant's motion for summary judgment be, and the same hereby is, GRANTED.

DATED: March 19, 1997

*[signature]*
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE