IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND | ) | |
| ALLIED TRADES INDUSTRY | ) | |
| PENSION FUND | ) | Civil Action No. 06-131(GK) |
| | ) | **Next – Scheduled Court Deadline** |
| Plaintiff, | ) | **Dispositive Motions: January 30, 2008** |
| v. | ) | |
| | ) | |
| MIDWEST DRYWALL CO., INC. | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY
## JUDGMENT AGAINST DEFENDANT MIDWEST DRYWALL CO., INC.

Plaintiff, International Painters and Allied Trades Industry Pension Fund ("Pension Fund" or "Plaintiff") by and through its legal counsel, submits this Memorandum of Points and Authorities in support of its Motion for Summary Judgment against Defendant Midwest Drywall Co., Inc. ("Midwest" or "Company").

## I.    FACTS

The Pension Fund is a trust fund and an employee benefit plan as defined by the Labor Management Relations Act ("LMRA"), 29 U.S.C. §§186(c)(5), and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §1002(37)(2) and (3) (Statement of Material Facts[1] at ¶ 1). The Pension Fund provides retirement and disability benefits to eligible participants, their spouses and families (SMF at ¶ 5). Those benefits are funded by contributions paid by employers who have agreed to incur an obligation under collective bargaining agreements to

---

[1] References to Plaintiff's Statement of Material Facts shall hereinafter be designated by "SMF" followed by the citation to the appropriate paragraph(s) in the document.
192983.1

which they are bound to make contributions to the Pension Fund based on hours worked or paid to their employees and through earnings from the investment of those contributions (SMF at ¶ 6).

Midwest, a Kansas corporation, is a large drywall contractor that generally operates its business in geographic areas west of the Mississippi River to California (SMF at ¶¶ 7, 8). In April 1998, the Company first became signatory to a collective bargaining agreement with International Union of Painters and Allied Trades, AFL-CIO, CLC, District Council 15 ("DC 15"), and International Union of Painters and Allied Trades Local 159 ("Local 159") (SMF at ¶ 9). That agreement terminated on June 30, 2001. Midwest thereafter became bound to three successor collective bargaining agreements that were in effect from July 1, 2001 through June 30, 2004, July 1, 2004 through June 30, 2007, and July 1, 2007 through June 30, 2011 respectively. (SMF at ¶ 9).

Article VIII, Section 1 of the collective bargaining agreement binds the Company to the terms of the Agreement and Declaration of Trust of the Pension Fund ("Trust Agreement")(SMF at ¶ 9). The labor agreement, Trust Agreement and Plan Rules and Regulations require the Company to timely prepare and submit remittance reports and contributions on a monthly basis (SMF at ¶ 10).

Article XIV of the labor agreement requires that "[c]ontributions … be made monthly and shall be recorded on forms supplied by the International Union of Painters and Allied Trades Union and Industry National Pension Fund office…" (SMF at ¶ 12). Article VI of the Trust Agreement imposes the following requirements on contributing employers:

> *Section 1.* RATE OF CONTRIBUTIONS. In order to effectuate the purpose hereof, each Employer shall contribute to the Pension Fund the amount required by the Collective Bargaining Agreement between the Union and Employer. The rate of contribution shall at all times be covered by the aforesaid Collective Bargaining

192983.1

2

> Agreement then in force and effect, together with any
> amendments, supplements or modification thereto. On matters
> other than contribution rates, contributions to the Pension Plan
> shall be governed by the Rules and Regulations of the Pension
> Plan ...

(SMF at ¶ 13). Finally, under the International Painters and Allied Trades Industry Pension Plan

Rules and Regulations ("Plan"), "[a]n employer will pay contributions to the Plan or Trust, for

allocation to the Plan as directed by the Trustees, as required by law, a Collective Bargaining

Agreement, a Participation Agreement, or the Trust Agreement..." (SMF at ¶ 15).

The Company also agreed to make full and timely payments on a monthly basis to The

Finishing Trades Institute f/k/a International Union of Painters and Allied Trades Joint

Apprenticeship and Training Fund ("the FTI") and The Painters and Allied Trades Labor

Management Cooperation Initiative ("LMCI") (the LMCI and FTI are jointly referred to as

"Ancillary Funds") as required by the collective bargaining agreement and trust agreements of

the Ancillary Funds (SMF at ¶¶ 2, 3). The Pension Fund is the authorized collection agent for

the Ancillary Funds (SMF at ¶ 4). The Pension Fund and Ancillary Funds are, hereinafter,

jointly referred to as "Funds".

