IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INTERNATIONAL PAINTERS AND ALLIED TRADES INDUSTRY PENSION FUND | ) ) ) | |
| Plaintiff | ) | Civil Action No. 06-131 (GK) |
| v. | ) ) | Next-Scheduled Court Deadline Pretrial Conference: February, 2008 |
| MIDWEST DRYWALL CO., INC. | ) ) | |
| Defendant. | ) ) | |

DEFENDANT MIDWEST DRYWALL CO., INC.'S
STATEMENT OF GENUINE ISSUES OF MATERIAL FACT

Defendant, Midwest Drywall Co., Inc. (Midwest Drywall), by its undersigned attorneys and pursuant to Local Civil Rule 7(h) and all other applicable rules, hereby submits its Statement of Genuine Issues of Material Fact. Midwest Drywall identifies below each Plaintiff's Statement of Fact to which Midwest Drywall contends there exists a genuine issue necessary to be litigated. Immediately following each Plaintiff's Statement of Fact so controverted, Midwest Drywall sets forth facts showing a genuine issue for trial. Although said format increased the length of this Statement, for the ease of the Court, this format was followed instead of incorporation of facts by reference. This Statement is submitted in opposition to Plaintiff's Motion for Summary Judgment.

1.     Plaintiff's Statement of Fact No. 4:   "The Pension Fund is the authorized collection agent for LMCI and FTI (jointly 'Ancillary Funds,' and together with Pension Fund, 'Funds') pursuant to an agreement by and among the Funds (Meyers Decl. at ¶ 5)."

The Pension Fund does not own the causes of action for any of the Ancillary Funds named in the Complaint. [Midwest Drywall's Statement of Facts As To Which There Is No Genuine Issue filed in support of Midwest Drywall's Motion for Summary Judgment (Midwest Drywall's SOMF) ¶ 38, Midwest Drywall's Exhibits filed in support of Midwest Drywall's Motion for Summary Judgment (Midwest Drywall's Exhibit), Midwest Drywall's Exhibit 29, International Painters and Allied Trades Pension Fund Responses and Objections to Midwest Drywall Co., Inc.'s First Request for Production of Documents to Plaintiff, Midwest Drywall's Exhibit 30 documents Bates numbered PF1022 to PF1040, Midwest Drywall's Exhibit 31 documents Bates numbered PF1041 to 1058, and Midwest Drywall's Exhibit 32 documents Bates numbered PF1294 to PF1310.]

2.    Plaintiff's Statement of Fact No. 6:   "The benefits provided by the Funds are funded by contributions paid by employers who have an obligation under a collective bargaining agreement(s) to make contributions based on hours of covered employment worked or paid to their employees and through earnings from the investment of those contributions (Meyers Decl. at ¶ 9)."

Benefits provided by the Pension Fund and the Ancillary Funds are funded by employers who are obligated to make contributions under the terms of a collective bargaining agreement only where doing so would not be inconsistent with law, based on hours of covered employment worked or paid to their employees and through earnings from the investment of those contributions. (Additional Midwest Drywall Exhibit 37 attached hereto, 29 U.S.C. § 1145.)

3.    Plaintiff's Statement of Fact No. 8:   "Midwest Drywall is a large drywall contractor that operates throughout the midwest, generally in geographic areas west of the Mississippi River (Declaration of Robert E. Moore ('Moore Decl.'), Exhibit 2 at ¶ 5)."

Midwest Drywall is a drywall specialty contractor headquartered in Wichita, Kansas with its employees engaged in construction work in and outside the State of Kansas and with local offices in other states. (Midwest Drywall's SOMF ¶ 1, S. Nienke's Dec. ¶ 2.)

4.    Plaintiff's Statement of Fact No. 10:   "Under the labor agreements, the Company agreed to abide by the terms of the Restated Agreement and Declaration of Trust Establishing the International Painters and Allied Trades Industry Pension Fund ('Pension Trust Agreement') and the International Painters and Allied Trades Industry Pension Plan Rules and Regulations ('Plan'). Article VIII, Section 1(d) of the labor agreement states that '[t]he Employer . . .  agrees to be bound by and to the said Agreement and Declaration of Trust, as amended from time to time, as though he actually signed same' (Meyers Decl. at ¶ 11; Exhibit 5(a), Art. VIII; *see also*, Exhibits 5(b)-5(d)). The labor agreements contain similar commitments to abide by the Ancillary Funds' trust agreements and rules and regulations (Exhibit 5(a), Art. XIV; *see also*, Exhibits (b)-(d), Art. XIII; Exhibit 5(a), Art. IX; *see also*, Exhibits 5(b)-(d))."

In April, 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with the International Union of Painters and Allied Trades, AFL-CIO, CLC Local Union #159, affiliated with District Council 15, (Painters Local 159) covering its employees performing

certain work including drywall painting, taping, and finishing in an area extending to specified counties in Nevada including the city of Las Vegas. The collective bargaining agreement entered into by Midwest Drywall and Painters Local 159 contains detailed basis, as to each employee engaged in work covered by said agreement, on which contributions are to be made to the Pension Fund. (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044.) In that collective bargaining agreement, Midwest Drywall agreed to be bound by and to the IBPAT Union and Industry Pension Fund Agreement and Declaration of Trust, as amended from time to time, as though it actually signed the same. (Article VIII, Section 1(d).) Midwest Drywall has complied with said provisions. In that collective bargaining agreement, Midwest Drywall agreed to be bound by and to the Painters Joint Apprenticeship Committee Agreement and Declaration of Trust, dated May 1, 1966, and agreed to be bound by and to the National Painting and Decorating and Drywall Apprenticeship and Manpower Training Fund and Declaration of Trust, dated February 1, 1971, as though it actually signed the same and agreed to be bound to the Painters and Allied Trades Labor Management Cooperation Fund Agreement and Declaration of Trust, as amended from time to time. (Article IX, Sections 1(a) and 1(f) and Article XIV, Section 1(d).) Midwest Drywall also agreed to make contributions for employees covered by said agreement to the LMCF, to honor authorizations for check-off of political contributions from employees who are union members to the Political Action Together – Political Committee (PAT-PC). Midwest Drywall has complied with said provisions. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, during the time period of the Pension Fund's claims none of these employees were brought by Midwest Drywall to work in an outside

jurisdiction. (S. Nienke's Dec. ¶¶ 5 and 6 and Midwest Drywall's Exhibit 4 document Bates numbered MWD9367 to MWD9380, S. Regier's Dec.)

Painters Local 159 adopted Bylaws and Working Rules on March 1, 2003 as approved by the International Union of Painters and Allied Trades in February, 2003. (Midwest Drywall's Exhibit 5, document Bates numbered MWD9176 to MWD9230.) The Bylaws and Working Rules for Painters Local 159 designate its area jurisdiction as including "Clark, Lincoln, Nye and Esmeralda Counties, State of Nevada, La Paz and Mohave Counties, State of Arizona, floorcovering to include the preceding and also to include the State of Utah . . ."  (Midwest Drywall's Exhibit 5, p. i) and prescribe that persons seeking membership into Painters Local 159 must make written application and sign out-of-work lists maintained at the headquarters of the Painters Local 159 (Midwest Drywall's Exhibit 5, pp. 8-10). The  Painters Local 159's Bylaws and Working Rules in Article 3 require that to become a member of Painters Local 159, the individual must pass the exam given by an examination board governed by Painters Local 159. (Midwest Drywall's Exhibit 5, p. 7.) Also, the Bylaws and Working Rules in Article 6 require that the member must fully comply with the hiring hall and dispatching provisions of Painters Local 159 (to work in the Painters Local 159's jurisdiction and to work on a job for a signatory employer). (Midwest Drywall's Exhibit 5, p. 12.) Also, the Bylaws and Working Rules in Article 21 provide that only members of Painters Local 159 have the right to vote on a working agreement negotiated by Painters Local 159. (Midwest Drywall's Exhibit 5, p. 39.) Further, the Bylaws and Working Rules in Article 7 provide that membership in Painters Local 159 is equated to authorization of Painters Local 159 to be the exclusive bargaining representative for the individual. (Midwest Drywall's Exhibit 5, p. 17.)

5.       Plaintiff's Statement of Fact No. 11:  "The Funds' labor agreements, trust agreements and the Plan document require Company to timely prepare and submit monthly remittance reports and contributions where owing (Meyers Decl. at ¶ 9; Exhibit 4, Art. IV; Exhibit 5, Art. VII; Exhibit 6, Art. VI; Exhibit 7, Art. 10, §10.12, Exhibit 8, Art. 5). Similar language appears in relation to contributions owing to the FTI and the LMCI (Exhibit 5(a), Art. XIV; *see also*, Exhibits (b)-(d), Art. XIII; Exhibit 5(a), Art. IX; *see also,* Exhibits 5(b)-(d))."

In April, 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with the International Union of Painters and Allied Trades, AFL-CIO, CLC Local Union #159, affiliated with District Council 15, (Painters Local 159) covering its employees performing certain work including drywall painting, taping, and finishing in an area extending to specified counties in Nevada including the city of Las Vegas. The collective bargaining agreement entered into by Midwest Drywall and Painters Local 159 contains detailed basis, as to each employee engaged in work covered by said agreement, on which contributions are to be made to the Pension Fund, including requiring the filing of timely remittance reports. (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044, Article XV, Sections 2, 3, and 4.) Midwest Drywall has complied with said provisions. (S. Nienke's Dec. ¶¶ 5 and 6 and Midwest Drywall's Exhibit 4 document Bates numbered MWD9367 to MWD9380, S. Regier's Dec.)

Two months before the Pension Fund conducted a routine audit of Midwest Drywall's payroll records, on April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator of the Pension Fund, stated that Midwest Drywall is "living up to the terms

and conditions (including wage and benefit increases) of the new agreement." (Midwest

Drywall's Exhibit 15, document Bates numbered PF1079.)

6.    Plaintiff's Statement of Fact No. 12:  "Article VIII of the labor agreement

specifically provides that '[f]or each hour or portion thereof, for which an employee received pay, the

employer shall make a contribution to the above named Pension Fund . . .' (Exhibit 5(a), Art. VII; *see*

*also,* 5(b)-5(d), Art. VIII)."

In April, 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a

collective bargaining relationship and entered into a collective bargaining agreement with

the International Union of Painters and Allied Trades, AFL-CIO, CLC Local Union #159,

affiliated with District Council 15, (Painters Local 159) covering its employees performing

certain work including drywall painting, taping, and finishing in an area extending to

specified counties in Nevada including the city of Las Vegas. The collective bargaining

agreement entered into by Midwest Drywall and Painters Local 159 in Article VIII, Section 1

provides in part: " . . . for  the duration of this Agreement, and any renewals or extensions

thereof, the Employer agrees to make payments to the IBPAT Union and Industry Pension

Fund for each employee covered by this Agreement as follows: (a) For each hour or portion

thereof, for which an employee received pay, the employer shall make a contribution to the

above named Pension Fund in accordance with the following: . . ."  (Midwest Drywall's

Exhibit 3, document Bates numbered MWD0005 to MWD0044, Article VIII, Section 1.)

Midwest Drywall has complied with said provisions. (S. Nienke's Dec. ¶¶ 5 and 6 and

Midwest Drywall's Exhibit 4 document Bates numbered MWD9367 to MWD9380, S.

Regier's Dec.)

Local Union No. 159 of the International Union of Painters and Allied Trades, AFL-CIO, adopted Bylaws and Working Rules on March 1, 2003 as approved by the International Union of Painters and Allied Trades in February, 2003. (Midwest Drywall's Exhibit 5, document Bates numbered MWD9176 to MWD9230.) The Bylaws and Working Rules for Painters Local 159 designate its area jurisdiction as including "Clark, Lincoln, Nye and Esmeralda Counties, State of Nevada, La Paz and Mohave Counties, State of Arizona, floorcovering to include the preceding and also to include the State of Utah . . ."  (Midwest Drywall's Exhibit 5, p. i) and prescribe that persons seeking membership into Painters Local 159 must make written application and sign out-of-work lists maintained at the headquarters of the Painters Local 159 (Midwest Drywall's Exhibit 5, pp. 8-10). The  Painters Local 159's Bylaws and Working Rules in Article 3 require that to become a member of Painters Local 159, the individual must pass the exam given by an examination board governed by Painters Local 159. (Midwest Drywall's Exhibit 5, p. 7.) Also, the Bylaws and Working Rules in Article 6 require that the member must fully comply with the hiring hall and dispatching provisions of Painters Local 159 (to work in the Painters Local 159's jurisdiction and to work on a job for a signatory employer). (Midwest Drywall's Exhibit 5, p. 12.) Also, the Bylaws and Working Rules in Article 21 provide that only members of Painters Local 159 have the right to vote on a working agreement negotiated by Painters Local 159. (Midwest Drywall's Exhibit 5, p. 39.) Further, the Bylaws and Working Rules in Article 7 provide that membership in Painters Local 159 is equated to authorization of Painters Local 159 to be the exclusive bargaining representative for the individual. (Midwest Drywall's Exhibit 5, p. 17.)

In 1986, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with Painters District Council No. 3, International Brotherhood of Painters & Allied Trades, AFL-CIO, CLC (Painters District Council No. 3) with successor negotiated agreements and after November 24, 1993, Midwest Drywall pursuant to 29 U.S.C.§ 159(a) established a collective bargaining relationship and entered into collective bargaining agreements with Painters District Council No. 3 with the agreements' jurisdiction extending to specified counties in Missouri and Kansas including cities of Kansas City, Kansas and Kansas City, Missouri. The collective bargaining agreement entered into by Midwest Drywall (through the Builders' Association) and Painters District Council No. 3 did not contain any basis upon which payments were to be made to the Pension Fund, but did provide that Midwest Drywall was required to make contributions for its employees working within the jurisdiction of the agreement to the Labor Management Cooperative Fund (LMCF) and Midwest Drywall made contributions as specified in said collective bargaining agreement. (Midwest Drywall's SOMF ¶ 3, S. Nienke's Dec. ¶ 3 and Midwest Drywall's Exhibit 1, document Bates numbered MWD0194 and MWD0196 to MWD0212.)

In 1984, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with International Union of Painters and Allied Trades, AFL-CIO, CLC District Council 3, Local Union 76 (Painters Local 76) with successor negotiated agreements and since May 19, 2003, Midwest Drywall pursuant to 29 U.S.C. § 159(a) has established a collective bargaining relationship and entered into collective bargaining agreements with said labor organization with the agreements' jurisdiction extending to specified counties in Kansas including the city of

Wichita. The collective bargaining agreements entered into by Midwest Drywall and Painters Local 76 do not contain any basis upon which payments are to be made to the Pension Fund. In a prior written collective bargaining agreement entered into by Midwest Drywall and Painters Local 76, Midwest Drywall agreed to make, as specified in said collective bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades LMCF and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into by Midwest Drywall and Painters Local 76, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. (Midwest Drywall's SOMF ¶ 4, S. Nienke's Dec. ¶ 4 and Midwest Drywall's Exhibit 2, document Bates numbered MWD0265 to MWD0290.)

In July, 1999, Midwest Drywall established a collective bargaining relationship with Painters District Council 80, International Brotherhood of Painters & Allied Trades, AFL-CIO, CLC (Painters District Council 80) and entered into a collective bargaining agreement titled "Memorandum of Understanding and Area Contract" with Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job. Midwest Drywall has paid all contributions to funds as specified in the Memorandum of Understanding, including contributions to the Pension Fund. (Midwest Drywall's SOMF ¶ 8, S. Nienke's Dec. ¶ 8 and Midwest Drywall's Exhibit 6, document Bates numbered MWD0877.)

7.    Plaintiff's Statement of Fact No. 13:  "Article XIV of the labor agreement further requires that '[c]ontributions . . . be made monthly and shall be recorded on forms supplied by the International Union of Painters and Allied Trades Union and Industry National Pension Fund office . . .'  (Exhibit 5(a), Art. XIV; *see also,* Exhibits 5(b)-5(d), Art. XIV)."

In April, 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with the International Union of Painters and Allied Trades, AFL-CIO, CLC Local Union #159, affiliated with District Council 15, (Painters Local 159) covering its employees performing certain work including drywall painting, taping, and finishing in an area extending to specified counties in Nevada including the city of Las Vegas. The collective bargaining agreement entered into by Midwest Drywall and Painters Local 159 contains detailed basis, as to each employee engaged in work covered by said agreement, on which contributions are to be made to the Pension Fund and provides in Article XV that "Contributions shall be made monthly and shall be recorded on forms supplied by the International Brotherhood of Painters and Allied Trades Union and Industry National Pension Fund office . . ." (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044.) Midwest Drywall has complied with said provisions. (S. Nienke's Dec. ¶¶ 5 and 6 and Midwest Drywall's Exhibit 4 document Bates numbered MWD9367 to MWD9380, S. Regier's Dec.)