Under the labor agreements, contributions are due to the Funds for work performed by

the employees of the employer not only within the jurisdiction of the signatory local union but

also in virtually all geographic areas of the country where there is a collective bargaining

agreement in effect between any local union or district council of the International Union of

Painters and Allied Trades ("IUPAT") and employers in the industry (SMF at ¶ 16). The labor

agreements contain specific language regarding an employer's responsibilities in such situations

in the following "out-of-area" provision:

(b)  The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographic jurisdiction and executed by the employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein: provided however, that as to employees employed by such employer from within the geographic jurisdiction of the Union party to this agreement and who are brought into an outside jurisdiction, such employee shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents.

(SMF at ¶ 16).

When an employer fails to make these required contributions or submit remittance reports, the labor agreements, trust agreement and Plan provide the Funds with remedies to evaluate and collect delinquent contributions (SMF ¶ 25).  Article VI of the Trust Agreement likewise provides a remedy to the Pension Fund in the event an employer defaults in its contribution obligation.

*Section 4.*  DEFAULT IN PAYMENT.  Non-payment by an Employer of any contributions when due shall not relieve any other Employer of his obligation to make payment.  In addition to any other remedies to which the parties may be entitled, an Employer in default for twenty days may be required at the discretion of the Trustees to pay such reasonable rate of interest as the Trustees may fix on the money due to the Trustees from the date when the payment was due to the date when payment is made, together with all expenses of collection (including attorneys fees) incurred by the Trustees and such liquidated damages or penalties as may be assessed by the Trustees...

(SMF at ¶ 26).

Finally, modeling the remedy provisions set out in ERISA, the Plan provides:

**Section 10.12 Collection of Delinquent Contributions.**

(a)    In the case of a Contributing Employer that fails to make the contributions to the Plan for which it is obligated, in accordance with the terms and conditions of a collective bargaining agreement, the Trustees may bring an action on behalf of the Plan pursuant to Sections 502(g)(2) of ERISA to enforce the Contributing Employer's obligation.

(b)    In any action in which judgment is awarded in favor of the Plan, the Contributing Employer shall pay to the Plan, in accordance with the court's award:

(1)    the unpaid contributions.

(2)    interest on the unpaid contributions, determined at the rate prescribed under Section 6621 of the Internal Revenue Code of 1954, as amended,

(3)    liquidated damages equal to the greater of

(A)    the amount of interest charges on the unpaid contributions, or

(B)    20 percent (higher percentage, if permitted by Federal or State law) of the unpaid contributions.

(4)    reasonable attorneys' fees and costs of the action, and

(5)    such other legal or equitable relief as the court deems appropriate.

(c)    Nothing in this section shall be construed as a waiver or limitation on the Plan's or the Trustees' right to enforce a Contributing Employer's contribution obligation in any other type of proceeding.

(SMF at ¶ 28).

Under the Trust Agreement, the Pension Fund is entitled to conduct audits on the books and records of any participating employer.

192983.1                                        5

> *Section 6.* AUDITS. The Trustees may at any time have an audit
> made by certified public accounts of the payroll, wage, and cash
> disbursement records, general ledger, and other financial records,
> including but not limited to tax returns, of any Employer in
> connection with the said contributions and/or reports.... If the
> Employer fails to cooperate with a scheduled audit, the Trustees
> may require that the Employer pay to the Fund all costs incurred as
> a result of the Employer's failure. Any Employer found delinquent
> or in violation of the Rules of Regulations of the Pension Plan...as
> a result of an audit may be required by the Trustees to pay to the
> Fund the cost of the audit.