In 1986, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with Painters District Council No. 3, International Brotherhood of Painters & Allied Trades, AFL-CIO, CLC (Painters District Council No. 3) with successor negotiated agreements and after

November 24, 1993, Midwest Drywall pursuant to 29 U.S.C.§ 159(a) established a collective bargaining relationship and entered into collective bargaining agreements with Painters District Council No. 3 with the agreements' jurisdiction extending to specified counties in Missouri and Kansas including cities of Kansas City, Kansas and Kansas City, Missouri. The collective bargaining agreement entered into by Midwest Drywall (through the Builders' Association) and Painters District Council No. 3 did not contain any basis upon which payments were to be made to the Pension Fund, but did provide that Midwest Drywall was required to make contributions for its employees working within the jurisdiction of the agreement to the Labor Management Cooperative Fund (LMCF) and Midwest Drywall made contributions as specified in said collective bargaining agreement. (Midwest Drywall's SOMF ¶ 3, S. Nienke's Dec. ¶ 3 and Midwest Drywall's Exhibit 1, document Bates numbered MWD0194 and MWD0196 to MWD0212.)

In 1984, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into a collective bargaining agreement with International Union of Painters and Allied Trades, AFL-CIO, CLC District Council 3, Local Union 76 (Painters Local 76) with successor negotiated agreements and since May 19, 2003, Midwest Drywall pursuant to 29 U.S.C. § 159(a) has established a collective bargaining relationship and entered into collective bargaining agreements with said labor organization with the agreements' jurisdiction extending to specified counties in Kansas including the city of Wichita. The collective bargaining agreements entered into by Midwest Drywall and Painters Local 76 do not contain any basis upon which payments are to be made to the Pension Fund. In a prior written collective bargaining agreement entered into by Midwest Drywall and Painters Local 76, Midwest Drywall agreed to make, as specified in said collective

bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades LMCF and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into by Midwest Drywall and Painters Local 76, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. (Midwest Drywall's SOMF ¶ 4, S. Nienke's Dec. ¶ 4 and Midwest Drywall's Exhibit 2, document Bates numbered MWD0265 to MWD0290.)

In July, 1999, Midwest Drywall established a collective bargaining relationship with Painters District Council 80, International Brotherhood of Painters & Allied Trades, AFL-CIO, CLC (Painters District Council 80) and entered into a collective bargaining agreement titled "Memorandum of Understanding and Area Contract" with Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job. Midwest Drywall has paid all contributions to funds as specified in the Memorandum of Understanding, including contributions to the Pension Fund. (Midwest Drywall's SOMF ¶ 8, S. Nienke's Dec. ¶ 8 and Midwest Drywall's Exhibit 6, document Bates numbered MWD0877.)

8.    Plaintiff's Statement of Fact No. 16:   "Under the labor agreements, contributions are due for work performed within the jurisdiction of the signatory local union and, when the signatory employer performs work outside the geographic jurisdiction of the signatory local union, in areas where there is a collective bargaining agreement in effect between any local union or district council

of the International Union of Painters and Allied Trades and employers of the industry.  Article IV of

the labor agreement included the following provision, known as an 'out-of-area' clause:

> (b) The Employer party hereto shall, when engaged in work outside the geographic jurisdiction of the Union party to the agreement, comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographic jurisdiction and executed by the employers of the industry and the affiliated Local Unions in that jurisdiction, including but not limited to, the wages, hours, working conditions, fringe benefits, and procedure for settlement of grievances set forth therein; provided however, that as to employees employed by such employer from within the geographic jurisdiction of the Union party to this agreement and who are brought into an outside jurisdiction, such employees shall be entitled to receive the wages and conditions effective in either the home or outside jurisdiction whichever are more favorable to such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents.  This provision is enforceable by the District Council or Local Union in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable collective bargaining agreement and through the courts, and is also enforceable by the Union party to this agreement, both through the procedure for settlement of grievances set forth in this agreement and through the courts.

(Exhibit 5(a), Art. IV(b); *see also*, Exhibits 5(b)-5(d), Art. IV; Meyers Decl. at ¶ 12)."

        In April, 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a

collective bargaining relationship and entered into a collective bargaining agreement with the

International Union of Painters and Allied Trades, AFL-CIO, CLC Local Union #159,

affiliated with District Council 15, (Painters Local 159) covering its employees performing

certain work including drywall painting, taping, and finishing in an area extending to

specified counties in Nevada including the city of Las Vegas. The collective bargaining

agreement entered into by Midwest Drywall and Painters Local 159 contains in Article IV,

50-50 Clause the following:

> "It being understood that the principle place of business and the employment of the employer is in the area jurisdiction as stated, but that such employer on occasion undertakes painting work in other cities and areas, on which occasions such employer

employs such additional employees, residents of such other city or area as the needs of the work require; now therefore, be it resolved:

(a)   The Contractor or Employer party to this Agreement, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement, shall employ not less than fifty persent (sic) (50%) of the workers' employed on such work from the residents of the area where the work is performed or from among persons who are employed the greater percentage of their time in such area; any others shall be employed only from the Contractor's home area.

(b)   And further provided that the employer or contractor, when engaged in work outside the geographical jurisdiction of the Union party to this Agreement shall comply with all of the lawful clauses of the collective bargaining agreement in effect in said other geographical jurisdiction and executed by the employers of the industry and the local unions in that jurisdiction, including but not limited to, the provisions of the wages, hours, working conditions and all fringe benefits therein provided, including grievances; provided, however, that as to employees employed by such employer from within the geographical jurisdiction to the Union party to this Agreement and who are brought into an outside jurisdiction, such employees, and fringe benefit contributions on behalf of such employees shall be made solely to their home funds in accordance with their governing documents. This provision is enforceable by the Local Union or District Council in whose jurisdiction the work is being performed, both through the procedure for settlement of grievances set forth in its applicable Collective Bargaining Agreement and the Union party to this agreement, both through the procedure for settlement of grievances set forth in this agreement and through the courts. "

(Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044.)

Local Union No. 159 of the International Union of Painters and Allied Trades, AFL-CIO, adopted Bylaws and Working Rules on March 1, 2003 as approved by the International Union of Painters and Allied Trades in February, 2003. (Midwest Drywall's Exhibit 5, document Bates numbered MWD9176 to MWD9230.) The Bylaws and Working Rules for Painters Local 159 designate its area jurisdiction as including "Clark, Lincoln, Nye and Esmeralda Counties, State of Nevada, La Paz and Mohave Counties, State of Arizona, floorcovering to include the preceding and also to include the State of Utah . . ." (Midwest Drywall's Exhibit 5, p. i) and prescribe that persons seeking membership into Painters Local 159 must make written application and sign out-of-work lists maintained at the headquarters

of the Painters Local 159 (Midwest Drywall's Exhibit 5, pp. 8-10). The Painters Local 159's Bylaws and Working Rules in Article 3 require that to become a member of Painters Local 159, the individual must pass the exam given by an examination board governed by Painters Local 159. (Midwest Drywall's Exhibit 5, p. 7.) Also, the Bylaws and Working Rules in Article 6 require that the member must fully comply with the hiring hall and dispatching provisions of Painters Local 159 (to work in the Painters Local 159's jurisdiction and to work on a job for a signatory employer). (Midwest Drywall's Exhibit 5, p. 12.) Also, the Bylaws and Working Rules in Article 21 provide that only members of Painters Local 159 have the right to vote on a working agreement negotiated by Painters Local 159. (Midwest Drywall's Exhibit 5, p. 39.) Further, the Bylaws and Working Rules in Article 7 provide that membership in Painters Local 159 is equated to authorization of Painters Local 159 to be the exclusive bargaining representative for the individual. (Midwest Drywall's Exhibit 5, p. 17.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the collective bargaining agent for Midwest Drywall's employees who work solely in locations outside the jurisdiction of Painters Local 159. (Midwest Drywall's SOMF ¶ 10, S. Nienke's Dec. ¶ 9.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the authorized agent for foreign Painters District Councils and/or Painters Local Unions. (Midwest Drywall's SOMF ¶ 11, S. Nienke's Dec. ¶ 10.)

In reference to District Councils and Local Unions affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with

Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters
Local 159/District Council 15. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 13.)

Painters District Council 3, Painters District Council 80, and Painters Local Union 76
have not represented to Midwest Drywall that Painters Local 159 was or is the collective
bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or
was or is their authorized agent for collective bargaining. (Midwest Drywall's SOMF ¶ 1, S.
Nienke's Dec. ¶ 12.)

Midwest Drywall is not signatory to and has not entered into any national agreement
with the International Painters and Allied Trades Union. The Pension Fund does not claim
that Midwest Drywall has done so. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 12
and Compl.)

In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, Midwest
Drywall's President, Steven Nienke, met with International Union of Painters and Allied
Trades, Local Union #109 (Painters Local 109) representative, Pat Stoysich, and his boss and
discussed a proposed Painters Local 109 collective bargaining agreement including
jurisdiction: what it would cover and what it would require. Painters Local 109 gave Steven
Nienke a copy of a proposed Agreement to cover drywall taper and/or finisher work or
installing and/or finishing of exterior insulation finish systems (E.I.F.S.) in specified counties
in Iowa and Nebraska, including the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 8,
document Bates numbered MWD1182 to MWD1199.) Steven Nienke told Painters Local 109
that he didn't have a problem with the painting work part of the proposed Agreement, but he
did have a problem with the EIFS-exterior insulating finish system because where Midwest
Drywall did EIFS work (for example in Las Vegas) that work was under the jurisdiction of

the Plasters Local Union, it was not painters' work, and to have EIFS work added to painting

work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat

Stoysich responded that EIFS work was the way the Agreement was written and he would

not negotiate it out. Steven Nienke told Painters Local 109 that he was there to negotiate an

Agreement as to painting work; he had no problem signing an Agreement that day only as to

painting work. Pat Stoysich said he would check with Painters Local 109's attorney and

telephone Steven Nienke later that day. Later, Pat Stoysich telephoned Steven Nienke and

said that there was no way Painters Local 109 would change its proposed Agreement, it had

to cover EIFS work, too. No Agreement was agreed to between Midwest Drywall and

Painters Local 109. (Midwest Drywall's SOMF ¶ 15, S. Nienke's Dec. ¶ 14.)

In a letter dated September 28, 1999, and sent to Midwest Drywall's President,

Steven Nienke, Leonard Wittman, representative of Painters Local 159, stated: "It has been

brought to my attention that your company was engaged in contracting work covered by the

collective bargaining agreement between Midwest Drywall and Painters Local 159 and that

Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV

50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this

oversight has been rectified by close of business October 8, 1999 to avoid further action by

Local 159." (Midwest Drywall's SOMF ¶ 16, S. Nienke's Dec. ¶ 15 and Midwest Drywall's

Exhibit 9 document Bates numbered MWD0001.)

In a letter dated October 4, 1999, sent to Leonard Wittman, Steven Nienke, President

of Midwest Drywall, stated that "Midwest Drywall Co., Inc. denies that it has violated any

lawful terms of and/or intent of the collective bargaining agreement with Painters Local No.

159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a

violation of that agreement and when it claimed the violation had occurred and requested a prompt response. (Midwest Drywall's SOMF ¶ 17, S. Nienke's Dec. ¶ 16 and Midwest Drywall's Exhibit 10 document Bates numbered MWD0003.)

In a letter dated November 3, 1999, to Steven Nienke, Leonard Wittman stated Painters Local 159's intent and meaning of Article IV 50/50 Clause, Section 1 (b) by stating that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who states he has spoken to your company about becoming signatory to his Local. As you can see our Article IV, clearly states that your company agrees to abide by the Agreement in place, in the 'outside the geographical area.'
>
> Please understand it is not the position of Local 159 or that of Local 109 to 'hammer' a contractor into becoming signatory. I am confident that if you or your representative would meet with Mr. Stoysich both sides would come to an agreement."

(Midwest Drywall's SOMF ¶ 18, S. Nienke's Dec. ¶ 17 and Midwest Drywall's Exhibit 11 document Bates numbered MWD0004.)

In a letter dated November 8, 1999, to Leonard Wittman, Midwest Drywall's President, Steven Nienke, stated to Painters Local 159:

> "For your information purpose, prior to your recent correspondence, Midwest Drywall met with Local 109 representatives in Omaha, Nebraska for collective bargaining. Midwest Drywall offered to sign a collective bargaining agreement with Local 109 including lawful clauses of an Agreement. Its offer is still there for Local 109 to accept."

(Midwest Drywall's SOMF ¶ 19, S. Nienke's Dec. ¶ 18 and Midwest Drywall's Exhibit 12 document Bates numbered MWD0045.)

When Midwest Drywall thereafter had not entered into a collective bargaining agreement through a collective bargaining relationship with Painters Local 109, Midwest Drywall, in March, 2000, was notified that charges had been brought against it for violation of the collective bargaining agreement between Midwest Drywall and Painters Local 159,

Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and

Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement

between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the

Joint Committee the power to adjust all disputes and grievances that may arise out of the

application or interpretation of the Agreement and that the decisions of the Joint Committee

shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶

20, S. Nienke's Dec. ¶ 19 and  Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to

MWD0039.)

On April 10, 2000, a hearing was held before the Joint Committee and Midwest

Drywall was informed that Painters Local 159 asserted a violation of the collective

bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest

Drywall's continuing failure to enter into a collective bargaining agreement with Painters

Local 109 in Omaha, Nebraska. (Midwest Drywall's SOMF ¶ 21, Midwest Drywall's Exhibit

13 document Bates numbered MWD0110 to MWD0113 at p. 1.)

Midwest Drywall through its President, Steven Nienke, provided facts at the hearing

as to its negotiations in the summer of 1999 with Painters Local 109, that they had not

reached an agreement, and that Midwest Drywall had not signed an agreement with

Painters Local 109. The Joint Committee stated at the close of the hearing that it determined

that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement

in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local

109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with

Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve

the continuing violation. After the Hearing, Leonard Wittman said to Steven Nienke that the

Union was "not going to enforce the finding." (Midwest Drywall's SOMF ¶ 21, S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109" ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to

MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121,

documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled

"Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator

of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions

(including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit

15, document Bates numbered PF1079.)

The Constitution of the International Union of Painters and Allied Trades (Midwest

Drywall's Exhibit 7 document Bates numbered MWD0416 to MWD0681) in Section 236(a)

provides that a Painters District Council or Painters Local Union "shall enter into Collective

Bargaining Agreements only with contractors or employers, whose principal place of

business is located within the geographical jurisdiction of such District Council or Local

Union" and may enter into agreements with an out-of-jurisdiction employer only under

prescribed conditions including sending "to the District Council or Local Union in whose

jurisdiction the employer's principal place of business is located notification that the

agreement has been signed and a complete, signed copy of that agreement." (Midwest

Drywall's Exhibit 7, p. 150.)

Thomas G. Pfundstein as the Senior Executive Director of the Southern Nevada

Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities

to negotiate collective bargaining agreements for contractors concerning work in Southern

Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of

Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed

language to Thomas Pfundstein for a Memorandum of Understanding between Painters

District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District

Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters Local 159 with the representation by Painters Local 159 that Painters District Council 15 would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered MWD1205 to MWD1208.)

In 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established collective bargaining relationships and entered into collective bargaining agreements that included in their jurisdiction Las Vegas, Nevada with the Southern California-Nevada Regional Council of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, Labors International Union of North America, Local Union No. 872, and Operative Plasters and Cement Masons International Association, Local Union 797. (S. Nienke's Dec. ¶ 7.)

In 1999, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into collective bargaining agreements with the Heartland Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters and Joiners of America (Carpenters Local Union No. 444) covering work performed in specified counties in Iowa and Nebraska that included the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 16, document Bates numbered MWD1315 to MWD1326, MWD0962 to MWD1000, and MWD1253 to MWD1297.)

In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers. (Midwest Drywall's Exhibit 17, document Bates numbered MWD0118 to MWD0121.) Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain work, including drywall taping, finishing and sanding in a defined geographical area in Nebraska and Iowa. (S. Nienke's Dec. ¶ 23 and Midwest Drywall's Exhibit 18 document Bates numbered MWD0122 to MWD0141.)