(SMF at ¶ 27).[2]

On March 10, 2004, the Funds informed Midwest of their intent to perform an audit

(SMF at ¶ 29). Robert Moore, CPA ("Auditor") conducted an audit of the payroll books and

related records of Midwest covering the period January 1, 2001 through June 30, 2004 (SMF at ¶

30). In preparing the audit report, the Auditor determined (1) the geographic areas in which

Midwest worked, (2) whether there were collective bargaining agreements in effect between any

local union or district council of the IUPAT, and (3) if the employers in those areas were bound

to those agreements and required to make contributions to the Funds (SMF at ¶ 31). The audit

revealed an aggregate shortage owed to the Funds in the amount of $619,325.96,[3] which resulted

in part from (1) Midwest's failure to make contributions for all hours of covered work performed

in areas where there is a collective bargaining agreement in effect between any local union or

district council of the IUPAT, and (2) Midwest's use of non-signatory contractors (SMF at ¶¶ 32,

33). A demand for payment of the amount(s) due and owing to the Funds was made on Midwest

as well as a request for reassurance from the Company that it will comply with provisions in the

---

[2] The Trust documents for the Ancillary Funds contain similar provisions (SMF at ¶ 27).
[3] This contribution shortage amount is broken down between the Funds as follows: Pension Fund   $603,370.43, FTI $12,722.13, LMCI $3,233.40.

agreement including the out-of-area clause and subcontractor clause. Midwest rejected this demand and this litigation was commenced.

## II. ARGUMENT

The Pension Fund has an irrefutable right under ERISA to seek an Order by this Court requiring that Midwest pay the Funds on its obligation to make these contributions. It is undisputed that Midwest entered into the collective bargaining agreements with DC 15 and Local 159 and is thereby bound to the Funds' trust agreements and the Plan. As signatory to the labor agreements, Midwest must abide by the out-of-area clause which clearly and unambiguously requires Midwest to comply with collective bargaining agreements in jurisdictions outside of Local 159. Midwest has breached the labor agreements as evidenced by the audit and owes each Fund delinquent contributions, liquidated damages, interest, attorneys' fees and costs and audit costs as provided by ERISA, the labor agreements, the trust agreements and the Plan.

### A.    SUMMARY JUDGMENT IS APPROPRIATE IN THIS CASE BECAUSE THERE ARE NO GENUINE ISSUES OF MATERIAL FACT.

Rule 56 of the Federal Rules of Civil Procedure provides:

> [Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*See,* Fed. R. Civ. P. 56(c).

Summary judgment is a "useful procedure when there is no dispute about the critical facts and it serves to eliminate the expense and delay of unnecessary trials." *Peterson v. Lehigh Valley District Council*, 676 F.2d 81, 83 (3d Cir. 1982). Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material facts and that the moving

party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Matsushita Elec. Indus.*

*Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87, 106 S.Ct. 1348, 1355-56 (1986); *Frito-Lay,*

*Inc. v. Willoughby*, 863 F.2d 1029, 1032 (D.D.Cir.1988); *Barnstead Broadcasting Corporation v.*

*Offshore Broadcasting Corporation*, 886 F.Supp. 874, 878 (D.D.Cir.1995). The moving party is

entitled to summary judgment where "the non-moving party has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof."

*Cortez III v. N.A.S.A.*, 921 F.Supp. 8, 11 (D.D.Cir.1996) (*citing Celotex Corp. v. Catrett*, 477

U.S. 317, 323, 106 S.Ct. 2548, 2552 (1986)),

On a motion for summary judgment, the Court accepts the truth of factual assertions

contained in affidavits and other evidence in support of the motion for summary judgment,

unless the facts are controverted by the non-moving party through affidavits or other

documentary evidence. *Cortez III*, 921 F.Supp. at 11. The adverse party's response to the

movant's summary judgment motion must set forth specific facts showing that there is a genuine

issue for trial. *Id*. Under *Harding v. Gray*, 9 F.3d 150, 154 (D.C.Cir.1993), the non-moving

party can only defeat a motion for summary judgment by responding with a factual showing to

create a genuine issue of material fact.

A "genuine issue" of material fact exists if the disputed facts "might affect the outcome

of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106

S.Ct. 2505, 2510 (1986). In order to show a genuine issue of material fact which will preclude

summary judgment, the non-movant "must not only identify the alleged *facts* at issue, but must

support its findings with evidence based upon appropriate references to the record before the

District Court." *W.M. Ercanbrack Co., Inc. v. Sol Salins, Inc.,* 844 F.Supp. 817, 819