On May 31, 2003, the collective bargaining agreement between Midwest Drywall and Carpenters Local Union Nos. 444 and 1055 expired. On June 2, 2003, the Carpenters Local Union Nos. 444 and 1055 filed with the National Labor Relations Board's (NLRB) Regional Office a Petition for an election. The NLRB held an election by secret ballot on June 27, 2003, among the employees in the appropriate unit. A majority of the valid votes counted were not cast for the union. Carpenters Local Union Nos. 444 and 1055 filed objections to the conduct of the election with the NLRB's Regional Office. The NLRB directed that a hearing be held on the objections to the election in the agreed upon appropriate unit that included carpenters and drywall finishers. (Midwest Drywall's Exhibit 19, document Bates numbered MWD7488 to MWD7490.) The NLRB's Regional Office conducted a hearing on the objections, issued recommendations, and the NLRB on September 10, 2003, issued its Decision finding that a majority of the valid ballots were not cast for Carpenters Local Union Nos. 444 and 1055 and it is not the exclusive representative of the bargaining unit employees. (Midwest Drywall's Exhibit 20, document Bates numbered MWD0142 to MWD0143.) During the term of its collective bargaining agreements with Carpenters Local Union Nos. 444 and 1055, Midwest Drywall made contributions for employees performing work covered by the agreements including drywall finishers and tapers, to the Omaha Construction Industry Pension Fund in accord with the negotiated and signed collective bargaining agreements. After the termination of the collective bargaining agreement, Midwest Drywall reached an agreement with the Omaha Construction Industry Pension Fund as to assessment of withdrawal liability and paid an additional $490,000.00 into said Pension Fund. (S. Nienke's Dec. ¶ 24 and Midwest Drywall's Exhibit 21 document Bates numbered MWD0144 to MWD0147.)

Midwest Drywall has had collective bargaining relationships with other affiliated District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and Joiners of America dating back to 1973. Pursuant to 29 U.S.C. § 159(a) and NLRB's certification of the unions as the exclusive bargaining representative for employees in appropriate bargaining units including drywall finishing, Midwest Drywall entered into collective bargaining agreements with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918, #1445, and #2279 covering work performed by its employees including drywall finishing in specified counties in north central and eastern Kansas (outside of Kansas City). (S. Nienke's Dec. ¶ 25 and Midwest Drywall's Exhibit 22 document Bates numbered MWD0148, MWD0152 to MWD0168, MWD0170, MWD0171 to MWD0187, MWD0149 to MWD0150 and MWD3780 to MWD3800.)

 In the spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall's President, Steven Nienke pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the UBCJA proposed an International Agreement to Midwest Drywall. (S. Nienke's Dec. ¶ 30 and Midwest Drywall's Exhibit 27 document Bates numbered MWD1426 to MWD1447.)

On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding wherein, in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for

the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the

UBCJA, "including but not limited to drywall hanging, drywall finishing and wet wall finish

work (plastering)" and that said "provision regarding drywall finish and plastering will not

apply in those areas where the Company (Midwest Drywall) is already signed to an

agreement with another labor organization as long as such an agreement remains in effect."

Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on

July 1, 2007. (S. Nienke's Dec. ¶ 31 and Midwest Drywall's Exhibit 28 document Bates

numbered MWD0817 to MWD0823.)


9.     Plaintiff's Statement of Fact No. 18:   "In April 2000, in accord with the grievance

procedure in its collective bargaining agreement with Midwest, Local 159 filed a claim with the Joint

Trade Board of the Painters and Decorators Joint Committee, Inc. ('Board') asserting Midwest's

violation of Article IV of the labor agreement (hereinafter 'out-of-area' clause) (Smirk Decl. at ¶ 6)."


In March, 2000, Midwest Drywall was notified that charges had been brought against

it for violation of the collective bargaining agreement between Midwest Drywall and Painters

Local 159, Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the

Painters and Decorators Joint Committee, Inc. (Joint Committee). (S. Nienke's Dec. ¶ 19.)

On April 10, 2000, a hearing was held before the Joint Committee. At the hearing Midwest

Drywall was informed that Painters Local 159 asserted a violation of the collective

bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest

Drywall's continuing failure to enter into a collective bargaining agreement with Painters

Local 109 in Omaha, Nebraska. (Midwest Drywall's Exhibit 13 document Bates numbered

MWD0110 to MWD0113 at p. 1, S. Nienke's Dec. ¶ 20.)


10.      Plaintiff's Statement of Fact No. 19:  "On April 14, 2000, the Board, after conducting

a hearing, rendered a Decision and Order concluding that Midwest was bound by the terms of the

labor agreement, including the out-of-area clause 'governing work performed by Midwest outside the

area jurisdiction of the [labor] agreement.'  The Board determined that Midwest is obligated, under

the out-of-area clause, to pay wages and fringe benefit contributions on all hours worked by its

employees, even when Midwest performed work outside of Local 159's geographic jurisdiction

(Smirk Decl. at ¶ 7; Exhibit 9).  This Order was not appealed by Midwest."


The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest

Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint

Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest

Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of

IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate

good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing

violation of the Master Agreement", and without Midwest Drywall establishing a collective

bargaining relationship and entering into and becoming bound to the outside jurisdiction

agreement, the Joint Committee did not impose the cost of foreign wages and benefits on

Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest

Drywall was not contacted further by the Joint Committee, by a Painters Local 159

representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121, documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled "Q" to "CC" from CD Bates numbered MWD4123A.)

11.    Plaintiff's Statement of Fact No. 21 states in part:   ". . . That waiver expired on June 30, 2007 (Smirk Decl. at ¶ 9; Exhibit 10)."

On April 10, 2000, a hearing was held before the Joint Committee and Midwest Drywall was informed that Painters Local 159 asserted a violation of the collective bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest Drywall's continuing failure to enter into a collective bargaining agreement with Painters Local 109 in Omaha, Nebraska. (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.)

The Joint Committee stated at the close of the hearing that it determined that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local 109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve the continuing violation. After the Hearing, Leonard Wittman, representative of Painters Local 159, said to Steven Nienke that the Union was "not going to enforce the finding." (S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee,

by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121, documents labeled "G" to "P" from CD Bates numbered MWD4123,  and documents labeled "Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions (including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit 15, document Bates numbered PF1079.)

Thomas G. Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Thomas Pfundstein for a Memorandum of Understanding between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new

32

July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, documents Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 documents Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377.)

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's Exhibit 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCAS to represent it in negotiations in 2007 for a Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters Local 159 with the representation by Painters District Council 15 that it would re-

issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after

negotiations for the new Master Agreement with Painters District Council 15 had been

completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked

if he had a new Memorandum of Understanding from the Painters for Midwest Drywall

Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who

said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent

an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk

said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit

23 documents Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26

document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25,

2007, requested Painters District Council 15 to execute a written agreement incorporating the

agreement reached as to the Memorandum of Understanding. The renewed Memorandum of

Understanding provides:

> "This Memorandum of Understanding between International Union of
> Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall
> (the Employer) constitutes a waiver of Article 4 of the current Painters and
> Decorators Master Agreement, to which the Employer is signatory. The parties
> agree that this Memorandum shall be in effect for the current Agreement, for the
> duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, Bates numbered documents

MWD1205 to MWD1208.)


12.     Plaintiff's Statement of Fact No. 22:   "On March 16, 2007, Midwest executed an

Assignment of Bargaining Rights ('Assignment') wherein Midwest assigned its bargaining rights to

the Negotiation Committee of the Southern Nevada Chapter of the Painting and Decorating

Contractors of America ('PDCA') (Smirk Decl. at ¶ 10; Exhibit 11)."

> In reliance upon the representations made by Painters District Council 15 to
>
> Midwest Drywall's collective bargaining representative that a new Memorandum of
>
> Understanding would be re-established with the new Master Agreement, Midwest Drywall
>
> agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating
>
> Committee of the Southern Nevada Chapter of The Painting and Decorating Contractors of
>
> America to represent it in negotiations in 2007 with Painters Local 159. (S. Nienke's Dec. ¶
>
> 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

13.    Plaintiff's Statement of Fact No. 23:   "Effective July 1, 2007, the PDCA negotiated a

new labor agreement with Local 159 (Smirk Decl. at ¶ 11; Exhibit 5(d)).  This new labor agreement

is binding on Midwest pursuant to the assignment of its bargaining rights to the PDCA. This

agreement is currently in effect and does not contain a waiver of Article IV (Smirk Decl. at ¶ 11;

Exhibit 5(d))."

> Thomas G. Pfundstein as the Senior Executive Director of the Southern Nevada
>
> Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities
>
> to negotiate collective bargaining agreements for contractors concerning work in Southern
>
> Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of
>
> Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed
>
> language to Thomas Pfundstein for a Memorandum of Understanding between Painters

District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, documents Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 documents Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377.)

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's Exhibit 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District

Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 documents Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, Bates numbered documents MWD1205 to MWD1208.)

14.    Plaintiff's Statement of Fact No. 24:  "As with all the labor agreements related to Midwest, the current labor agreement contains an out-of-area clause obligating all contractors represented by the PDCA to make contributions for work performed by their employees in jurisdictions where there is a collective bargaining agreement in effect between any Local Union or District Council of the International Unions of Painters and Allied Trades and employers of the industry (Smirk Decl. at ¶ 12; Exhibit 5(d), Art. IV, Section 1(b))."

Thomas G. Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Thomas Pfundstein for a Memorandum of Understanding between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, documents Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 documents Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377.)

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's Exhibit 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with

Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 documents Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, Bates numbered documents MWD1205 to MWD1208.)

The collective bargaining agreement between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the Joint Committee the power to adjust all disputes and grievances that may arise out of the application or interpretation of the Agreement and that the decisions of the Joint Committee shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶ 20, S. Nienke's Dec. ¶ 19 and

Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to MWD0039.) The Joint

Committee issued a Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13,

document Bates numbered MWD0110 to MWD0113) and therein interpreted Article IV, 50-

50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become

bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered

Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with

Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement",

and without Midwest Drywall establishing a collective bargaining relationship and entering

into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not

impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's

Exhibit 13, pp. 2-3.)


15.     Plaintiff's Statement of Fact No. 25:   "When an employer fails to make the required

contributions or remit remittance Reports as required under the collective bargaining agreement, the

labor agreements, trust agreements and Plan provide the Funds with remedies (Exhibit 4, Art. 4,

Section 4.07; Exhibit 5(a), Art. 10; Exhibit 6, Art. VI; Exhibit 7, Art. 10, § 10.12, Exhibit 8, Art. V,

Section 7)."


        Employers are obligated to make contributions under the terms of a collectively

bargained agreement only where doing so would not be inconsistent with law. (Additional

Midwest Drywall Exhibit 37 (29 U.S.C. § 1145) attached hereto.)

        In April, 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a

collective bargaining relationship and entered into a collective bargaining agreement with the

International Union of Painters and Allied Trades, AFL-CIO, CLC Local Union #159, affiliated with District Council 15, (Painters Local 159) covering its employees performing certain work including drywall painting, taping, and finishing in an area extending to specified counties in Nevada including the city of Las Vegas. The collective bargaining agreement entered into by Midwest Drywall and Painters Local 159 contains detailed basis, as to each employee engaged in work covered by said agreement, on which contributions are to be made to the Pension Fund. (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044.) Midwest Drywall has complied with said provisions. Midwest Drywall also agreed to make contributions for employees covered by said agreement to the LMCF, to honor authorizations for check-off of political contributions from employees who are union members to the Political Action Together – Political Committee (PAT-PC). Midwest Drywall has complied with said provisions. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, during the time period of the Pension Fund's claims none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. Midwest Drywall has made all required contributions to the Pension Fund and other benefit funds pursuant to the collective bargaining agreements entered into between Midwest Drywall and Painters Local 159. (S. Nienke's Dec. ¶¶ 5 and 6 and Midwest Drywall's Exhibit 4 document Bates numbered MWD9367 to 9380, S. Regier's Dec.)

16.    Plaintiff's Statement of Fact No. 27:    "Article VI, Section 6 of the Pension Trust Agreement also provides for audits.  Specifically:

> The Trustees may at any time have an audit made by certified public accounts of the payroll, wage, and cash disbursement records, general ledger, and other financial records, including but not limited to tax returns, of any Employer in

connection with the said contributions and/or reports . . . If the Employer fails to cooperate with a scheduled audit, the Trustees may require that the Employer pay to the Fund all costs incurred as a result of the Employer's failure.  Any Employer found delinquent or in violation of the Rules of Regulations of the Pension Plan . . . as a result of an audit may be required by the Trustees to pay to the Fund the cost of the audit.

(Exhibit 6, Art. VI)."

Plaintiff's Statement of Fact No. 27 misquotes Article VI, Section 6 of the Pension Trust Agreement as noted by the language below in bold:

The Trustees may at any time have an audit made by certified public **accountants** of the payroll, wage, and cash disbursement records, general ledger, and other financial records, including but not limited to tax returns, of any Employer in connection with the said contributions and/or reports . . . If the Employer fails to cooperate with a scheduled audit, the Trustees may require that the Employer pay to the Fund all costs incurred as a result of the Employer's failure. Any Employer found delinquent or in violation of the Rules ~~of~~ **and** Regulations of the Pension Plan . . . as a result of an audit may be required by the Trustees to pay to the Fund the cost of the audit.

(Pension Fund's Exhibit 6, Art. VI, Section 6).

17.    Plaintiff's Statement of Fact No. 28:  "The Plan provides, at Section 10.12, as follows:

**Section 10.12 Collection of Delinquent Contributions.**

(a)    In the case of a Contributing Employer that fails to make the contributions of the Plan for which it is obligated, in accordance with the terms and conditions of a collective bargaining agreement, the Trustees may bring an action on behalf of the Plan pursuant to Sections 502(g)92) of ERISA to enforce the Contributing Employer's obligation.

(b)    In any action in which judgment is awarded in favor of the Plan, the Contributing Employer shall pay to the Plan, in accordance with the court's award:

(1)    the unpaid contributions,

(2)      interest on the unpaid contributions, determined at the rate prescribed under Section 6621 of the Internal Revenue Code of 1954, as amended,

(3)      liquidated damages equal to the greater of

     (A)     the amount of interest charges on the unpaid contributions, or

     (B)     20 percent (higher percentage, if permitted by Federal or State law) of the unpaid contributions.

(4)      reasonable attorneys' fees and costs of this action, and

(5)      such other legal or equitable relief as the court deems appropriate.

(c)     Nothing in this section shall be construed as a waiver or limitation on the Plan's or the Trustee's right to enforce a Contributing Employer's contribution obligation in any other type of proceeding.

(Exhibit 7, Art. 10, § 10.12)"

Plaintiff's Statement of Fact No. 28 misquotes Section 10.12 of The Plan, as noted by the language below in bold:

Section 10.12 Collection of Delinquent Contributions.

(a)     In the case of a Contributing Employer that fails to make the contributions ~~of~~ **to** the Plan for which it is obligated, in accordance with the terms and conditions of a collective bargaining agreement, the Trustees may bring an action on behalf of the Plan pursuant to **ERISA 502(g)(2)** ~~502(g)92) of ERISA~~ to enforce the Contributing Employer's obligation.

(b)     In any **such** action in which judgment is awarded in favor of the Plan, the Contributing Employer shall pay to the Plan, in accordance with the court's award:

(1)      the unpaid contributions,

(2)      interest on the unpaid contributions, determined at the rate ~~**prescribed under Section 6621 of the Internal**~~

> **Revenue Code of 1954, as amended** for **underpayment of federal income taxes under IRC 6621,**
>
> (3)    liquidated damages equal to the greater of
>
> > (A)    the amount of interest charged on the unpaid contributions, or
> >
> > (B)    20 percent ~~(higher percentage, if permitted by Federal or State law)~~ of the unpaid contributions.
>
> (4)    reasonable attorneys' fees and costs of this action, and
>
> (5)    such other legal or equitable relief as the court deems appropriate.
>
> (c)    Nothing in this section shall be construed as a waiver or limitation on the ~~Plan's or the Trustee's~~ rights or ability of the Plan, Trustees or Union to enforce a Contributing Employer's contribution obligation in any other type of proceeding.

(Pension Fund's Exhibit 7, Art. 10, § 10.12.)