(D.D.C.1994) (emphasis added) (*citing Frito-Lay, Inc., supra* 863 F.2d at 1034). Evidence which is "merely colorable" or "not significantly probative," will not prevent summary judgment, *Liberty Lobby, supra*, 477 U.S. at 249-250, 106 S.Ct. at 2510-2511. The non-movant meets its burden of showing that a dispute of fact is material only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Laningham v. U.S. Navy*, 813 F.2d 1246, 1242 (D.C. Cir.1987). A purported dispute of fact based on internal contradictions in the testimony or evidence presented by the non-movant is not "genuine" so as to foreclose summary judgment. *Radobenko v. Automatic Equipment Corp.*, 520 F.2d, 540, 544  (9th Cir.1975). Whether a genuine issue as to any material fact exists is determined by whether the evidence is such that the fact finder reasonably could find in favor of the nonmoving party.  *Liberty Lobby*, 477 U.S. 242, 248 (1986).

As demonstrated below, there are no factual disputes and the Plaintiff is entitled to judgment as a matter of law.  Accordingly, the Court should dispose of this action by summary judgment.

**B.    MIDWEST IS SIGNATORY TO A LABOR AGREEMENT WITH DC 15 AND LOCAL 159 AND IS THUS OBLIGATED TO MAKE CONTRIBUTIONS TO THE FUNDS IN ACCORDANCE WITH THE LABOR AGREEMENT, TRUST AGREEMENTS AND PLAN.**

This case involves a straightforward effort by the Pension Fund to recover contributions due and owing under valid collective bargaining agreements that were voluntarily entered into by Midwest.

From April 15, 1998 through and including the present date, Midwest has been signatory to labor agreements with DC 15 and Local 159 (SMF at ¶ 9).  Therefore, at all times relevant to this action, Midwest has been bound to the terms and conditions of the Funds' trust agreements

192983.1

9

and the Plan (SMF at ¶¶ 9, 10), which in part, require Midwest to submit remittance reports and

pay contributions to the Funds for hours of covered work performed by or paid to its employees

(SMF at ¶ 12).

Section 515 of the Employee Retirement Income Security Act, 29 U.S.C. §1145 provides:

> "Every Employer who is obligated to make contributions to a
> multiemployer plan... under the terms of a collectively bargained
> agreement shall...make such contributions in accordance with . . .
> such agreement."

If an employer fails to make the contributions as required by the collective bargaining agreement

and Section 515, then the employer is subject to the provisions of Section 502(g)(2) of ERISA,

29 U.S.C. §1132(g)(2).  Section 502(g)(2) provides for the <u>mandatory</u> award of the following if a

judgment under Section 515 is entered in the Funds' favor:

    (A)    the unpaid contributions,

    (B)    interest on the unpaid contributions,

    (C)    an amount equal to the greater of:

        (i)    interest on the unpaid contributions; or

        (ii)    liquidated damages provided for under the plan in
            an amount not in excess of 20 percent (or such
            higher percentage as may be permitted under
            Federal or State law) of the amount determined by
            the Court under Subparagraph (a),

    (D)    reasonable attorneys' fees and costs of the action, to be
         paid by the defendant, and

    (E)    such other legal or <u>equitable</u> relief as the court deems
         appropriate.

29 U.S.C. § 1132 (g) (2) (A)-(E) (emphasis added).  Thus, federal law mandates that Midwest

make fringe benefit contributions to the Funds pursuant to the collective bargaining agreements

with DC 15 and Local 159.

### 1. The Audit Revealed that Midwest Failed to Make Contributions in Accordance with the Labor Agreements, Trust Agreements and Plan.

An audit of the period January 1, 2001 through June 30, 2004 revealed a contribution delinquency owed by Midwest to the Funds in the amount of $619,325.96 (SMF at ¶¶ 30, 33). Based on the results of the audit, the Pension Fund claims that Midwest has failed to comply with its obligations under the out-of-area provision by failing to remit contributions for covered work performed by its employees in areas outside Local 159's jurisdiction and by subcontracting covered work to nonunion contractors. Midwest does not deny that it failed to make these contributions. It raises only unmeritorious legal arguments relating to the alleged unlawfulness of the out-of-area clause in its defense. Since the out-of-area clause(s) in the labor agreements are lawful, the Funds are entitled to the unpaid contributions revealed by the audit, in addition to other related damages under ERISA, the labor agreements, the Funds' trust agreements and the Plan.