18.    Plaintiff's Statement of Fact No. 31:  "In preparing the audit report, the Auditor determined (1) the geographic areas in which Midwest worked, (2) whether there were collective bargaining agreements in effect between a local union or district councils of the IUPAT, and (3) if the employers in those areas were bound to those agreements and required to make contributions to the Funds. In preparing the audit report, the auditor reviewed records, provided by Midwest and the Funds, of all work performed in the geographical jurisdiction of the Union as well as those jurisdictions covered by the 'out of area' clause. (Moore Decl. at ¶ 7.)"

By the admission in Mr. Moore's Declaration as to what he relied upon in preparing his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV, Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000, Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective

bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc. Responses and Objections to the International Painters and Allied Trades Industry

Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to

Interrogatory No. 3.14 .)

19.     Plaintiff's Statement of Fact No. 32:  "The audit revealed an aggregate shortage

through June 30, 2004 in the amount of $619,325.96, which resulted, in part, (1) from Midwest's

failure to make contributions for all hours of covered work performed in areas where there is a

collective bargaining agreement in effect between the Local Unions or District Councils of the

International Union of Painters and Allied Trades, and (2) Company's use of non-signatory

contractors, a violation of the subcontracting provision in the labor agreement which, in turn, requires

that contributions to the Funds are owed for those hours worked (Moore Decl., ¶ 8; Exhibits 5(a),

Art. XVI; *see also*, Exhibit 5(b)-(d), Art. XV; Exhibit 13)."

By the admission in Mr. Moore's Declaration as to what he relied upon in preparing

his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV,

Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest

Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000,

Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to

MWD0113.)  The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by

finding that Midwest Drywall "had not entered into nor become bound by the Other

Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the

Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to

resolve Midwest's continuing violation of the Master Agreement", and without Midwest

Drywall establishing a collective bargaining relationship and entering into and becoming

bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to

make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc.  Responses and Objections to the International Painters and Allied Trades Industry Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to Interrogatory No. 3.14.)

Certified Public Accountant, Steven D. Regier, in preparing his expert opinion report reviewed the collective bargaining agreement, April 15, 1998 to June 30, 2001, between Painters Local 159 and Midwest Drywall (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044), the collective bargaining agreement, July 1, 2001 to June 30, 2004, between Painters Local 159 and Midwest Drywall (Additional Midwest Drywall Exhibit 35 attached hereto, document Bates numbered MWD0291 to MWD0327), the collective bargaining agreement, April 1, 1999 to March 31, 2002, between Painters District Council No. 3 and Midwest Drywall (Midwest Drywall's Exhibit 1, document Bates numbered MWD0196 to MWD0212), and the collective bargaining agreement, June 17, 2000 to April 30, 2003, between Painters Local 76 and Midwest Drywall (Additional Midwest

Drywall Exhibit 36 attached hereto, document Bates numbered MWD0213 to MWD0237.)

He applied the fact that these were the only collective bargaining agreements entered into

between Midwest Drywall and a Painters Local Union and/or Painters District Council during

the period from January 1, 2001 to June 30, 2004 (the period reviewed by Pension Fund's

auditor), that among these collective bargaining agreements, only the collective bargaining

agreements entered into between Midwest Drywall and Painters Local 159 specified the

detailed basis on which payments were to be made to the Pension Fund, and that no

individuals represented by Painters Local 159 and employed by Midwest Drywall within the

geographical jurisdiction of Painters Local 159 were brought by Midwest Drywall into an

outside jurisdiction to perform work. He then summarized the hours worked and required

pension payments during the period from January 1, 2001 and June 30, 2004, and found that

Midwest Drywall has made all required payment to the Pension Fund pursuant to the

collective bargaining agreements entered into between Midwest Drywall and Painters Local

Union 159 during the time covered by the Pension Fund's audit report prepared by Mr.

Moore. (S. Regier's Dec.)

Painters Local 159 did not and has not expressly or impliedly represented itself to

Midwest Drywall to be the collective bargaining agent for Midwest Drywall's employees

who work solely in locations outside the jurisdiction of Painters Local 159. (Midwest

Drywall's SOMF ¶ 10, S. Nienke's Dec. ¶ 9.)

Painters Local 159 did not and has not expressly or impliedly represented itself to

Midwest Drywall to be the authorized agent for foreign Painters District Councils and/or

Painters Local Unions. (Midwest Drywall's SOMF ¶ 11, S. Nienke's Dec. ¶ 10.)

In reference to District Councils and Local Unions affiliated with the International

Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters Local 159/District Council 15. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 13.)

Painters District Council 3, Painters District Council 80, and Painters Local Union 76 have not represented to Midwest Drywall that Painters Local 159 was or is the collective bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or was or is their authorized agent for collective bargaining. (Midwest Drywall's SOMF ¶ 1, S. Nienke's Dec. ¶ 12.)

Midwest Drywall is not signatory to and has not entered into any national agreement with the International Painters and Allied Trades Union. The Pension Fund does not claim that Midwest Drywall has done so. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 12 and Compl.)

In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, Midwest Drywall's President, Steven Nienke, met with International Union of Painters and Allied Trades, Local Union #109 (Painters Local 109) representative, Pat Stoysich, and his boss and discussed a proposed Painters Local 109 collective bargaining agreement including jurisdiction: what it would cover and what it would require. Painters Local 109 gave Steven Nienke a copy of a proposed Agreement to cover drywall taper and/or finisher work or installing and/or finishing of exterior insulation finish systems (E.I.F.S.) in specified counties in Iowa and Nebraska, including the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 8, document Bates numbered MWD1182 to MWD1199.) Steven Nienke told Painters Local 109 that he didn't have a problem with the painting work part of the proposed Agreement, but he

did have a problem with the EIFS-exterior insulating finish system because where Midwest Drywall did EIFS work (for example in Las Vegas) that work was under the jurisdiction of the Plasters Local Union, it was not painters' work, and to have EIFS work added to painting work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat Stoysich responded that EIFS work was the way the Agreement was written and he would not negotiate it out. Steven Nienke told Painters Local 109 that he was there to negotiate an Agreement as to painting work; he had no problem signing an Agreement that day only as to painting work. Pat Stoysich said he would check with Painters Local 109's attorney and telephone Steven Nienke later that day. Later, Pat Stoysich telephoned Steven Nienke and said that there was no way Painters Local 109 would change its proposed Agreement, it had to cover EIFS work, too. No Agreement was agreed to between Midwest Drywall and Painters Local 109. (Midwest Drywall's SOMF ¶ 15, S. Nienke's Dec. ¶ 14.)

In a letter dated September 28, 1999, and sent to Midwest Drywall's President, Steven Nienke, Leonard Wittman, representative of Painters Local 159, stated: "It has been brought to my attention that your company was engaged in contracting work covered by the collective bargaining agreement between Midwest Drywall and Painters Local 159 and that Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV 50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this oversight has been rectified by close of business October 8, 1999 to avoid further action by Local 159." (Midwest Drywall's SOMF ¶ 16, S. Nienke's Dec. ¶ 15 and Midwest Drywall's Exhibit 9 document Bates numbered MWD0001.)

In a letter dated October 4, 1999, sent to Leonard Wittman, Steven Nienke, President of Midwest Drywall, stated that "Midwest Drywall Co., Inc. denies that it has violated any

lawful terms of and/or intent of the collective bargaining agreement with Painters Local No. 159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a violation of that agreement and when it claimed the violation had occurred and requested a prompt response. (Midwest Drywall's SOMF ¶ 17, S. Nienke's Dec. ¶ 16 and Midwest Drywall's Exhibit 10 document Bates numbered MWD0003.)

In a letter dated November 3, 1999, to Steven Nienke, Leonard Wittman stated Painters Local 159's intent and meaning of Article IV 50/50 Clause, Section 1 (b) by stating that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who states he has spoken to your company about becoming signatory to his Local. As you can see our Article IV, clearly states that your company agrees to abide by the Agreement in place, in the 'outside the geographical area.'
>
> Please understand it is not the position of Local 159 or that of Local 109 to 'hammer' a contractor into becoming signatory. I am confident that if you or your representative would meet with Mr. Stoysich both sides would come to an agreement."

(Midwest Drywall's SOMF ¶ 18, S. Nienke's Dec. ¶ 17 and Midwest Drywall's Exhibit 11 document Bates numbered MWD0004.)

In a letter dated November 8, 1999, to Leonard Wittman, Midwest Drywall's President, Steven Nienke, stated to Painters Local 159:

> "For your information purpose, prior to your recent correspondence, Midwest Drywall met with Local 109 representatives in Omaha, Nebraska for collective bargaining. Midwest Drywall offered to sign a collective bargaining agreement with Local 109 including lawful clauses of an Agreement. Its offer is still there for Local 109 to accept."

(Midwest Drywall's SOMF ¶ 19, S. Nienke's Dec. ¶ 18 and Midwest Drywall's Exhibit 12 document Bates numbered MWD0045.)

When Midwest Drywall thereafter had not entered into a collective bargaining agreement through a collective bargaining relationship with Painters Local 109, Midwest

Drywall, in March, 2000, was notified that charges had been brought against it for violation of the collective bargaining agreement between Midwest Drywall and Painters Local 159, Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the Joint Committee the power to adjust all disputes and grievances that may arise out of the application or interpretation of the Agreement and that the decisions of the Joint Committee shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶ 20,  S. Nienke's Dec. ¶ 19 and  Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to MWD0039.)

On April 10, 2000, a hearing was held before the Joint Committee and Midwest Drywall was informed that Painters Local 159 asserted a violation of the collective bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest Drywall's continuing failure to enter into a collective bargaining agreement with Painters Local 109 in Omaha, Nebraska. (Midwest Drywall's SOMF ¶ 21, Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)

Midwest Drywall through its President, Steven Nienke, provided facts at the hearing as to its negotiations in the summer of 1999 with Painters Local 109, that they had not reached an agreement, and that Midwest Drywall had not signed an agreement with Painters Local 109. The Joint Committee stated at the close of the hearing that it determined that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local 109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with

Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve the continuing violation. After the Hearing, Leonard Wittman said to Steven Nienke that the Union was "not going to enforce the finding." (Midwest Drywall's SOMF ¶ 21,S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109" ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe

benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's

Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to

MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121,

documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled

"Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator

of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions

(including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit

15, document Bates numbered PF1079.)

Thomas Pfundstein as the Senior Executive Director of the Southern Nevada Chapter

of the Painting and Decorating Contractors of America (PDCA) has responsibilities to

negotiate collective bargaining agreements for contractors concerning work in Southern

Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of

Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed

language to Thomas Pfundstein for a Memorandum of Understanding between Painters

District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January

30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of

Painters District Council 15's proposed language for a Memorandum. In his fax he informed

Steven Nienke that the Memorandum of Understanding would be re-established with the new

July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23,

document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with

Midwest Drywall wherein part of the last sentence that Painters District Council 15 had

proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCAS to represent it in negotiations in 2007 for a new Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas

Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 documents Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered MWD1205 to MWD1208.)

In 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established collective bargaining relationships and entered into collective bargaining agreements that included in their jurisdiction Las Vegas, Nevada with the Southern California-Nevada Regional Council of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, Labors International Union of North America, Local Union No. 872, and Operative Plasters and Cement Masons International Association, Local Union 797. (S. Nienke's Dec. ¶ 7.)

In 1999, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into collective bargaining agreements with the Heartland Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters and Joiners of America (Carpenters Local Union No. 444) covering work performed in specified counties in Iowa and Nebraska that included the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 16, document Bates numbered MWD1315 to MWD1326, MWD0962 to MWD1000, and MWD1253 to MWD1297.)

In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers. (Midwest Drywall's Exhibit 17, document Bates numbered MWD0118 to MWD0121.) Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain work, including drywall taping, finishing and sanding in a defined geographical area in Nebraska and Iowa. (S. Nienke's Dec. ¶ 23 and Midwest Drywall's Exhibit 18 document Bates numbered MWD0122 to MWD0141.)

On May 31, 2003, the collective bargaining agreement between Midwest Drywall and Carpenters Local Union Nos. 444 and 1055 expired. On June 2, 2003, the Carpenters Local Union Nos. 444 and 1055 filed with the National Labor Relations Board's (NLRB) Regional Office a Petition for an election. The NLRB held an election by secret ballot on June 27, 2003, among the employees in the appropriate unit. A majority of the valid votes counted were not cast for the union. Carpenters Local Union Nos. 444 and 1055 filed objections to the conduct of the election with the NLRB's Regional Office. The NLRB directed that a hearing be held on the objections to the election in the agreed upon appropriate unit that included

carpenters and drywall finishers. (Midwest Drywall's Exhibit 19, document Bates numbered MWD7488 to MWD7490.) The NLRB's Regional Office conducted a hearing on the objections, issued recommendations, and the NLRB on September 10, 2003, issued its Decision finding that a majority of the valid ballots were not cast for Carpenters Local Union Nos. 444 and 1055 and it is not the exclusive representative of the bargaining unit employees. (Midwest Drywall's Exhibit 20, document Bates numbered MWD0142 to MWD0143.) During the term of its collective bargaining agreements with Carpenters Local Union Nos. 444 and 1055, Midwest Drywall made contributions for employees performing work covered by the agreements including drywall finishers and tapers, to the Omaha Construction Industry Pension Fund in accord with the negotiated and signed collective bargaining agreements. After the termination of the collective bargaining agreement, Midwest Drywall reached an agreement with the Omaha Construction Industry Pension Fund as to assessment of withdrawal liability and paid an additional $490,000.00 into said Pension Fund. (S. Nienke's Dec. ¶ 24 and Midwest Drywall's Exhibit 21 document Bates numbered MWD0144 to MWD0147.)

Midwest Drywall has had collective bargaining relationships with other affiliated District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and Joiners of America dating back to 1973. Pursuant to 29 U.S.C. § 159(a) and NLRB's certification of the unions as the exclusive bargaining representative for employees in appropriate bargaining units including drywall finishing, Midwest Drywall entered into collective bargaining agreements with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918, #1445, and #2279 covering work performed by its employees including drywall finishing in

specified counties in north central and eastern Kansas (outside of Kansas City). (S. Nienke's Dec. ¶ 25 and Midwest Drywall's Exhibit 22 document Bates numbered MWD0148, MWD0152 to MWD0168, MWD0170, MWD0171 to MWD0187, MWD0149 to MWD0150 and MWD3780 to MWD3800.)

In the spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall's President, Steven Nienke pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the UBCJA proposed an International Agreement to Midwest Drywall. (S. Nienke's Dec. ¶ 30 and Midwest Drywall's Exhibit 27 document Bates numbered MWD1426 to MWD1447.)

On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding wherein, in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the UBCJA, "including but not limited to drywall hanging, drywall finishing and wet wall finish work (plastering)" and that said "provision regarding drywall finish and plastering will not apply in those areas where the Company (Midwest Drywall) is already signed to an agreement with another labor organization as long as such an agreement remains in effect." Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on July 1, 2007. (S. Nienke's Dec. ¶ 31 and Midwest Drywall's Exhibit 28 document Bates numbered MWD0817 to MWD0823.)

20.     Plaintiff's Statement of Fact No. 33:   "The delinquency amount uncovered by the audit is allocated between the Funds as follows:   FTI - $12,722.30; LMCI - $3,233.40; Pension Fund - $603,370.43 (Exhibit 13)."

By the admission in Mr. Moore's Declaration as to what he relied upon in preparing his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV, Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000, Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)  The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the

relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local

159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc.  Responses and Objections to the International Painters and Allied Trades Industry Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to Interrogatory No. 3.14.)