### C.    MIDWEST IS BOUND TO THE OUT-OF-AREA CLAUSE WHICH IS CLEAR AND UNAMBIGUOUS.

Where an "agreement admits of only one reasonable interpretation" the court may resolve a contract dispute as a matter of law. *UMWA 1974 Pension v. Pittston Co.*, 984 F.2d 469, 473 (D.C. Cir. 1993). Here, the out-of-area clause is unambiguously worded and states that signatory employers:

> *shall*, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographic jurisdiction and executed by the employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions,

fringe benefits, and procedure for settling grievances set forth
therein . . .

(SMF ¶ 16)(emphasis added).   This language clearly incorporates by reference "all of the lawful

clauses of the collective bargaining agreement in effect [in other areas of the country where

Midwest may work] . . . including the wages, hours, working conditions [and] fringe benefits ...",

including pension benefits and contributions.  *Id.* There is no doubt that this means an employer

engaging in work within the industry in a jurisdiction outside the geographic boundaries of Local

159 must abide by the collective bargaining agreements in effect in those out of area

jurisdictions.   In essence, those provisions have become incorporated into the Local 159

agreement.   Similar provisions have been upheld as lawful, valid, and enforceable by numerous

courts including the United States Court of Appeals for the District of Columbia.[4]

In *Flynn et al. v. Dick*, 481 F.3d 824 (D.C. Cir. 2007), the Court of Appeals upheld the

validity of a similar out-of-area clause.  In *Dick* the company was signatory to collective

bargaining agreements with the Bricklayers & Allied Craftworkers local unions in

Massachusetts.  The agreements contained a "traveling contractor's clause" which provided:

> When the Employer has any work specified in . . . this Agreement
> to be performed outside of the geographic area covered by this
> Agreement and *within the geographic area covered by an
> Agreement with another affiliate* of the BAC [International Union
> of Bricklayers And Allied Craftsworkers], the Employer agrees to
> abide by the full terms and conditions of the Agreement in effect in
> the job site area.

*Dick*, 481 F.3d at 830 (quoting CBA)(emphasis in original).   The company was sued by the

---

[4] *See McKinstry v. Sheet Metal Workers Int'l Assoc.*, 859 F.2d 1382 (9th Cir. 1988) (finding out-of-area clause
ambiguous yet valid based on agreement as a whole), *Mid-Atlantic Painting Contractors, Inc.*, 315 NLRB 193
(1994) (enforcing a similar Painters clause), *Local Union No. 36, Sheet Metal Workers' International Association,
AFL-CIO v. Atlas Air Conditioning Company*, 926 F. 2d 770 (8th Cir. 1991) (finding out-of-area provision valid and
binding on employer).

192983.1

12

Bricklayers & Trowel Trades International Pension Fund for violating the traveling contractor's clause by failing to make fringe benefit contributions for work done in Florida. The District Court granted summary judgment to the company and the Court of Appeals reversed, concluding that the traveling contractor's clause was valid and enforceable. *Id.* at 830–831.

Notably, the Court of Appeals reached this conclusion based on the intent of the parties because it found the contract language ambiguous. Specifically, the Court explained,

> the first sentence of the BAC Traveling Contractor clause is susceptible to more than one interpretation because the phrase 'within the area covered by an agreement with another affiliate of the [BAC]' could refer to an agreement between [the employer] and the BAC affiliate, or it could refer to an agreement between *any* employer and the BAC affiliate.

*Id.* at 830 (internal citations omitted)(emphasis in original).   The traveling contractor's clause in *Dick* is distinguishable from the language in the out-of-area clause in the present action because the language in *Dick* may have been ambiguous whereas the language in the IUPAT agreement is carefully drafted to avoid any ambiguity or opportunity for  multiple interpretations.

Here, there is no question about what is considered out-of-area; out-of-area is anywhere outside the jurisdiction of Local 159, which is the "Union party to the agreement." It is also clear *what* agreements are included:  the collective bargaining agreements in effect in those out-of-area jurisdictions which are signed by employers in the industry and the local unions affiliated with the IUPAT. Moreover, the language of the out-of-area clause even specifically refers to incorporating "wages" and "fringe benefits" of the out-of-area agreements into the Local 159 agreement.  Thus, it is clear that there is only one reasonable interpretation of the out-of-area clause.