Certified Public Accountant, Steven D. Regier, in preparing his expert opinion report reviewed the collective bargaining agreement, April 15, 1998 to June 30, 2001, between Painters Local 159 and Midwest Drywall (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044), the collective bargaining agreement, July 1, 2001 to June 30, 2004, between Painters Local 159 and Midwest Drywall (Additional Midwest Drywall Exhibit 35 attached hereto, document Bates numbered MWD0291 to MWD0327), the collective bargaining agreement, April 1, 1999 to March 31, 2002, between Painters District Council No. 3 and Midwest Drywall (Midwest Drywall's Exhibit 1, document Bates numbered MWD0196 to MWD0212), and the collective bargaining agreement, June 17, 2000 to April 30, 2003, between Painters Local 76 and Midwest Drywall (Additional Midwest Drywall Exhibit 36 attached hereto, document Bates numbered MWD0213 to MWD0237.) He applied the fact that these were the only collective bargaining agreements entered into between Midwest Drywall and a Painters Local Union and/or Painters District Council during the period from January 1, 2001 to June 30, 2004 (the period reviewed by Pension Fund's auditor), that among these collective bargaining agreements, only the collective bargaining agreements entered into between Midwest Drywall and Painters Local 159 specified the detailed basis on which payments were to be made to the Pension Fund, and that no

individuals represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159 were brought by Midwest Drywall into an outside jurisdiction to perform work. He then summarized the hours worked and required pension payments during the period from January 1, 2001 and June 30, 2004, and found that Midwest Drywall has made all required payment to the Pension Fund pursuant to the collective bargaining agreements entered into between Midwest Drywall and Painters Local Union 159 during the time covered by the Pension Fund's audit report prepared by Mr. Moore. (S. Regier's Dec.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the collective bargaining agent for Midwest Drywall's employees who work solely in locations outside the jurisdiction of Painters Local 159. (Midwest Drywall's SOMF ¶ 10, S. Nienke's Dec. ¶ 9.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the authorized agent for foreign Painters District Councils and/or Painters Local Unions. (Midwest Drywall's SOMF ¶ 11, S. Nienke's Dec. ¶ 10.)

In reference to District Councils and Local Unions affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters Local 159/District Council 15. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 13.)

Painters District Council 3, Painters District Council 80, and Painters Local Union 76 have not represented to Midwest Drywall that Painters Local 159 was or is the collective bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or

was or is their authorized agent for collective bargaining. (Midwest Drywall's SOMF ¶ 1, S. Nienke's Dec. ¶ 12.)

Midwest Drywall is not signatory to and has not entered into any national agreement with the International Painters and Allied Trades Union. The Pension Fund does not claim that Midwest Drywall has done so. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 12 and Compl.)

In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, Midwest Drywall's President, Steven Nienke, met with International Union of Painters and Allied Trades, Local Union #109 (Painters Local 109) representative, Pat Stoysich, and his boss and discussed a proposed Painters Local 109 collective bargaining agreement including jurisdiction: what it would cover and what it would require. Painters Local 109 gave Steven Nienke a copy of a proposed Agreement to cover drywall taper and/or finisher work or installing and/or finishing of exterior insulation finish systems (E.I.F.S.) in specified counties in Iowa and Nebraska, including the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 8, document Bates numbered MWD1182 to MWD1199.) Steven Nienke told Painters Local 109 that he didn't have a problem with the painting work part of the proposed Agreement, but he did have a problem with the EIFS-exterior insulating finish system because where Midwest Drywall did EIFS work (for example in Las Vegas) that work was under the jurisdiction of the Plasters Local Union, it was not painters' work, and to have EIFS work added to painting work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat Stoysich responded that EIFS work was the way the Agreement was written and he would not negotiate it out. Steven Nienke told Painters Local 109 that he was there to negotiate an Agreement as to painting work; he had no problem signing an Agreement that day only as to

painting work. Pat Stoysich said he would check with Painters Local 109's attorney and telephone Steven Nienke later that day. Later, Pat Stoysich telephoned Steven Nienke and said that there was no way Painters Local 109 would change its proposed Agreement, it had to cover EIFS work, too. No Agreement was agreed to between Midwest Drywall and Painters Local 109. (Midwest Drywall's SOMF ¶ 15, S. Nienke's Dec. ¶ 14.)

In a letter dated September 28, 1999, and sent to Midwest Drywall's President, Steven Nienke, Leonard Wittman, representative of Painters Local 159, stated: "It has been brought to my attention that your company was engaged in contracting work covered by the collective bargaining agreement between Midwest Drywall and Painters Local 159 and that Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV 50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this oversight has been rectified by close of business October 8, 1999 to avoid further action by Local 159." (Midwest Drywall's SOMF ¶ 16, S. Nienke's Dec. ¶ 15 and Midwest Drywall's Exhibit 9 document Bates numbered MWD0001.)

In a letter dated October 4, 1999, sent to Leonard Wittman, Steven Nienke, President of Midwest Drywall, stated that "Midwest Drywall Co., Inc. denies that it has violated any lawful terms of and/or intent of the collective bargaining agreement with Painters Local No. 159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a violation of that agreement and when it claimed the violation had occurred and requested a prompt response. (Midwest Drywall's SOMF ¶ 17, S. Nienke's Dec. ¶ 16 and Midwest Drywall's Exhibit 10 document Bates numbered MWD0003.)

In a letter dated November 3, 1999, to Steven Nienke, Leonard Wittman stated Painters Local 159's intent and meaning of Article IV 50/50 Clause, Section 1 (b) by stating that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who states he has spoken to your company about becoming signatory to his Local. As you can see our Article IV, clearly states that your company agrees to abide by the Agreement in place, in the 'outside the geographical area.'
>
> Please understand it is not the position of Local 159 or that of Local 109 to 'hammer' a contractor into becoming signatory. I am confident that if you or your representative would meet with Mr. Stoysich both sides would come to an agreement."

(Midwest Drywall's SOMF ¶ 18, S. Nienke's Dec. ¶ 17 and Midwest Drywall's Exhibit 11 document Bates numbered MWD0004.)

In a letter dated November 8, 1999, to Leonard Wittman, Midwest Drywall's President, Steven Nienke, stated to Painters Local 159:

> "For your information purpose, prior to your recent correspondence, Midwest Drywall met with Local 109 representatives in Omaha, Nebraska for collective bargaining. Midwest Drywall offered to sign a collective bargaining agreement with Local 109 including lawful clauses of an Agreement. Its offer is still there for Local 109 to accept."

(Midwest Drywall's SOMF ¶ 19, S. Nienke's Dec. ¶ 18 and Midwest Drywall's Exhibit 12 document Bates numbered MWD0045.)

When Midwest Drywall thereafter had not entered into a collective bargaining agreement through a collective bargaining relationship with Painters Local 109, Midwest Drywall, in March, 2000, was notified that charges had been brought against it for violation of the collective bargaining agreement between Midwest Drywall and Painters Local 159, Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement

between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the Joint Committee the power to adjust all disputes and grievances that may arise out of the application or interpretation of the Agreement and that the decisions of the Joint Committee shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶ 20,  S. Nienke's Dec. ¶ 19 and  Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to MWD0039.)

On April 10, 2000, a hearing was held before the Joint Committee and Midwest Drywall was informed that Painters Local 159 asserted a violation of the collective bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest Drywall's continuing failure to enter into a collective bargaining agreement with Painters Local 109 in Omaha, Nebraska. (Midwest Drywall's SOMF ¶ 21, Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)

Midwest Drywall through its President, Steven Nienke, provided facts at the hearing as to its negotiations in the summer of 1999 with Painters Local 109, that they had not reached an agreement, and that Midwest Drywall had not signed an agreement with Painters Local 109. The Joint Committee stated at the close of the hearing that it determined that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local 109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve the continuing violation. After the Hearing, Leonard Wittman said to Steven Nienke that the Union was "not going to enforce the finding." (Midwest Drywall's SOMF ¶ 21, S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109" ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121,

documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled "Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions (including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit 15, document Bates numbered PF1079.)

Thomas Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Thomas Pfundstein for a Memorandum of Understanding between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration

of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to

MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and

Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of
> Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall
> (the Employer) constitutes a waiver of Article 4 of the current Painters and
> Decorators Master Agreement, to which the Employer is signatory. The parties agree
> that this Memorandum shall be in effect for the current Agreement, for the duration
> of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's Exhibit 24 document Bates numbered

MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest

Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an

Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to

represent it in negotiations in 2007 for a new Master Agreement with Painters District

Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25

document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with

Painters District Council and Painters Local 159 with the representation by Painters District

Council 15 that it would re-issue a new Memorandum of Understanding with Midwest

Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters

District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email

on July 11, 2007, and asked if he had a new Memorandum of Understanding from the

Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein

talked with John Smirk who said that he would re-issue a new letter for the new

agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered MWD1205 to MWD1208.)

In 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established collective bargaining relationships and entered into collective bargaining agreements that included in their jurisdiction Las Vegas, Nevada with the Southern California-Nevada Regional Council of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, Labors International Union of North America, Local Union No. 872, and Operative Plasters and Cement Masons International Association, Local Union 797. (S. Nienke's Dec. ¶ 7.)

In 1999, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into collective bargaining agreements with the Heartland

Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters and Joiners of America (Carpenters Local Union No. 444) covering work performed in specified counties in Iowa and Nebraska that included the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 16, document Bates numbered MWD1315 to MWD1326, MWD0962 to MWD1000, and MWD1253 to MWD1297.)

In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers. (Midwest Drywall's Exhibit 17, document Bates numbered MWD0118 to MWD0121.) Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain work, including drywall taping, finishing and sanding in a defined geographical area in Nebraska and Iowa. (S. Nienke's Dec. ¶ 23 and Midwest Drywall's Exhibit 18 document Bates numbered MWD0122 to MWD0141.)

On May 31, 2003, the collective bargaining agreement between Midwest Drywall and Carpenters Local Union Nos. 444 and 1055 expired. On June 2, 2003, the Carpenters Local Union Nos. 444 and 1055 filed with the National Labor Relations Board's (NLRB) Regional Office a Petition for an election. The NLRB held an election by secret ballot on June 27, 2003, among the employees in the appropriate unit. A majority of the valid votes counted were not cast for the union. Carpenters Local Union Nos. 444 and 1055 filed objections to the conduct of the election with the NLRB's Regional Office. The NLRB directed that a hearing be held on the objections to the election in the agreed upon appropriate unit that included carpenters and drywall finishers. (Midwest Drywall's Exhibit 19, document Bates numbered MWD7488 to MWD7490.) The NLRB's Regional Office conducted a hearing on the

objections, issued recommendations, and the NLRB on September 10, 2003, issued its

Decision finding that a majority of the valid ballots were not cast for Carpenters Local Union

Nos. 444 and 1055 and it is not the exclusive representative of the bargaining unit employees.

(Midwest Drywall's Exhibit 20, document Bates numbered MWD0142 to MWD0143.)

During the term of its collective bargaining agreements with Carpenters Local Union Nos.

444 and 1055, Midwest Drywall made contributions for employees performing work covered

by the agreements including drywall finishers and tapers, to the Omaha Construction Industry

Pension Fund in accord with the negotiated and signed collective bargaining agreements.

After the termination of the collective bargaining agreement, Midwest Drywall reached an

agreement with the Omaha Construction Industry Pension Fund as to assessment of

withdrawal liability and paid an additional $490,000.00 into said Pension Fund. (S. Nienke's

Dec. ¶ 24 and Midwest Drywall's Exhibit 21 document Bates numbered MWD0144 to

MWD0147.)

      Midwest Drywall has had collective bargaining relationships with other affiliated

District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and

Joiners of America dating back to 1973. Pursuant to 29 U.S.C. § 159(a) and NLRB's

certification of the unions as the exclusive bargaining representative for employees in

appropriate bargaining units including drywall finishing, Midwest Drywall entered into

collective bargaining agreements with the United Brotherhood of Carpenters and Joiners of

America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918,

#1445, and #2279 covering work performed by its employees including drywall finishing in

specified counties in north central and eastern Kansas (outside of Kansas City). (S. Nienke's

Dec. ¶ 25 and Midwest Drywall's Exhibit 22 document Bates numbered MWD0148,

MWD0152 to MWD0168, MWD0170, MWD0171 to MWD0187, MWD0149 to MWD0150 and MWD3780 to MWD3800.)

   In the spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall's President, Steven Nienke pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the UBCJA proposed an International Agreement to Midwest Drywall. (S. Nienke's Dec. ¶ 30 and Midwest Drywall's Exhibit 27 document Bates numbered MWD1426 to MWD1447.)

   On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding wherein, in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the UBCJA, "including but not limited to drywall hanging, drywall finishing and wet wall finish work (plastering)" and that said "provision regarding drywall finish and plastering will not apply in those areas where the Company (Midwest Drywall) is already signed to an agreement with another labor organization as long as such an agreement remains in effect." Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on July 1, 2007. (S. Nienke's Dec. ¶ 31 and Midwest Drywall's Exhibit 28 documents Bates numbered MWD0817 to MWD0823.)

   The Pension Fund does not own the causes of action for any of the Ancillary Funds named in the Complaint. (Midwest Drywall's SOMF ¶ 38, Midwest Drywall's Exhibit 29,

International Painters and Allied Trades Pension Fund Responses and Objections to Midwest

Drywall Co., Inc.'s First Request for Production of Documents to Plaintiff, Midwest

Drywall's Exhibit 30 documents Bates numbered PF1022 to PF1040, Midwest Drywall's

Exhibit 31 document Bates numbered PF1041 to 1058, and Midwest Drywall's Exhibit 32

document Bates numbered PF1294 to PF1310.)


21.     Plaintiff's Statement of Fact No. 34:    "Midwest owes additional contribution

amounts to each of the Funds for the period of July 1, 2004 to the present date (except for the period

of February 8, 2007 through June 30, 2007) as a result of Midwest's continuing violations of the

labor agreements. The amounts of these additional obligations have not yet been liquidated as

additional audits will need to be performed (Meyers Decl. at ¶ 15)."


By the admission in Mr. Moore's Declaration as to what he relied upon in preparing

his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV,

Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest

Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000,

Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to

MWD0113.)  The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by

finding that Midwest Drywall "had not entered into nor become bound by the Other

Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the

Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to

resolve Midwest's continuing violation of the Master Agreement", and without Midwest

Drywall establishing a collective bargaining relationship and entering into and becoming

bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall.  (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to

make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc. Responses and Objections to the International Painters and Allied Trades Industry Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to Interrogatory No. 3.14.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121, documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled "Q" to "CC" from CD Bates numbered MWD4123A.)

Thomas Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern

Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of

Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed

language to Thomas Pfundstein for a Memorandum of Understanding between Painters

District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January

30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of

Painters District Council 15's proposed language for a Memorandum. In his fax he informed

Steven Nienke that the Memorandum of Understanding would be re-established with the new

July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23,

document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with

Midwest Drywall wherein part of the last sentence that Painters District Council 15 had

proposed was changed from "shall be in effect from the date of execution forward for the

duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration

of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to

MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and

Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of
> Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall
> (the Employer) constitutes a waiver of Article 4 of the current Painters and
> Decorators Master Agreement, to which the Employer is signatory. The parties agree
> that this Memorandum shall be in effect for the current Agreement, for the duration
> of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's Exhibit 24 document Bates numbered

MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

"This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered MWD1205 to 1208.)

22.    Plaintiff's Statement of Fact No. 35:    "Midwest owes interest on all delinquent contribution amounts as required by the Funds' rules and regulations (Meyers Dec. at ¶ 18)."

By the admission in Mr. Moore's Declaration as to what he relied upon in preparing his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV, Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000, Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)  The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective

bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc.  Responses and Objections to the International Painters and Allied Trades Industry Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to Interrogatory No. 3.14.)

Certified Public Accountant, Steven D. Regier, in preparing his expert opinion report reviewed the collective bargaining agreement, April 15, 1998 to June 30, 2001, between Painters Local 159 and Midwest Drywall (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044), the collective bargaining agreement, July 1, 2001 to June 30, 2004, between Painters Local 159 and Midwest Drywall (Additional Midwest Drywall Exhibit 35 attached hereto, document Bates numbered MWD0291 to MWD0327), the collective bargaining agreement, April 1, 1999 to March 31, 2002, between Painters District Council No. 3 and Midwest Drywall (Midwest Drywall's Exhibit 1, document Bates numbered MWD0196 to MWD0212), and the collective bargaining agreement, June 17, 2000 to April 30, 2003, between Painters Local 76 and Midwest Drywall (Additional Midwest Drywall Exhibit 36 attached hereto, document Bates numbered MWD0213 to MWD0237.) He applied the fact that these were the only collective bargaining agreements entered into

between Midwest Drywall and a Painters Local Union and/or Painters District Council during the period from January 1, 2001 to June 30, 2004 (the period reviewed by Pension Fund's auditor), that among these collective bargaining agreements, only the collective bargaining agreements entered into between Midwest Drywall and Painters Local 159 specified the detailed basis on which payments were to be made to the Pension Fund, and that no individuals represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159 were brought by Midwest Drywall into an outside jurisdiction to perform work. He then summarized the hours worked and required pension payments during the period from January 1, 2001 and June 30, 2004, and found that Midwest Drywall has made all required payment to the Pension Fund pursuant to the collective bargaining agreements entered into between Midwest Drywall and Painters Local Union 159 during the time covered by the Pension Fund's audit report prepared by Mr. Moore. (S. Regier's Dec.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the collective bargaining agent for Midwest Drywall's employees who work solely in locations outside the jurisdiction of Painters Local 159. (Midwest Drywall's SOMF ¶ 10, S. Nienke's Dec. ¶ 9.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the authorized agent for foreign Painters District Councils and/or Painters Local Unions. (Midwest Drywall's SOMF ¶ 11, S. Nienke's Dec. ¶ 10.)