Even if there was an ambiguity regarding the meaning and scope of the out-of-area

clause, it was surely dispelled in 2000, when Local 159 filed a claim with the Joint Trade Board

of the Painters and Decorators Joint Committee, Inc. ("Board") asserting Midwest's violation of

the out-of-area clause (SMF at ¶ 18).  On April 14, 2000, the Board rendered a binding Decision

and Order ("Order") concluding that Midwest was bound by the terms of the labor agreement,

including the out-of-area clause "governing work performed by Midwest outside the area

jurisdiction of ...[Local 159]..." (SMF at ¶ 19). The Board further found that Midwest was

properly notified of its continuing violation and that it was, as of the date of the Order, in

continued violation of the clause (SMF at ¶ 19). Accordingly, Midwest was obligated to abide by

the collective bargaining agreements when working outside of Local 159's jurisdiction and was

clearly advised, by a neutral body during the grievance process, of the meaning of the provision.

The Company can hardly claim that it did not understand the clear meaning of the out-of-area

clause in Article IV.

The United States District Court for the Eastern District of California upheld an

essentially identical out-of-area clause in *Harris & Ruth Painting Contracting, Inc. v. Painters &*

*Tapers Local Union 487,* Opinion of March 21, 1997, pp. 1, 2, 5-6, 7 (E.D. Calif., Civ. No. 96-

1030) (not available on Westlaw; attached as Exh. 15).   In *Harris & Ruth*, the issue before the

court was "to what extent an 'extraterritorial clause' in one collective bargaining agreement

signed by an employer confers benefits on out-of-area union employees covered by a separate

collective bargaining agreement to which the employer is not a signatory." *Harris & Ruth* at 1.

The contract language in question stated:

> The Employer or Contractor when engaged in work outside the
> geographical jurisdiction of this Agreement, shall comply with all
> of the lawful clauses of the Collective Bargaining Agreement [in]
> effect in said or other geographical jurisdiction and executed by the

> Employer of the Industry and the Local Unions in that jurisdiction,
> including, but not limited to, the provisions of the wages, hours,
> working conditions, and all fringe benefits therein provided,
> including all provisions relating to the settlement of grievances
> provided . . . .

*Id.* at 7 (quoting collective bargaining agreement)(emphasis in original).   The court found that

"...the extraterritorial clause in the [collective bargaining agreement] is unambiguous.  It plainly

states that the employer "shall comply" with the collective bargaining agreement in effect in

other areas when it performs work in such areas." *Id.*     The out-of-area clause in the Local 159

labor agreement is the same clause as in *Harris & Ruth*, and "unquestionably reflects the parties'

intent to...confer benefits on out-of-area unions, . . . , by requiring that [Midwest] comply with

'all of the lawful clauses of the [collective bargaining agreement] in effect in said or other

geographical jurisdiction...'" *Id.*  at 8.

    Even if the out-of-area clause is ambiguous (which it is not), the parties intended for the

employers to be required to abide by and apply all of the "lawful" collective bargaining

provisions negotiated by local IUPAT unions even if the employer does not sign a labor

agreement directly with those other unions.   Any other interpretation would be nonsensical.

*Dick* rejected a narrow interpretation of the clause where the clause would only apply when the

employer worked in a jurisdiction in which it had signed a separate labor agreement with that

local union, because that "would render the traveling contractor's clause meaningless and, absent

evidence of such intent, parties 'ought not be presumed to have included in their agreement a

meaningless provision.'" *Id.*  at 831 (quoting *Martinsville Nylon Employees Council Corp. v.

NLRB*, 969 F.2d 1263, 1267 (D.C. Cir. 1992)).   *Dick* applies squarely to the present case and

renders the out-of-area clause valid and enforceable.

**D.    MIDWEST OWES CONTRIBUTIONS, INTEREST, LIQUIDATED DAMAGES, ATTORNEYS' FEES AND COSTS AND AUDIT COSTS UNDER THE LABOR AGREEMENTS, TRUST AGREEMENTS, PLAN AND ERISA.**

The failure of Midwest to comply with its contractual and statutory obligations results in a substantial adverse impact on the ability of the Funds to meet their legal obligations. The Pension Fund is obligated by express mandates of ERISA and by the documents and instruments by which it is administered to provide benefits and eligibility credits to employees who are eligible to receive them. 29 C.F.R. §2530-200b-2(a)(1) and (2); *see also Central States, S.E. & S.W. Areas Pension Fund v. Admiral Merchants Motor Freight, Inc.*, 511 F.Supp. 38 (D.Minn. 1980), *aff'd sub nom, Central States, S.E. & S.W. Areas Pension Fund v. Jack Cole-Dixie Highway Company, Inc.*, 642 F.2d 1122 (8th Cir. 1981). The Pension Fund is required to provide these benefits and credits regardless of whether Midwest makes the contributions. When an employer fails to submit fringe benefit contributions for the work performed by its employees, the result is a significant drain on the resources of the Pension Fund. The Ancillary Funds experienced similar adverse affects in relation to their operations when an employer fails to make contributions.