In reference to District Councils and Local Unions affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with

Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters Local 159/District Council 15. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 13.)

Painters District Council 3, Painters District Council 80, and Painters Local Union 76 have not represented to Midwest Drywall that Painters Local 159 was or is the collective bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or was or is their authorized agent for collective bargaining. (Midwest Drywall's SOMF ¶ 1, S. Nienke's Dec. ¶ 12.)

Midwest Drywall is not signatory to and has not entered into any national agreement with the International Painters and Allied Trades Union. The Pension Fund does not claim that Midwest Drywall has done so. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 12 and Compl.)

In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, Midwest Drywall's President, Steven Nienke, met with International Union of Painters and Allied Trades, Local Union #109 (Painters Local 109) representative, Pat Stoysich, and his boss and discussed a proposed Painters Local 109 collective bargaining agreement including jurisdiction: what it would cover and what it would require. Painters Local 109 gave Steven Nienke a copy of a proposed Agreement to cover drywall taper and/or finisher work or installing and/or finishing of exterior insulation finish systems (E.I.F.S.) in specified counties in Iowa and Nebraska, including the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 8, document Bates numbered MWD1182 to MWD1199.) Steven Nienke told Painters Local 109 that he didn't have a problem with the painting work part of the proposed Agreement, but he did have a problem with the EIFS-exterior insulating finish system because where Midwest Drywall did EIFS work (for example in Las Vegas) that work was under the jurisdiction of

the Plasters Local Union, it was not painters' work, and to have EIFS work added to painting

work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat

Stoysich responded that EIFS work was the way the Agreement was written and he would

not negotiate it out. Steven Nienke told Painters Local 109 that he was there to negotiate an

Agreement as to painting work; he had no problem signing an Agreement that day only as to

painting work. Pat Stoysich said he would check with Painters Local 109's attorney and

telephone Steven Nienke later that day. Later, Pat Stoysich telephoned Steven Nienke and

said that there was no way Painters Local 109 would change its proposed Agreement, it had

to cover EIFS work, too. No Agreement was agreed to between Midwest Drywall and

Painters Local 109. (Midwest Drywall's SOMF ¶ 15, S. Nienke's Dec. ¶ 14.)

In a letter dated September 28, 1999, and sent to Midwest Drywall's President,

Steven Nienke, Leonard Wittman, representative of Painters Local 159, stated:  "It has been

brought to my attention that your company was engaged in contracting work covered by the

collective bargaining agreement between Midwest Drywall and Painters Local 159 and that

Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV

50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this

oversight has been rectified by close of business October 8, 1999 to avoid further action by

Local 159." (Midwest Drywall's SOMF ¶ 16, S. Nienke's Dec. ¶ 15 and Midwest Drywall's

Exhibit 9 document Bates numbered MWD0001.)

In a letter dated October 4, 1999, sent to Leonard Wittman, Steven Nienke, President

of Midwest Drywall, stated that "Midwest Drywall Co., Inc. denies that it has violated any

lawful terms of and/or intent of the collective bargaining agreement with Painters Local No.

159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a

violation of that agreement and when it claimed the violation had occurred and requested a

prompt response. (Midwest Drywall's SOMF ¶ 17, S. Nienke's Dec. ¶ 16 and Midwest

Drywall's Exhibit 10 document Bates numbered MWD0003.)

In a letter dated November 3, 1999, to Steven Nienke, Leonard Wittman stated

Painters Local 159's intent and meaning of Article IV 50/50 Clause, Section 1 (b) by stating

that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who
> states he has spoken to your company about becoming signatory to his Local. As you
> can see our Article IV, clearly states that your company agrees to abide by the
> Agreement in place, in the 'outside the geographical area.'
>
> Please understand it is not the position of Local 159 or that of Local 109 to 'hammer'
> a contractor into becoming signatory. I am confident that if you or your representative
> would meet with Mr. Stoysich both sides would come to an agreement."

(Midwest Drywall's SOMF ¶ 18, S. Nienke's Dec. ¶ 17 and Midwest Drywall's Exhibit 11

document Bates numbered MWD0004.)

In a letter dated November 8, 1999, to Leonard Wittman, Midwest Drywall's

President, Steven Nienke, stated to Painters Local 159:

> "For your information purpose, prior to your recent correspondence, Midwest
> Drywall met with Local 109 representatives in Omaha, Nebraska for collective
> bargaining. Midwest Drywall offered to sign a collective bargaining agreement with
> Local 109 including lawful clauses of an Agreement. Its offer is still there for Local
> 109 to accept."

(Midwest Drywall's SOMF ¶ 19, S. Nienke's Dec. ¶ 18 and Midwest Drywall's Exhibit 12

document Bates numbered MWD0045.)

When Midwest Drywall thereafter had not entered into a collective bargaining

agreement through a collective bargaining relationship with Painters Local 109, Midwest

Drywall, in March, 2000, was notified that charges had been brought against it for violation

of the collective bargaining agreement between Midwest Drywall and Painters Local 159,

Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and

Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement

between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the

Joint Committee the power to adjust all disputes and grievances that may arise out of the

application or interpretation of the Agreement and that the decisions of the Joint Committee

shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶

20,  S. Nienke's Dec. ¶ 19 and  Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to

MWD0039.)

On April 10, 2000, a hearing was held before the Joint Committee and Midwest

Drywall was informed that Painters Local 159 asserted a violation of the collective

bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest

Drywall's continuing failure to enter into a collective bargaining agreement with Painters

Local 109 in Omaha, Nebraska. (Midwest Drywall's SOMF ¶ 21, Midwest Drywall's Exhibit

13 document Bates numbered MWD0110 to MWD0113.)

Midwest Drywall through its President, Steven Nienke, provided facts at the hearing

as to its negotiations in the summer of 1999 with Painters Local 109, that they had not

reached an agreement, and that Midwest Drywall had not signed an agreement with

Painters Local 109. The Joint Committee stated at the close of the hearing that it determined

that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement

in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local

109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with

Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve

the continuing violation. After the Hearing, Leonard Wittman said to Steven Nienke that the

Union was "not going to enforce the finding." (Midwest Drywall's SOMF ¶ 21, S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109" ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to

MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121, documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled "Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions (including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit 15, document Bates numbered PF1079.)

Thomas Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Thomas Pfundstein for a Memorandum of Understanding between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration

of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007,

informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered MWD1205 to MWD1208.)

In 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established collective bargaining relationships and entered into collective bargaining agreements that included in their jurisdiction Las Vegas, Nevada with the Southern California-Nevada Regional Council of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, Labors International Union of North America, Local Union No. 872, and Operative Plasters and Cement Masons International Association, Local Union 797. (S. Nienke's Dec. ¶ 7.)

In 1999, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into collective bargaining agreements with the Heartland Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters

and Joiners of America (Carpenters Local Union No. 444) covering work performed in specified counties in Iowa and Nebraska that included the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 16, document Bates numbered MWD1315 to MWD1326, MWD0962 to MWD1000, and MWD1253 to MWD1297.)

In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers. (Midwest Drywall's Exhibit 17, document Bates numbered MWD0118 to MWD0121.) Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain work, including drywall taping, finishing and sanding in a defined geographical area in Nebraska and Iowa. (S. Nienke's Dec. ¶ 23 and Midwest Drywall's Exhibit 18 document Bates numbered MWD0122 to MWD0141.)

On May 31, 2003, the collective bargaining agreement between Midwest Drywall and Carpenters Local Union Nos. 444 and 1055 expired. On June 2, 2003, the Carpenters Local Union Nos. 444 and 1055 filed with the National Labor Relations Board's (NLRB) Regional Office a Petition for an election. The NLRB held an election by secret ballot on June 27, 2003, among the employees in the appropriate unit. A majority of the valid votes counted were not cast for the union. Carpenters Local Union Nos. 444 and 1055 filed objections to the conduct of the election with the NLRB's Regional Office. The NLRB directed that a hearing be held on the objections to the election in the agreed upon appropriate unit that included carpenters and drywall finishers. (Midwest Drywall's Exhibit 19, document Bates numbered MWD7488 to MWD7490.) The NLRB's Regional Office conducted a hearing on the objections, issued recommendations, and the NLRB on September 10, 2003, issued its

Decision finding that a majority of the valid ballots were not cast for Carpenters Local Union

Nos. 444 and 1055 and it is not the exclusive representative of the bargaining unit employees.

(Midwest Drywall's Exhibit 20, document Bates numbered MWD0142 to MWD0143.)

During the term of its collective bargaining agreements with Carpenters Local Union Nos.

444 and 1055, Midwest Drywall made contributions for employees performing work covered

by the agreements including drywall finishers and tapers, to the Omaha Construction Industry

Pension Fund in accord with the negotiated and signed collective bargaining agreements.

After the termination of the collective bargaining agreement, Midwest Drywall reached an

agreement with the Omaha Construction Industry Pension Fund as to assessment of

withdrawal liability and paid an additional $490,000.00 into said Pension Fund. (S. Nienke's

Dec. ¶ 24 and Midwest Drywall's Exhibit 21 document Bates numbered MWD0144 to

MWD0147.)

        Midwest Drywall has had collective bargaining relationships with other affiliated

District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and

Joiners of America dating back to 1973. Pursuant to 29 U.S.C. § 159(a) and NLRB's

certification of the unions as the exclusive bargaining representative for employees in

appropriate bargaining units including drywall finishing, Midwest Drywall entered into

collective bargaining agreements with the United Brotherhood of Carpenters and Joiners of

America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918,

#1445, and #2279 covering work performed by its employees including drywall finishing in

specified counties in north central and eastern Kansas (outside of Kansas City). (S. Nienke's

Dec. ¶ 25 and Midwest Drywall's Exhibit 22 document Bates numbered MWD0148,

MWD0152 to MWD0168, MWD0170, MWD0171 to MWD0187, MWD0149 to MWD0150 and MWD3780 to MWD3800.)

In the spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall's President, Steven Nienke pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the UBCJA proposed an International Agreement to Midwest Drywall. (S. Nienke's Dec. ¶ 30 and Midwest Drywall's Exhibit 27 document Bates numbered MWD1426 to MWD1447.)

On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding wherein, in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the UBCJA, "including but not limited to drywall hanging, drywall finishing and wet wall finish work (plastering)" and that said "provision regarding drywall finish and plastering will not apply in those areas where the Company (Midwest Drywall) is already signed to an agreement with another labor organization as long as such an agreement remains in effect." Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on July 1, 2007. (S. Nienke's Dec. ¶ 31 and Midwest Drywall's Exhibit 28 documents Bates numbered MWD0817 to MWD0823.)

23.    Plaintiff's Statement of Fact No. 36:  "The Company owes $123,865.19 in liquidated damages based on known delinquent contributions in the amount of $619,325.96 (Meyers Decl. at ¶ 19)."

By the admission in Mr. Moore's Declaration as to what he relied upon in preparing his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV, Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000, Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)  The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest

Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside

jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc.  Responses and Objections to the International Painters and Allied Trades Industry Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to Interrogatory No. 3.14.)

Certified Public Accountant, Steven D. Regier, in preparing his expert opinion report reviewed the collective bargaining agreement, April 15, 1998 to June 30, 2001, between Painters Local 159 and Midwest Drywall (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044), the collective bargaining agreement, July 1, 2001 to June 30, 2004, between Painters Local 159 and Midwest Drywall (Additional Midwest Drywall Exhibit 35 attached hereto, document Bates numbered MWD0291 to MWD0327), the collective bargaining agreement, April 1, 1999 to March 31, 2002, between Painters District Council No. 3 and Midwest Drywall (Midwest Drywall's Exhibit 1, document Bates numbered MWD0196 to MWD0212), and the collective bargaining agreement, June 17, 2000 to April 30, 2003, between Painters Local 76 and Midwest Drywall (Additional Midwest Drywall Exhibit 36 attached hereto, document Bates numbered MWD0213 to MWD0237.) He applied the fact that these were the only collective bargaining agreements entered into between Midwest Drywall and a Painters Local Union and/or Painters District Council during the period from January 1, 2001 to June 30, 2004 (the period reviewed by Pension Fund's auditor), that among these collective bargaining agreements, only the collective bargaining agreements entered into between Midwest Drywall and Painters Local 159 specified the detailed basis on which payments were to be made to the Pension Fund, and that no individuals represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159 were brought by Midwest Drywall into an

outside jurisdiction to perform work. He then summarized the hours worked and required pension payments during the period from January 1, 2001 and June 30, 2004, and found that Midwest Drywall has made all required payment to the Pension Fund pursuant to the collective bargaining agreements entered into between Midwest Drywall and Painters Local Union 159 during the time covered by the Pension Fund's audit report prepared by Mr. Moore. (S. Regier's Dec.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the collective bargaining agent for Midwest Drywall's employees who work solely in locations outside the jurisdiction of Painters Local 159. (Midwest Drywall's SOMF ¶ 10, S. Nienke's Dec. ¶ 9.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the authorized agent for foreign Painters District Councils and/or Painters Local Unions. (Midwest Drywall's SOMF ¶ 11, S. Nienke's Dec. ¶ 10.)

In reference to District Councils and Local Unions affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters Local 159/District Council 15. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 13.)

Painters District Council 3, Painters District Council 80, and Painters Local Union 76 have not represented to Midwest Drywall that Painters Local 159 was or is the collective bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or was or is their authorized agent for collective bargaining. (Midwest Drywall's SOMF ¶ 1, S. Nienke's Dec. ¶ 12.)

Midwest Drywall is not signatory to and has not entered into any national agreement with the International Painters and Allied Trades Union. The Pension Fund does not claim that Midwest Drywall has done so. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 12 and Compl.)

In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, Midwest Drywall's President, Steven Nienke, met with International Union of Painters and Allied Trades, Local Union #109 (Painters Local 109) representative, Pat Stoysich, and his boss and discussed a proposed Painters Local 109 collective bargaining agreement including jurisdiction: what it would cover and what it would require. Painters Local 109 gave Steven Nienke a copy of a proposed Agreement to cover drywall taper and/or finisher work or installing and/or finishing of exterior insulation finish systems (E.I.F.S.) in specified counties in Iowa and Nebraska, including the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 8, document Bates numbered MWD1182 to MWD1199.) Steven Nienke told Painters Local 109 that he didn't have a problem with the painting work part of the proposed Agreement, but he did have a problem with the EIFS-exterior insulating finish system because where Midwest Drywall did EIFS work (for example in Las Vegas) that work was under the jurisdiction of the Plasters Local Union, it was not painters' work, and to have EIFS work added to painting work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat Stoysich responded that EIFS work was the way the Agreement was written and he would not negotiate it out. Steven Nienke told Painters Local 109 that he was there to negotiate an Agreement as to painting work; he had no problem signing an Agreement that day only as to painting work. Pat Stoysich said he would check with Painters Local 109's attorney and telephone Steven Nienke later that day. Later, Pat Stoysich telephoned Steven Nienke and

said that there was no way Painters Local 109 would change its proposed Agreement, it had to cover EIFS work, too. No Agreement was agreed to between Midwest Drywall and Painters Local 109. (Midwest Drywall's SOMF ¶ 15, S. Nienke's Dec. ¶ 14.)

In a letter dated September 28, 1999, and sent to Midwest Drywall's President, Steven Nienke, Leonard Wittman, representative of Painters Local 159, stated: "It has been brought to my attention that your company was engaged in contracting work covered by the collective bargaining agreement between Midwest Drywall and Painters Local 159 and that Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV 50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this oversight has been rectified by close of business October 8, 1999 to avoid further action by Local 159." (Midwest Drywall's SOMF ¶ 16, S. Nienke's Dec. ¶ 15 and Midwest Drywall's Exhibit 9 document Bates numbered MWD0001.)

In a letter dated October 4, 1999, sent to Leonard Wittman, Steven Nienke, President of Midwest Drywall, stated that "Midwest Drywall Co., Inc. denies that it has violated any lawful terms of and/or intent of the collective bargaining agreement with Painters Local No. 159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a violation of that agreement and when it claimed the violation had occurred and requested a prompt response. (Midwest Drywall's SOMF ¶ 17, S. Nienke's Dec. ¶ 16 and Midwest Drywall's Exhibit 10 document Bates numbered MWD0003.)