In addition to the remedies set forth in ERISA, the Funds are entitled to an award based upon the contractual remedies set forth in the labor agreements, the trust agreements and the Plan. *Laborers' Dist. Council Pension & Disability Trust No. 3 v. Jones & Artis Constr. Co. Inc.*, 1992 WL 510260, *1 (D.D.C. 1992); *Carpenters Health and Welfare Fund of Philadelphia and Vicinity v. Building Tech*, 747 F.Supp. 288, 297 (E.D. Pa. 1990).

**1.    Liquidated Damages**

When an employer fails to remit its contributions, the Funds lose the income that they

could have earned by investing these contributions (SMF at ¶ 38). Combining this loss of investment income with the requirement to continue to pay benefits will eventually affect the actuarial soundness of the Pension Fund as well as deplete resources available to pay current and future retirement benefits (SMF at ¶ 38). Furthermore, the Funds incur additional administrative expenses as a result of an employer's failure to pay its contributions (SMF at ¶ 38). These added costs include the substantial time and expense involved in administrative efforts to collect the delinquent contributions (SMF at ¶ 38). The Funds are unable to determine the precise amount of these losses and added costs (SMF at ¶ 38). The liquidated damages provided in the labor agreements, trust agreements and Plan are, in part, to compensate the Funds for the losses and added costs resulting from employer contribution delinquencies. The liquidated damages are reasonable and rationally related to the losses and additional costs incurred by the Funds and the Funds are entitled to judgment for them.

In *Building Tech,* the court addressed at length the right of plaintiff funds to recover liquidated damages from a delinquent employer for unpaid contributions. Specifically, the court found that because the parties' labor agreement sets forth the conditions that would trigger the assessment of liquidated damages for failure to timely pay contributions, the plaintiff funds were entitled to recover liquidated damages from the delinquent defendant for (1) contributions that were unpaid at the time the complaint was filed, (2) contributions which were paid by the time the complaint was filed, and (3) contributions which arose after the complaint was filed and paid before trial. *Building Tech*, 747 F.Supp. at 296. The court noted:

> [w]e can not believe Congress wanted to make things worse by
> voiding provisions of master agreements that penalized employers
> for late payments (footnote omitted). Without such protection,
> union workers covered by funds such as the plaintiff funds could
> be routinely deprived of substantial interest through deliberate

> patterns of late, last minute payments and there would be nothing
> the funds could do about it.

*Id.* at 297-298.[5]

The court's discussion in *Building Tech* was echoed by this Court in *Flynn v. Mastro Masonry Contractors*, 237 F.Supp.2d 66 (D.D.C. 2002), where the Court stated:

> Congress intended to preserve the private multi-employer pension
> plan system by ensuring that employers make the required
> contributions to the pension plans. The intent of this section is to
> promote the prompt payment of contributions and <u>assist plans in
> recovering the costs incurred in connection with delinquencies.</u>

*Flynn*, 237 F.Supp.2d 66 at 69-70 (citations omitted) (emphasis added).

The teachings of the *Building Tech* and *Flynn* line of cases are equally applicable to the matter before this Court. Midwest is bound to the labor agreements, the trust agreements and the Plan. The labor agreements and Plan provide that the Company will be assessed liquidated damages if it fails to timely pay its contribution obligations (SMF at ¶¶ 25, 28). Here, Midwest has failed to pay the contractually required contributions on a timely basis. As in *Building Tech*, the Funds must be awarded liquidated damages on (1) the contributions paid in an untimely manner before commencement of this action, (2) the delinquent contributions owed at commencement of this action, and (3) the contributions that became due after suit was filed and that remain unpaid. *Building Tech*, 747 F.Supp. at 298. Accordingly, the Court should order the Company to pay liquidated damages in the amount of $123,865.19, which have been calculated on delinquent contributions in accordance with the Plan and ERISA (SMF at ¶ 36) and order that