In a letter dated November 3, 1999, to Steven Nienke, Leonard Wittman stated Painters Local 159's intent and meaning of Article IV 50/50 Clause, Section 1 (b) by stating that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who states he has spoken to your company about becoming signatory to his Local. As you

> can see our Article IV, clearly states that your company agrees to abide by the Agreement in place, in the 'outside the geographical area.'
>
> Please understand it is not the position of Local 159 or that of Local 109 to 'hammer' a contractor into becoming signatory. I am confident that if you or your representative would meet with Mr. Stoysich both sides would come to an agreement."

(Midwest Drywall's SOMF ¶ 18, S. Nienke's Dec. ¶ 17 and Midwest Drywall's Exhibit 11

document Bates numbered MWD0004.)

In a letter dated November 8, 1999, to Leonard Wittman, Midwest Drywall's

President, Steven Nienke, stated to Painters Local 159:

> "For your information purpose, prior to your recent correspondence, Midwest Drywall met with Local 109 representatives in Omaha, Nebraska for collective bargaining. Midwest Drywall offered to sign a collective bargaining agreement with Local 109 including lawful clauses of an Agreement. Its offer is still there for Local 109 to accept."

(Midwest Drywall's SOMF ¶ 19, S. Nienke's Dec. ¶ 18 and Midwest Drywall's Exhibit 12

document Bates numbered MWD0045.)

When Midwest Drywall thereafter had not entered into a collective bargaining

agreement through a collective bargaining relationship with Painters Local 109, Midwest

Drywall, in March, 2000, was notified that charges had been brought against it for violation

of the collective bargaining agreement between Midwest Drywall and Painters Local 159,

Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and

Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement

between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the

Joint Committee the power to adjust all disputes and grievances that may arise out of the

application or interpretation of the Agreement and that the decisions of the Joint Committee

shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶

20, S. Nienke's Dec. ¶ 19 and Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to MWD0039.)

On April 10, 2000, a hearing was held before the Joint Committee and Midwest Drywall was informed that Painters Local 159 asserted a violation of the collective bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest Drywall's continuing failure to enter into a collective bargaining agreement with Painters Local 109 in Omaha, Nebraska. (Midwest Drywall's SOMF ¶ 21, Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)

Midwest Drywall through its President, Steven Nienke, provided facts at the hearing as to its negotiations in the summer of 1999 with Painters Local 109, that they had not reached an agreement, and that Midwest Drywall had not signed an agreement with Painters Local 109. The Joint Committee stated at the close of the hearing that it determined that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local 109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve the continuing violation. After the Hearing, Leonard Wittman said to Steven Nienke that the Union was "not going to enforce the finding." (Midwest Drywall's SOMF ¶ 21,S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of

IBPAT Local Union No. 109" ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall was not contacted further by the Joint Committee, by a Painters Local 159 representative, by a Painters Local 109 representative, or by an IBPAT representative as to the finding of the Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of entering a final order and enforcement. No further action was taken by the Joint Committee, by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S. Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121, documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled "Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions

(including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit 15, document Bates numbered PF1079.)

Thomas Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Thomas Pfundstein for a Memorandum of Understanding between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council 15 agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

"This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall

(the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the agreement reached as to the Memorandum of Understanding. The renewed Memorandum of Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered MWD1205 to MWD1208.)

In 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established collective bargaining relationships and entered into collective bargaining agreements that included in their jurisdiction Las Vegas, Nevada with the Southern California-Nevada Regional Council of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of America, Labors International Union of North America, Local Union No. 872, and Operative Plasters and Cement Masons International Association, Local Union 797. (S. Nienke's Dec. ¶ 7.)

In 1999, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship and entered into collective bargaining agreements with the Heartland Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters and Joiners of America (Carpenters Local Union No. 444) covering work performed in specified counties in Iowa and Nebraska that included the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 16, document Bates numbered MWD1315 to MWD1326, MWD0962 to MWD1000, and MWD1253 to MWD1297.)

In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers. (Midwest Drywall's Exhibit 17, document Bates numbered MWD0118 to MWD0121.) Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain work, including drywall taping, finishing and sanding in a defined geographical area in Nebraska and Iowa. (S. Nienke's Dec. ¶ 23 and Midwest Drywall's Exhibit 18 document Bates numbered MWD0122 to MWD0141.)

On May 31, 2003, the collective bargaining agreement between Midwest Drywall and Carpenters Local Union Nos. 444 and 1055 expired. On June 2, 2003, the Carpenters Local Union Nos. 444 and 1055 filed with the National Labor Relations Board's (NLRB) Regional Office a Petition for an election. The NLRB held an election by secret ballot on June 27, 2003, among the employees in the appropriate unit. A majority of the valid votes counted were not cast for the union. Carpenters Local Union Nos. 444 and 1055 filed objections to the conduct of the election with the NLRB's Regional Office. The NLRB directed that a hearing be held on the objections to the election in the agreed upon appropriate unit that included carpenters and drywall finishers. (Midwest Drywall's Exhibit 19, document Bates numbered MWD7488 to MWD7490.) The NLRB's Regional Office conducted a hearing on the objections, issued recommendations, and the NLRB on September 10, 2003, issued its Decision finding that a majority of the valid ballots were not cast for Carpenters Local Union Nos. 444 and 1055 and it is not the exclusive representative of the bargaining unit employees. (Midwest Drywall's Exhibit 20, document Bates numbered MWD0142 to MWD0143.)

During the term of its collective bargaining agreements with Carpenters Local Union Nos. 444 and 1055, Midwest Drywall made contributions for employees performing work covered by the agreements including drywall finishers and tapers, to the Omaha Construction Industry Pension Fund in accord with the negotiated and signed collective bargaining agreements. After the termination of the collective bargaining agreement, Midwest Drywall reached an agreement with the Omaha Construction Industry Pension Fund as to assessment of withdrawal liability and paid an additional $490,000.00 into said Pension Fund. (S. Nienke's Dec. ¶ 24 and Midwest Drywall's Exhibit 21 document Bates numbered MWD0144 to MWD0147.)

Midwest Drywall has had collective bargaining relationships with other affiliated District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and Joiners of America dating back to 1973. Pursuant to 29 U.S.C. § 159(a) and NLRB's certification of the unions as the exclusive bargaining representative for employees in appropriate bargaining units including drywall finishing, Midwest Drywall entered into collective bargaining agreements with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918, #1445, and #2279 covering work performed by its employees including drywall finishing in specified counties in north central and eastern Kansas (outside of Kansas City). (S. Nienke's Dec. ¶ 25 and Midwest Drywall's Exhibit 22 document Bates numbered MWD0148, MWD0152 to MWD0168, MWD0170, MWD0171 to MWD0187, MWD0149 to MWD0150 and MWD3780 to MWD3800.)

In the spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in

multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall's President, Steven Nienke pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the UBCJA proposed an International Agreement to Midwest Drywall. (S. Nienke's Dec. ¶ 30 and Midwest Drywall's Exhibit 27 document Bates numbered MWD1426 to MWD1447.)

On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding wherein, in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the UBCJA, "including but not limited to drywall hanging, drywall finishing and wet wall finish work (plastering)" and that said "provision regarding drywall finish and plastering will not apply in those areas where the Company (Midwest Drywall) is already signed to an agreement with another labor organization as long as such an agreement remains in effect." Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on July 1, 2007. (S. Nienke's Dec. ¶ 31 and Midwest Drywall's Exhibit 28 document Bates numbered MWD0817 to MWD0823.)

24.     Plaintiff's Statement of Fact No. 37:   "As a signatory to the labor agreements, the Company is obligated to reimburse the Fund for the cost of a compliance audit. The Company also owes audit costs in the amount of $3,484.57 (Meyers Decl. at ¶ 18)."

By the admission in Mr. Moore's Declaration as to what he relied upon in preparing his audit report, the Pension Fund's auditor did not apply the interpretation of Article IV, Section 1(b) (50-50 Clause) in the collective bargaining agreement between Midwest Drywall and Painters Local 159 as found by the Joint Committee in the April 14, 2000, Decision and Order. (Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)  The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109", ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing violation of the Master Agreement", and without Midwest Drywall establishing a collective bargaining relationship and entering into and becoming bound to the outside jurisdiction agreement, the Joint Committee did not impose the cost of foreign wages and benefits on Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

Except through its collective bargaining relationships with Painters District Council 80, Painters District Council 3, and Painters Local Union 76, Midwest Drywall has not entered into a collective bargaining agreement with a Painters District Council and/or Painters Local Union as to employees represented by a Painters District Council and/or a Painters Local Union outside the jurisdiction of Painters Local Union 159. During the relevant time period, the collective bargaining agreements entered into between Painters District Council 3 and Midwest Drywall and between Painters Local 76 and Midwest Drywall do not contain any basis upon which payments are to be made to the Pension Fund. In a prior collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make, as specified in said collective

bargaining agreement for employees covered by said collective bargaining agreement, contributions to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT-JATF) and to the International Union of Painters and Allied Trades Labor Management Cooperative Fund (LMCF) and made contributions as specified in said collective bargaining agreement. In the current collective bargaining agreement entered into between Painters Local 76 and Midwest Drywall, Midwest Drywall agreed to make contributions as specified in said collective bargaining agreement to the IUPAT-JATF and has made contributions as specified in said collective bargaining agreement. In a collective bargaining agreement entered into between Midwest Drywall and Painters District Council 80 effective from July 13, 1999, until the substantial completion of Midwest Drywall's work on the FDA Jefferson Laboratories, Jefferson, Arkansas job, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Pension Fund and made contributions as specified in said collective bargaining agreement. In the collective bargaining agreement entered into between District Council 3 and Midwest Drywall, Midwest Drywall agreed to make contributions for employees covered by said agreement to the Labor Management Cooperative Fund and made contributions as specified in said collective bargaining agreement. In reference to the employees represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159, Midwest Drywall has checked is records during the relevant time frame and found that none of these employees were brought by Midwest Drywall to work in an outside jurisdiction. (Additional Midwest Drywall Exhibit 34 attached hereto, Midwest Drywall Co., Inc.  Responses and Objections to the International Painters and Allied Trades Industry

Pension Fund's Interrogatories to Midwest Drywall Co., Inc. (First Set) Answer to Interrogatory No. 3.14.)

Certified Public Accountant, Steven D. Regier, in preparing his expert opinion report reviewed the collective bargaining agreement, April 15, 1998 to June 30, 2001, between Painters Local 159 and Midwest Drywall (Midwest Drywall's Exhibit 3, document Bates numbered MWD0005 to MWD0044), the collective bargaining agreement, July 1, 2001 to June 30, 2004, between Painters Local 159 and Midwest Drywall (Additional Midwest Drywall Exhibit 35 attached hereto, document Bates numbered MWD0291 to MWD0327), the collective bargaining agreement, April 1, 1999 to March 31, 2002, between Painters District Council No. 3 and Midwest Drywall (Midwest Drywall's Exhibit 1, document Bates numbered MWD0196 to MWD0212), and the collective bargaining agreement, June 17, 2000 to April 30, 2003, between Painters Local 76 and Midwest Drywall (Additional Midwest Drywall Exhibit 36 attached hereto, document Bates numbered MWD0213 to MWD0237.) He applied the fact that these were the only collective bargaining agreements entered into between Midwest Drywall and a Painters Local Union and/or Painters District Council during the period from January 1, 2001 to June 30, 2004 (the period reviewed by Pension Fund's auditor), that among these collective bargaining agreements, only the collective bargaining agreements entered into between Midwest Drywall and Painters Local 159 specified the detailed basis on which payments were to be made to the Pension Fund, and that no individuals represented by Painters Local 159 and employed by Midwest Drywall within the geographical jurisdiction of Painters Local 159 were brought by Midwest Drywall into an outside jurisdiction to perform work. He then summarized the hours worked and required pension payments during the period from January 1, 2001 and June 30, 2004, and found that

Midwest Drywall has made all required payment to the Pension Fund pursuant to the collective bargaining agreements entered into between Midwest Drywall and Painters Local Union 159 during the time covered by the Pension Fund's audit report prepared by Mr. Moore. (S. Regier's Dec.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the collective bargaining agent for Midwest Drywall's employees who work solely in locations outside the jurisdiction of Painters Local 159. (Midwest Drywall's SOMF ¶ 10, S. Nienke's Dec. ¶ 9.)

Painters Local 159 did not and has not expressly or impliedly represented itself to Midwest Drywall to be the authorized agent for foreign Painters District Councils and/or Painters Local Unions. (Midwest Drywall's SOMF ¶ 11, S. Nienke's Dec. ¶ 10.)

In reference to District Councils and Local Unions affiliated with the International Union of Painters and Allied Trades, AFL-CIO, CLC, Midwest Drywall has only had collective bargaining relations with and entered into collective bargaining agreements with Painters District Council 3, Painters District Council 80, Painters Local 76, and Painters Local 159/District Council 15. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 13.)

Painters District Council 3, Painters District Council 80, and Painters Local Union 76 have not represented to Midwest Drywall that Painters Local 159 was or is the collective bargaining agent for Midwest Drywall's employees working in their jurisdictional areas or was or is their authorized agent for collective bargaining. (Midwest Drywall's SOMF ¶ 1, S. Nienke's Dec. ¶ 12.)

Midwest Drywall is not signatory to and has not entered into any national agreement with the International Painters and Allied Trades Union. The Pension Fund does not claim

that Midwest Drywall has done so. (Midwest Drywall's SOMF ¶ 13, S. Nienke's Dec. ¶ 12 and Compl.)

In the summer of 1999, at Midwest Drywall's Omaha, Nebraska office, Midwest Drywall's President, Steven Nienke, met with International Union of Painters and Allied Trades, Local Union #109 (Painters Local 109) representative, Pat Stoysich, and his boss and discussed a proposed Painters Local 109 collective bargaining agreement including jurisdiction: what it would cover and what it would require. Painters Local 109 gave Steven Nienke a copy of a proposed Agreement to cover drywall taper and/or finisher work or installing and/or finishing of exterior insulation finish systems (E.I.F.S.) in specified counties in Iowa and Nebraska, including the city of Omaha, Nebraska. (Midwest Drywall's Exhibit 8, document Bates numbered MWD1182 to MWD1199.) Steven Nienke told Painters Local 109 that he didn't have a problem with the painting work part of the proposed Agreement, but he did have a problem with the EIFS-exterior insulating finish system because where Midwest Drywall did EIFS work (for example in Las Vegas) that work was under the jurisdiction of the Plasters Local Union, it was not painters' work, and to have EIFS work added to painting work in an Agreement with the Painters would cause problems for Midwest Drywall. Pat Stoysich responded that EIFS work was the way the Agreement was written and he would not negotiate it out. Steven Nienke told Painters Local 109 that he was there to negotiate an Agreement as to painting work; he had no problem signing an Agreement that day only as to painting work. Pat Stoysich said he would check with Painters Local 109's attorney and telephone Steven Nienke later that day. Later, Pat Stoysich telephoned Steven Nienke and said that there was no way Painters Local 109 would change its proposed Agreement, it had

to cover EIFS work, too. No Agreement was agreed to between Midwest Drywall and Painters Local 109. (Midwest Drywall's SOMF ¶ 15, S. Nienke's Dec. ¶ 14.)

In a letter dated September 28, 1999, and sent to Midwest Drywall's President, Steven Nienke, Leonard Wittman, representative of Painters Local 159, stated: "It has been brought to my attention that your company was engaged in contracting work covered by the collective bargaining agreement between Midwest Drywall and Painters Local 159 and that Midwest Drywall Co., Inc. appears to be in violation of that agreement to wit: Article IV 50/50 Clause, Section 1 (b)", and requested Midwest Drywall to "notify this office that this oversight has been rectified by close of business October 8, 1999 to avoid further action by Local 159." (Midwest Drywall's SOMF ¶ 16, S. Nienke's Dec. ¶ 15 and Midwest Drywall's Exhibit 9 document Bates numbered MWD0001.)