---

[5] *See also Idaho Plumbers & Pipefitters v. United Mechanical Contractors, Inc.*, 875 F.2d 212, 215 (9th Cir.1989) (provisions of 29 U.S.C. § 1132(g)(2) apply at the time suit is filed rather than at the time of judgment); *Carpenters & Joiners Welfare Fund v. Gittleman Corp.*, 857 F.2d 476, 478 (8th Cir.1988) (same); *Bennett v. Machined Metals Co.*, 591 F.Supp. 600, 605-06 (E.D.Pa.1984) (same); *Trustees of the Glaziers Local 963 Pension, Welfare and Apprentice Funds v. Walker and Laberge Co.. Inc.*, 619 F.Supp. 1402, 1405 (D.Md.1985) (same).

192983.1                                                    18

liquidated damages be paid on other amounts found to be owed following audits yet to be completed.

### 2.    Interest

Interest under ERISA is calculated in accordance with 26 U.S.C. §6621 from the date the contributions became due until the date of actual payment and is a mandatory award under ERISA. *See* 29 U.S.C. §1132 (a)(2); *International Painters and Allied Trades Industry Pension Fund v. R.W. Amrine Drywall Co., Inc.*, 239 F.Supp.2d 26, 31 (D.D.C. 2002). The Plan sets the interest rate on delinquent contributions according to the Internal Revenue Service rate for delinquent taxes (SMF at ¶ 28).

### 3.    Attorneys' Fees and Costs

The Funds have incurred attorneys' fees and costs in connection with this matter.  Under ERISA, if the court enters a judgment in favor of the plaintiffs, the court shall award the plaintiffs reasonable attorney's fees and costs.  *See*, 29 U.S.C. §1132(g)(2); *see also, Flynn v. Thibodeaux Masonry, Inc.*, 311 F.Supp.2d 30 (D.D.C. 2004) (delinquent employers are liable for attorneys' fees and costs under ERISA); *Free v. Briody,* 703 F.2d, 807 (7th Cir. 1986) (ERISA authorizes award of fees in collecting judgment).  Furthermore, under the labor agreements, the Trust Agreements and the Funds' rules and regulations, the Funds are entitled to reimbursement of all attorneys' fees and costs incurred in connection with the enforcement of the labor agreements' contribution provisions (SMF at ¶¶ 25-28). The audit results have revealed that Midwest is a delinquent employer.  Based on ERISA and the Funds' rules governing the reimbursement of attorneys' fees and costs, the Funds are entitled to all reasonable attorneys' fees and costs expended in litigating this matter.

192983.1

19

### 4.    Audit Costs

The Trust Agreement and Plan provide that in the event an audit of the employer's records determines that contributions are owed to the Pension Fund, then the employer shall be responsible for the cost of the audit (SMF at ¶ 27).   In the present case, the audit uncovered a delinquency in the amount of $619,325.96 to the Pension Fund for which Midwest is liable and suggests the high likelihood that additional substantial amounts are owed to the Funds for work performed after the audit cut off date.  The cost of the audit and the cost of the supplemental audit required should be paid by the Company.  Therefore, Midwest should be ordered to pay all audit fees that may be incurred by Plaintiff.

### III.    <u>CONCLUSION</u>

The terms of Local 159's labor agreement are clear and unambiguous.  Furthermore, the out-of-area clauses contained in Article IV of the Local 159 labor agreements are lawful and binding.  Consequently, Midwest is required to pay contributions for all hours of covered work performed in any area where a collective bargaining agreement is in effect between a Local Unions or District Council of the IUPAT. As there are no genuine issues of material fact, the

Pension Fund is entitled to summary judgment as a matter of law.

Respectfully submitted,

JENNINGS SIGMOND, P.C.

BY: /s/ Richard B. Sigmond
RICHARD B. SIGMOND, ESQUIRE
(I.D. NO. 446969)
KENT CPREK
(I.D. NO. 478231)
The Penn Mutual Towers, 16th Floor
510 Walnut Street, Independence Square
Philadelphia, PA 19106-3683
(215) 351-0609/0615
Date: January 30, 2008    Attorney for Plaintiff

192983.1