In a letter dated October 4, 1999, sent to Leonard Wittman, Steven Nienke, President of Midwest Drywall, stated that "Midwest Drywall Co., Inc. denies that it has violated any lawful terms of and/or intent of the collective bargaining agreement with Painters Local No. 159" and asked Painters Local 159 what it claimed Midwest Drywall had done that was a violation of that agreement and when it claimed the violation had occurred and requested a prompt response. (Midwest Drywall's SOMF ¶ 17, S. Nienke's Dec. ¶ 16 and Midwest Drywall's Exhibit 10 document Bates numbered MWD0003.)

In a letter dated November 3, 1999, to Steven Nienke, Leonard Wittman stated Painters Local 159's intent and meaning of Article IV 50/50 Clause, Section 1 (b) by stating that:

> "Local 159 is in contact with Mr. Pat Stoysich of Local 109 in Omaha Nebraska who states he has spoken to your company about becoming signatory to his Local. As you can see our Article IV, clearly states that your company agrees to abide by the Agreement in place, in the 'outside the geographical area.'

Please understand it is not the position of Local 159 or that of Local 109 to 'hammer' a contractor into becoming signatory. I am confident that if you or your representative would meet with Mr. Stoysich both sides would come to an agreement."

(Midwest Drywall's SOMF ¶ 18, S. Nienke's Dec. ¶ 17 and Midwest Drywall's Exhibit 11

document Bates numbered MWD0004.)

In a letter dated November 8, 1999, to Leonard Wittman, Midwest Drywall's

President, Steven Nienke, stated to Painters Local 159:

"For your information purpose, prior to your recent correspondence, Midwest Drywall met with Local 109 representatives in Omaha, Nebraska for collective bargaining. Midwest Drywall offered to sign a collective bargaining agreement with Local 109 including lawful clauses of an Agreement. Its offer is still there for Local 109 to accept."

(Midwest Drywall's SOMF ¶ 19, S. Nienke's Dec. ¶ 18 and Midwest Drywall's Exhibit 12

document Bates numbered MWD0045.)

When Midwest Drywall thereafter had not entered into a collective bargaining

agreement through a collective bargaining relationship with Painters Local 109, Midwest

Drywall, in March, 2000, was notified that charges had been brought against it for violation

of the collective bargaining agreement between Midwest Drywall and Painters Local 159,

Article IV, 50-50 Clause, Section 1, and that a hearing would be held by the Painters and

Decorators Joint Committee, Inc. (Joint Committee). The collective bargaining agreement

between Midwest Drywall and Painters Local 159 in Article XXV, Section 6(A), vests in the

Joint Committee the power to adjust all disputes and grievances that may arise out of the

application or interpretation of the Agreement and that the decisions of the Joint Committee

shall be final and binding on both parties to the Agreement. (Midwest Drywall's SOMF ¶

20,  S. Nienke's Dec. ¶ 19 and  Midwest Drywall's Exhibit 3 at Bates numbers MWD0038 to

MWD0039.)

On April 10, 2000, a hearing was held before the Joint Committee and Midwest Drywall was informed that Painters Local 159 asserted a violation of the collective bargaining agreement, Article IV, Section 1(b), (50-50 Clause), caused by Midwest Drywall's continuing failure to enter into a collective bargaining agreement with Painters Local 109 in Omaha, Nebraska. (Midwest Drywall's SOMF ¶ 21, Midwest Drywall's Exhibit 13 document Bates numbered MWD0110 to MWD0113.)

Midwest Drywall through its President, Steven Nienke, provided facts at the hearing as to its negotiations in the summer of 1999 with Painters Local 109, that they had not reached an agreement, and that Midwest Drywall had not signed an agreement with Painters Local 109. The Joint Committee stated at the close of the hearing that it determined that Midwest Drywall had violated the 50-50 Clause because it had not signed an agreement in Omaha with Painters Local 109, it wanted Midwest Drywall to work with Painters Local 109 to sign a collective bargaining agreement, and directed Painters Local 159 to work with Painters Local 109 and the International Brotherhood of Painters & Allied Trades to resolve the continuing violation. After the Hearing, Leonard Wittman said to Steven Nienke that the Union was "not going to enforce the finding." (Midwest Drywall's SOMF ¶ 21, S. Nienke's Dec. ¶ 20.)

The Joint Committee issued its Decision and Order on April 14, 2000, (Midwest Drywall's Exhibit 13, document Bates numbered MWD0110 to MWD0113.) The Joint Committee interpreted Article IV, 50-50 Clause, Section 1(b) by finding that Midwest Drywall "had not entered into nor become bound by the Other Jurisdiction Agreement of IBPAT Local Union No. 109" ordered Midwest Drywall and the Union to "forthwith initiate good faith discussion and efforts" with Painters Local 109 "to resolve Midwest's continuing

violation of the Master Agreement", and without Midwest Drywall establishing a collective

bargaining relationship and entering into and becoming bound to the outside jurisdiction

agreement, the Joint Committee did not impose the cost of foreign wages and benefits on

Midwest Drywall. (Midwest Drywall's Exhibit 13, pp. 2-3.)

After receipt of the Decision and Order of the Joint Committee, Midwest Drywall

was not contacted further by the Joint Committee, by a Painters Local 159 representative, by

a Painters Local 109 representative, or by an IBPAT representative as to the finding of the

Joint Committee. The Joint Committee retained jurisdiction of the matter for purpose of

entering a final order and enforcement. No further action was taken by the Joint Committee,

by Painters Local 159, or by Painters Local 109. (Midwest Drywall's SOMF ¶ 22, S.

Nienke's Dec. ¶ 21.)

Since April, 2000, the Joint Committee has on numerous occasions stated in written

communication to Midwest Drywall that Midwest Drywall is current in its payment of fringe

benefits. (Midwest Drywall's SOMF ¶ 23, S. Nienke's Dec. ¶ 22 and Midwest Drywall's

Exhibit 14 documents Bates numbered MWD9381 to MWD9382, MWD9536 to

MWD9542, and documents labeled "A" to "F" from CD Bates numbered MWD4121,

documents labeled "G" to "P" from CD Bates numbered MWD4123, and documents labeled

"Q" to "CC" from CD Bates numbered MWD4123A.)

On April 16, 2004, Painters Local 159 in an email to Gary Meyers, the Administrator

of the Pension Fund, stated that Midwest Drywall is "living up to the terms and conditions

(including wage and benefit increases) of the new agreement." (Midwest Drywall's Exhibit

15, document Bates numbered PF1079.)

Thomas Pfundstein as the Senior Executive Director of the Southern Nevada Chapter of the Painting and Decorating Contractors of America (PDCA) has responsibilities to negotiate collective bargaining agreements for contractors concerning work in Southern Nevada, including the Las Vegas, Nevada. On January 30, 2007, the International Union of Painters and Allied Trades, District Council 15 (Painters District Council 15) proposed language to Thomas Pfundstein for a Memorandum of Understanding between Painters District Council 15 (which includes Painters Local 159) and Midwest Drywall. On January 30, 2007, Thomas Pfundstein sent a fax to Steven Nienke of Midwest Drywall with a copy of Painters District Council 15's proposed language for a Memorandum. In his fax he informed Steven Nienke that the Memorandum of Understanding would be re-established with the new July 1, 2007, Master Agreement. (S. Nienke's Dec. ¶ 26 and Midwest Drywall's Exhibit 23, document Bates numbered MWD1200 to MWD1201.)

Thereafter, Painters District Council 15 agreed to a Memorandum of Understanding with Midwest Drywall wherein part of the last sentence that Painters District Council 15 had proposed was changed from "shall be in effect from the date of execution forward for the duration of the Agreement" to "shall be in effect for the current Agreement, for the Duration of the Agreement." (Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201 and Midwest Drywall Exhibit 24 document Bates numbered MWD0377).

The Memorandum of Understanding entered into by Painters District Council 15 and Midwest Drywall on February 8, 2007, provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(S. Nienke's Dec. ¶ 27 and Midwest Drywall's 24 document Bates numbered MWD0377.)

In reliance upon the representations made by Painters District Council 15 to Midwest Drywall's collective bargaining representative, Midwest Drywall agreed to and signed an Assignment of Bargaining Rights authorizing the Negotiating Committee of the PDCA to represent it in negotiations in 2007 for a new Master Agreement with Painters District Council 15 and Painters Local 159. (S. Nienke's Dec. ¶ 28 and Midwest Drywall's Exhibit 25 document Bates numbered MWD1202 to MWD1203.)

The PDCA negotiated a new Master Agreement on Midwest Drywall's behalf with Painters District Council 15 and Painters Local 159 with the representation by Painters District Council 15 that it would re-issue a new Memorandum of Understanding with Midwest Drywall. In July, 2007, after negotiations for the new Master Agreement with Painters District Council 15 had been completed, Steven Nienke sent Thomas Pfundstein an email on July 11, 2007, and asked if he had a new Memorandum of Understanding from the Painters for Midwest Drywall Co., Inc. The next day, July 12, 2007, Thomas Pfundstein talked with John Smirk who said that he would re-issue a new letter for the new agreement. Thomas Pfundstein sent an email to Steven Nienke on July 12, 2007, informing Steven Nienke what John Smirk said. (Midwest Drywall's SOMF ¶ 34, S. Nienke's Dec. ¶ 29, and Midwest Drywall's Exhibit 23 document Bates numbered MWD1200 to MWD1201, and Midwest Drywall's Exhibit 26 document Bates numbered MWD1200 and MWD1204.)

Pursuant to 29 U.S.C. § 158(d), Midwest Drywall, by letter dated September 25, 2007, requested Painters District Council 15 to execute a written agreement incorporating the

agreement reached as to the Memorandum of Understanding. The renewed Memorandum of

Understanding provides:

> "This Memorandum of Understanding between International Union of Painters and Allied Trades, District Council 15 (the Union) and Midwest Drywall (the Employer) constitutes a waiver of Article 4 of the current Painters and Decorators Master Agreement, to which the Employer is signatory. The parties agree that this Memorandum shall be in effect for the current Agreement, for the duration of the Agreement."

(Additional Midwest Drywall Exhibit 33 attached hereto, document Bates numbered

MWD1205 to MWD1208.)

In 1998, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established collective

bargaining relationships and entered into collective bargaining agreements that included in

their jurisdiction Las Vegas, Nevada with the Southern California-Nevada Regional Council

of Carpenters and Affiliated Local Unions, United Brotherhood of Carpenters and Joiners of

America, Labors International Union of North America, Local Union No. 872, and Operative

Plasters and Cement Masons International Association, Local Union 797. (S. Nienke's Dec. ¶

7.)

In 1999, Midwest Drywall pursuant to 29 U.S.C. § 158(f) established a collective

bargaining relationship and entered into collective bargaining agreements with the Heartland

Regional Council of Carpenters affiliated Local 444 of the United Brotherhood of Carpenters

and Joiners of America (Carpenters Local Union No. 444) covering work performed in

specified counties in Iowa and Nebraska that included the city of Omaha, Nebraska.

(Midwest Drywall's Exhibit 16, document Bates numbered MWD1315 to MWD1326,

MWD0962 to MWD1000, and MWD1253 to MWD1297.)

In a letter dated November 30, 2001, Carpenters Local Union No. 444 submitted

evidence to Midwest Drywall that it represented a majority of Midwest Drywall's tapers.

(Midwest Drywall's Exhibit 17, document Bates numbered MWD0118 to MWD0121.)
Thereafter, Midwest Drywall pursuant to 29 U.S.C. § 158(f) entered into a collective
bargaining agreement with Carpenters Local Union Nos. 444 and 1055 covering certain
work, including drywall taping, finishing and sanding in a defined geographical area in
Nebraska and Iowa. (S. Nienke's Dec. ¶ 23 and Midwest Drywall's Exhibit 18 document
Bates numbered MWD0122 to MWD0141.)

On May 31, 2003, the collective bargaining agreement between Midwest Drywall and
Carpenters Local Union Nos. 444 and 1055 expired. On June 2, 2003, the Carpenters Local
Union Nos. 444 and 1055 filed with the National Labor Relations Board's (NLRB) Regional
Office a Petition for an election. The NLRB held an election by secret ballot on June 27,
2003, among the employees in the appropriate unit. A majority of the valid votes counted
were not cast for the union. Carpenters Local Union Nos. 444 and 1055 filed objections to the
conduct of the election with the NLRB's Regional Office. The NLRB directed that a hearing
be held on the objections to the election in the agreed upon appropriate unit that included
carpenters and drywall finishers. (Midwest Drywall's Exhibit 19, document Bates numbered
MWD7488 to MWD7490.) The NLRB's Regional Office conducted a hearing on the
objections, issued recommendations, and the NLRB on September 10, 2003, issued its
Decision finding that a majority of the valid ballots were not cast for Carpenters Local Union
Nos. 444 and 1055 and it is not the exclusive representative of the bargaining unit employees.
(Midwest Drywall's Exhibit 20, document Bates numbered MWD0142 to MWD0143.)
During the term of its collective bargaining agreements with Carpenters Local Union Nos.
444 and 1055, Midwest Drywall made contributions for employees performing work covered
by the agreements including drywall finishers and tapers, to the Omaha Construction Industry

Pension Fund in accord with the negotiated and signed collective bargaining agreements. After the termination of the collective bargaining agreement, Midwest Drywall reached an agreement with the Omaha Construction Industry Pension Fund as to assessment of withdrawal liability and paid an additional $490,000.00 into said Pension Fund. (S. Nienke's Dec. ¶ 24 and Midwest Drywall's Exhibit 21 document Bates numbered MWD0144 to MWD0147.)

Midwest Drywall has had collective bargaining relationships with other affiliated District/Regional Councils/or Local Unions of the United Brotherhood of Carpenters and Joiners of America dating back to 1973. Pursuant to 29 U.S.C. § 159(a) and NLRB's certification of the unions as the exclusive bargaining representative for employees in appropriate bargaining units including drywall finishing, Midwest Drywall entered into collective bargaining agreements with the United Brotherhood of Carpenters and Joiners of America, AFL-CIO, Kaw Valley & Vicinity District Council of Carpenters, Locals #918, #1445, and #2279 covering work performed by its employees including drywall finishing in specified counties in north central and eastern Kansas (outside of Kansas City). (S. Nienke's Dec. ¶ 25 and Midwest Drywall's Exhibit 22 document Bates numbered MWD0148, MWD0152 to MWD0168, MWD0170, MWD0171 to MWD0187, MWD0149 to MWD0150 and MWD3780 to MWD3800.)

In the spring of 2007, United Brotherhood of Carpenters and Joiners of America District Councils and Local Unions engaged in informational picketing at various job sites in multiple states where Midwest Drywall employees were performing work on construction projects. Because of this and other reasons, in June, 2007, Midwest Drywall's President, Steven Nienke pursuant to 29 U.S.C. § 158(f) established a collective bargaining relationship

with the United Brotherhood of Carpenters and Joiners of America (UBCJA) and the UBCJA proposed an International Agreement to Midwest Drywall. (S. Nienke's Dec. ¶ 30 and Midwest Drywall's Exhibit 27 document Bates numbered MWD1426 to MWD1447.)

On June 28, 2007, Midwest Drywall and the UBCJA agreed to a Memorandum of Understanding wherein, in addition to other provisions, Midwest Drywall agreed to become signatory to a No. 1 International Agreement and a Drywall Addendum with the UBCJA for the period July 1, 2007 to June 30, 2011, to cover all work within the jurisdiction of the UBCJA, "including but not limited to drywall hanging, drywall finishing and wet wall finish work (plastering)" and that said "provision regarding drywall finish and plastering will not apply in those areas where the Company (Midwest Drywall) is already signed to an agreement with another labor organization as long as such an agreement remains in effect." Midwest Drywall became signatory to No. 1 International Agreement with the UBCJA on July 1, 2007. (S. Nienke's Dec. ¶ 31 and Midwest Drywall's Exhibit 28 document Bates numbered MWD0817 to MWD0823.)

Respectfully submitted,

By  s/Robert D. Overman
Robert D. Overman
KS Bar No. 08155
MORRIS, LAING, EVANS, BROCK & KENNEDY, CHTD.
300 N. Mead, Suite 200
Wichita, Kansas  67202-2722
Telephone:  (316) 262-2671
Facsimile:  (316) 262-6226
E-mail:  roverman@morrislaing.com

Charles F. Walters
D.C. Bar No. 444529
SEYFARTH SHAW, LLP
815 Connecticut Avenue, N.W.
Suite 500
Washington, DC  20006
Telephone:  (202) 263-2400
Facsimile:  (202) 828-5393
E-mail:  cwalters@seyfarth.com

February 6, 2008                *Attorneys for Defendant Midwest
                                Drywall Co., Inc.*