EXHIBIT 36

## COLLECTIVE BARGAINING AGREEMENT

Between

International Union of Painters and Allied Trades, AFL-CIO,CLC
District Council 3
Local Union 76

And

MIDWEST DRYWALL CO., INC.

Effective:        June 17, 2000
Ending:           April 30, 2003

## COLLECTIVE BARGAINING AGREEMENT

This Agreement made and entered into this Seventeenth day of June, 2000, by and between the International Union of Painters and Allied Trades, AFL-CIO, District Council 3, Local Union No. 76, hereinafter called the "Union" and Midwest Drywall Co., Inc., hereinafter called the "Employer" and/or any other contractor who wishes to operate under this Agreement and attaches his signature hereto.

## ARTICLE I
## RECOGNITION

SECTION 1.  Purpose - Recognition - Bargaining and Geographical Area:

The Purpose of this agreement is to provide by collective bargaining, for the establishment of uniform wage rates, hours, and working conditions and to foster harmonious employer - employee relationship between the "Employer" and the "Union".

This agreement as expressly set forth herein constitutes the extent of the parties commitments to one another on all matters relating to wages, hours and working conditions.    All prior agreements, understanding, practices, oral and/or written, expressed or implied, whose continuation is not expressly provided for herein, are hereby canceled.

The Employer therefore recognizes District Council #3, Local Union 76 of the International Union of Painters and Allied Trades, in its own craft jurisdiction, as the sole and exclusive bargaining agent for all the employees of the Employer engaged in the performance of work covered by this agreement as stated in Article II, Jurisdiction of work.

It is agreed between the parties hereto that this Agreement has full force and effect in the territorial jurisdiction of the Union and said territorial jurisdiction is herein defined to include the following named counties in Kansas: Barber, Barton, Butler, Clark, Comanche, Cowley, Edwards, Finney, Ford, Grant, Gray, Greenwood, Harper, Harvey, Haskell, Hodgeman, Kearney, Kingman, Kiowa, Lane, Marion, McPherson, Mead, Ness, Pratt, Pawnee, Reno, Rice, Rush, Scott, Sedgwick, Seward, Stafford, Stevens, Sumner, and Wichita counties.  Butler, Cowley, Kingman, Harvey, Reno, Sedgwick, and Sumner counties are referred to as Zone A in this Agreement.    Barber, Barton, Clark,

Comanche, Edwards, Finney, Ford, Grant, Gray, Greenwood, Harper, Haskell, Hodgeman, Kearney, Kiowa, Lane, Marion, McPherson, Mead, Ness, Pratt, Pawnee, Rice, Rush, Scott, Seward, Stafford, Stevens, and Wichita counties are referred to as Zone B in this agreement.

## ARTICLE II
## JURISDICTION OF WORK

**Section 1.**    The Employer hereby recognizes the jurisdiction of the Union over work to be that work that has historically and traditionally been previously performed by members of Local Union 76 now recognized as District Council #3, in the geographical jurisdiction of the Agreement.  Nothing contained in this Article is designed to limit or change current industry practices.  This work jurisdiction shall include, but not be limited to the following areas and applicable wage rates.

Brush and Roll, Drywall Taper, Surface preparation, Wall covering, Bazooka, Box and Power sander operators, Storage bin and Tanks, Elevated tanks, Stage work, Belt work, Bridge, Structural Steel, Spray (paint and texture or imitation acoustics), Sand or Water blasting, Steeplejack, Sign painting, and Floor covering.

**Section 2.  Management Rights:**  The Company reserves, and is given the right to hire and discharge any of its employees subject to the provisions of this contract.    The management of the problems of the Company are reserved by the Company and shall be vested exclusively in the Company, and the Company shall have the right to determine how many employees it will employ or retain in all departments, together with the right to exercise full control of its business, except as expressly restricted in this Contract.  No employee shall be dismissed for an unjust cause.

## ARTICLE III
## WAGES

SECTION 1.    The Employer agrees to pay the following wage scales to employees covered by this agreement.  Any and all moneys can be put into any existing fringes at the decision of Local Union No. 76.

<u>Wages Per Hour and Effective Dates</u>

<u>WORK CLASSIFICATION</u>

Brush work, Floorcovering, Sheetrock finishing

Employees shall be classified and paid at not less than the following hourly rates, it being understood that the Employer may pay more but not less than such rates to any or all employees:
Employees working for the Employer on the effective date of this Agreement shall not be considered to receive a wage reduction as a result of this Agreement.

Fully Qualified Employees (Journeyman)

| <u>Date</u> | <u>Wage</u> | <u>DC3 Appr.</u> | <u>IUPAT-JATF</u> | <u>LMCF</u> |
|------|------|------|------|------|
| ZONE A | | | | |
| 6/17/2000 | $14.15 | .10 | .05 | .02 |
| 5/1/2001 | $14.65 | .20 | .05 | .02 |
| 5/1/2002 | $15.25 | .25 | .05 | .02 |
| ZONE B | | | | |
| 6/17/2000 | $10.00 | .10 | .05 | ..02 |
| 5/1/2001 | $10.50 | .20 | .05 | .02 |
| 5/1/2002 | $11.10 | .25 | .05 | .02 |

Foremen shall be paid $0.50 per hour above Journeyman scale effective June 17, 2000. A foreman shall be appointed when four or more employees covered by this agreement are working on a job.

The hourly wage rate paid to each covered employee in Zone A only shall be increased by Fifty Cents ($0.50) per hour on June 17, 2000.

The hourly wage rate paid to each covered employee in both Zone A and B shall be increased by Fifty cents ($0.50) per hour on May 1, 2001.

The hourly wage rate paid to each covered employee in both Zone A and B shall be increased by Sixty cents ($0.60) per hour on May 1, 2002.

SECTION 2.  MAINTENANCE SCALE.  Maintenance scale for work requiring or involving any remodeling, including partially new and partial remodeling construction. Maintenance work is to normally be performed from 4:30 P.M. to 8:00 A.M. and shall be considered maintenance work when over 50% of the work performed that day or shift is performed during those hours unless agreed to by both employee and the Employer prior to beginning work or unless work performed is "make-up" work as described elsewhere in this agreement.  Maintenance shall not include the completion of a gutted or new structure.

A $1.00 per hour increase in the regular scale shall be paid from 5:00 P.M. until 2:00 A.M.  If a third shift is required an increase of $1.00 per hour over the regular scale shall be paid.

All hours worked over twelve (12) hours in any twenty-four (24) hour period shall be paid for at the rate of double time.

The Union must be notified of all maintenance jobs before the work is started.  This is to insure the job properly comes under the maintenance scale.

SECTION 3.    One dollar ($1.00) per hour above the classified wage rate shall be paid for any of the following work or combinations of work.

| | |
|---|---|
| Sand Blasting | Spray Painting |
| Water blasting | Structural Steel |
| Stage Work | Stacks |
| Elevated Tanks | Towers |

Sandblasting shall include water blasting or any other work of similar nature, design or result.

SECTION 4. Apprentice Wage Rates:

**Effective Dates**

|  |  | 6/17/2000 | 5/1/2001 | 5/1/2002 |
|---|---|---|---|---|
| 1st 90 days | 50% | 7.08 | 7.33 | 7.63 |
| 2nd 90 days | 55% | 7.78 | 8.06 | 8.39 |
| 2nd 6 Months | 60% | 8.49 | 8.79 | 9.15 |
| 3rd 6 Months | 65% | 9.20 | 9.52 | 9.91 |
| 4th 6 Months | 70% | 9.91 | 10.26 | 10.68 |
| 5th 6 Months | 80% | 11.32 | 11.72 | 12.20 |
| 6th 6 Months | 90% | 12.74 | 13.19 | 13.73 |
|  | 100% | 14.15 | 14.65 | 15.25 |

## ARTICLE IV
## APPRENTICESHIP AND JOURNEY PERSON TRAINING

**SECTION 1. Standards** The Apprenticeship Standards for Painters District Council #3, formulated by the Joint Apprenticeship Committee for Kansas City, Missouri, and vicinity dated July 7, 1959 and revised March 29, 1984 and subsequent amendments thereto become apart of this contract.

**SECTION 2. JATC:** The Employer is bound by and to the Agreement and Declaration of Trust, Effective July 7, 1959, and was revised March 29, 1984, establishing the District Council #3 JATC Fund, and shall make all contributions by provisions contained in this Agreement at the applicable rate of pay.

**SECTION 3. DISTRICT COUNCIL #3 Painters Apprenticeship Health and Safety Training Fund** The Employer and Union agree that the jointly administrated District Council #3 Painters Apprenticeship Health and Safety Training Fund shall be administered from a neutral location not occupied by Employer or Union.

The Employer further agrees to adhere to, comply with and be bound by all rules, regulations and resolutions of the Board of Trustees of said funds. The Employer authorizes the parties to the said Trust Agreement to appoint trustees and successor trustees to administer said Funds and hereby ratifies and accepts the trustees so appointed as if made by the Employer.

The employer and the Union agree that the amounts of fringe benefit contributions specified herein after shall be due and owing for all bargaining unit work performed by all employees in the geographic area covered by this Agreement. For the purposes of this section, Section 3, "employee" shall include all persons performing bargaining unit work under this agreement whether the person is a member of the union or not.

The Employer and Union further agree that for purposes of this article "employee" shall include any and all persons or individuals who perform bargaining unit work at the request of the Employer, except for legitimate subcontractors.

Further any such persons or individuals shall be "employees" for the purpose of this Section unless said individuals or persons comply with the following list of criteria which indicates they are legitimate subcontractors:

A. Compliance with all applicable state workers' compensation and employment security laws; and

B. Compliance with all applicable federal employment and tax laws; and

C. Obtaining and maintaining a federal employer identification number.

## 1. Hourly Rate Contributions

The contributions required by this Article IV, Section 3 shall be remitted to the United Missouri Bank of Kansas City, N.A., or to such other Depository as the parties of this Agreement and the Trustees of the involved Funds may agree upon. Said contribution payments shall be made within ten (10) days after the last day of the preceding month for the hours worked during the said preceding month. Simultaneously with the making of said contribution payments the Employer shall prepare and file a written report with said depository setting forth the name, social security numbers, locations of work, and hours worked by each employee and such other information as is required by the trustees of the involved Funds. The written report forms shall be furnished to the Employer by the trustees of the involved Funds.

A. Effective June 17, 2000, in addition the wages set out in this Agreement, each employer agrees to pay for each hour worked in the area covered by this Agreement by journey persons and current apprentices to the depository bank as follows:
( $.10) Ten cents hourly contribution to Painters' Apprenticeship Health and Safety Training Fund.

B. Effective May 1, 2001, in addition the wages set out in this Agreement, each employer agrees to pay for each hour worked in the area covered by this Agreement by journey persons and current apprentices to the depository bank as follows:
( $.20) Twenty cents hourly contribution to Painters' Apprenticeship Health and Safety Training Fund.

C. Effective May 1, 2002, in addition the wages set out in this Agreement, each employer agrees to pay for each hour worked in the area covered by this Agreement by journey persons and current apprentices to the depository bank as follows:
( $.25) Twenty-Five cents hourly contribution to Painters' Apprenticeship Health and Safety Training Fund.

## ARTICLE V
## JOURNEYMEN UPGRADE HEALTH & SAFETY TRAINING

Effective from the first day of this agreement and through out its duration, the Painters' Apprenticeship, Health and Safety Training Fund shall provide apprenticeship training and journey person upgrade training as well as ongoing health and safety training. All employees working under the jurisdiction of this agreement shall be trained in mandatory health and safety programs. All employees shall be certified as having completed a variety of such training and examination of this program including but not limited to First Aid, CPR, OSHA 500, Fall Protection, Respirator Fit Testing, Lead Abatement Scaffolding, etc. All employees shall be required to successfully complete a minimum of eight (8) hours of health and safety training or journeyman upgrade training each contractual year before becoming eligible to receive the scheduled contractual wage increases. Only those employees who have upgraded themselves by successfully completing the required minimum of eight (8) hours training per contractual year shall be eligible to receive the scheduled wage increases.

## ARTICLE VI
## DRUG AND ALCOHOL POLICY

It is understood that no employee shall consume or be under the influence of drugs or alcohol while at work.

The joint apprenticeship committee shall institute a pre-employment drug-testing program for apprentices. An Employer may require a blood alcohol content test or urine drug test for any employee who has been involved in a job-related injury or accident, which requires medical treatment or other workers compensation benefits or involving lost time. Such drug or alcohol test must be carried out in a professional and scientific manner to insure accurate results. The Joint Apprenticeship Committee shall develop a drug test program that provides funding for the cost of the pre-employment drug testing for prospective apprentices. The cost for drug or alcohol testing done after a job-related injury or lost time accident shall be paid by the Employer.

The Union's role in this testing program is solely advisory. Nothing in this agreement will make the Union liable to the Employer, any employee, or to any other person, and

the Union will be held harmless from any damages. The Employer will not engage in any litigation against the Union.

An employee at his discretion shall have the right to be represented by a Union representative at any disciplinary hearing or meetings as a result of an Employer's drug or alcohol testing, and the Union retains the right to grieve or arbitrate any aspect of the drug testing program instituted by the Employer or any disciplinary action resulting from it under the grievance and arbitration clause of this Agreement.

## ARTICLE VII
## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES
## JOINT APPRENTICESHIP AND TRAINING FUND

The agreement between the Employer(s) and Union parties to this Agreement regarding payment to the International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT – JATF) is as follows:

Subsection A:

(a) Commencing with the first day of the contract, and for the duration of this Agreement, and any renewals or extensions thereof, the Employer, agrees to make payments to (thru the depository bank) the International Union of Painters and Allied Trades Apprenticeship and Training Fund (IUPAT – JATF) is as follows:

(b) For each hour or portion of an hour worked by an employee, the Employer shall make a minimum contribution of five ($0.05) cents per hour to the above named Apprenticeship Fund.

(c) Contributions shall be paid on behalf of any employee starting with the employees first hour of employment in a job classification covered by this Agreement. This includes, but is not limited to apprentices and journey person.

(d) The payments to the Apprenticeship Fund required above shall be made to the "International Union of Painters and Allied Trades Joint Apprenticeship and Training Fund (IUPAT – JATF)" which was established under an Agreement and Declaration of Trust, effective May 1, 1995. The Employer hereby agrees to be bound by and to said Agreement and Declaration Trust, as though he had actually signed the same.

Subsection B:

(a) The Employer hereby irrevocably designates as its representatives on the Board of Trustees of the International Fund (IUPAT – JAFT), such Trustees as are now serving, or who will in the future serve, as Employer Trustees or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(b) The Union hereby irrevocably designates as its representatives on the Board of Trustees of the International Fund (IUPAT – JATF), such Trustees as are now serving, or who will in the future serve, as Union Trustees, together with their successors, as provided for in the aforesaid Trust Indenture.

(c) The parties hereto further agree to be bound by all actions taken by the Trustees of the International Fund (IUPAT – JATF), pursuant to the said Agreement and Declaration of Trust.

(d) All contributions shall be made at such time and in such manner as the Trustees require consistent with the Collective Bargaining Agreement, and the Trustees shall have the authority to have a Certified Public Accountant audit the payroll and wage records of the Employer for the purpose of determining the accuracy of contributions to the Apprenticeship Fund.

## ARTICLE VIII
## INTERNATIONAL UNION OF PAINTERS AND ALLIED TRADES
## LABOR MANAGEMENT COOPERATION FUND

Commencing with the first day of the contract for the duration of this Agreement and any renewals or extensions thereof, the Employer agrees to make payments to the International Union of Painters and Allied Trades Labor Management Cooperation Fund ("Fund") for each employee covered by this Agreement as follows:

For each hour or portion thereof, for which an employee receives pay, the Employer shall make a contribution of $0.02 (two cents) to the Fund.

For the purpose of this Article, each hour paid for, including hours attributable to show up time, and other hours for which pay is received by the employee in accordance with the Agreement, shall be counted as hours for which contributions are payable.

Contributions shall be paid on behalf of any employee starting with the employees first day of employment in a job classification by this Agreement.  This includes, but is not limited to, apprentices and journey persons.

The Employer and Union signatory to this Agreement agree to be bound by and to the Agreement and Declaration of Trust, as amended from time to time, establishing the Fund.

The Employer hereby irrevocably designates as its representatives on the Board of Trustees such Trustees who as are now serving, or who will in the future serve, as Employer Trustees, together with their successors.  All contributions shall be made in such time and in such manner as the Trustees require consistent with the payment schedule for Local Fringes, and the Trustees may at any time conduct an audit in accordance with the Agreement and Declaration of Trust.

If an Employer fails to make contributions to the fund within twenty (20) days after the date required by the Trustees, the Union shall have the right to take whatever steps are necessary to secure compliance with this Agreement, any other provisions hereof to the contrary notwithstanding, and the Employer shall be liable for all costs of collection of the payments due together with attorney fees and such penalties as may be assessed by the Trustees.  The Employers liability for payment under this Article shall not be

subject to or covered by any grievance or arbitration procedure or any "no-strike" clause, which may be provided or set forth elsewhere in this Agreement.

The Trustees shall at all times operate the IUPAT – LMCF in such a manner to enable the Employer at all times to treat contributions to IUPAT – LMCF as a deduction for income tax purposes.

## ARTICLE XIX
## VACATION AND HOLIDAY PAY

**SECTION 1. Vacation**   Effective June 17, 2000, all employees working 1600 hours (or more), during the 12 months following the anniversary date of employees beginning continuous employment, will be entitled to 40 hours paid vacation during the following 12 months from the anniversary date of employees beginning continuous employment. Vacation may be used in multiples of 8 hours and must be scheduled and approved by Midwest Drywall Co., Inc. 45 days in advance.

Employment shall be viewed as continuous if there is no period of not working for more than 180 days or more.  Following a break of 180 days or more the beginning date is the first date worked following the break.

**SECTION 2.  Holidays**  The following days shall be observed as unpaid holidays:

| | |
|---|---|
| New Year's Day | Labor Day |
| Memorial Day | Independence Day (Federal Observance) |
| Thanksgiving Day | Christmas Day |

Provided, if a holiday falls on Sunday, the Monday following said holiday shall be observed as such holiday, and if a holiday falls on Saturday the preceding Friday shall be observed as such holiday. Employees who work on such Monday or said holiday or such Friday or said holiday shall receive double their regular rate of pay.

All employees who are working for the employer in the week immediately preceding Thanksgiving Day and who have worked 1600 hours or more during the concurrent calendar year will receive 8 (eight) hours of holiday pay for Thanksgiving Day.

All employees who are working for the employer in the week immediately preceding Christmas Day and who have worked 1600 hours or more during the concurrent calendar year will receive 8 (eight) hours of holiday pay for Christmas Day.

## ARTICLE X

## TRAVEL EXPENSES AND REGULATIONS

**Section 1.  Out-of-Town Expenses**:

The Company will reimburse employees for vehicle expense in excess of 30 miles one way at a rate of $0.28 per mile up to a total of 150 miles one way.  The Company will reimburse employees for vehicle expense in excess of 150 miles one way at the rate of $0.35 per mile.  Carpooling is encouraged.  Employees who choose not to share rides will receive only half the mileage rate.

Mileage will be computed by using the lesser of the two following calculations:
   (a) shortest distance using reasonable routes between the Company's office (currently 1351 South Reca Court, Wichita, Kansas) and the main address of the project; or,
   (b)  the shortest distance using reasonable routes between the employee's home address and the main address of the project.

The above mileage rates will be increased to the following rates on the following dates:

| Date | 30 to 150 Miles | Over 150 Miles |
|------|-----------------|----------------|
| 6/17/2000 | .28 | .35 |

The Company will reimburse employees who do not drive for expenses at the rate of $0.10 per mile for all miles in excess of 100 miles one way.

The Company will provide reasonable out of town lodging when an overnight stay is required.  No smoking or drinking will be allowed in Company provided lodging.

An employee will receive a per diem allowance in lieu of reimbursing actual expenses for meal and incidental expenses incurred for travel away from home for each day a minimum of 4 hours is worked in a location where it is necessary for an employee to stay overnight either the day before of the day of the work day.  Per diem allowances will be as follows:

| Beginning | Ending | Per Diem Allowance |
|-----------|--------|--------------------|
| 6/17/2000 | 4/30/2001 | 14.00 |
| 5/1/2001 | 4/30/2003 | 14.50 |

## ARTICLE XI
## WORK HOURS

SECTION 1.  The normal workweek at the signing of this Agreement shall be forty (40) hours:  provided, nothing in this Agreement shall be interpreted as guaranteeing a

Midwest Drywall Co., Inc.  - Final Agreement 6/16/00

12

definite number of hours per day or hours or days per week. The Employer may schedule such hours as it deems necessary. One-half (1/2) hour lunch break will be available to each employee.

SECTION 2. Employees shall receive one and one-half (1.5) times their regular hourly rate for all work performed in excess of forty (40) hours in any one workweek. Hours paid but not worked shall not be counted in the computation of overtime.

SECTION 3. The Employer shall show the regular and overtime hours and rates on the employees check stubs.

SECTION 4. Make-up day shall be at the option of the employee when the employee misses work during the regular workweek due to inclement weather. The employee shall have permission to request his Employer for the opportunity to make up his lost work on Saturday, Sunday or any part thereof at the regular time pay scale. The Employers may not assign make up requirements to any employee.

SECTION 5. WORKING CONDITIONS: The Employer shall carry Workmen's Compensation Insurance and shall file Certificates of Compliance with his employer's number with District Council #3.

SECTION 6. Wages earned shall be due and payable each Friday on the job, at or before the regular quitting time and shall include all wages earned up to 5:00 p.m. of the preceding Friday. In any case where any employee is discharged, or laid off, the Employer agrees that all wages earned and unpaid at the time of such discharge or layoff, shall be paid either by payroll check on a local bank or in cash.

SECTION 7. Employee who report for work at such time as they are instructed to report by the Employer or his agent and such employees are not placed at work, they shall receive one-half (1/2) day's pay, provided that where the employees are not put to work because of inclement weather or on account of unavoidable conditions which prevent the Employer from putting the employee to work, they shall not receive such pay.

SECTION 8. The Employer agrees that if he desires to lay off an employee he or his foreman shall notify such employees not later than quitting time on the last day the employee works, otherwise, he shall pay any employee not so notified one-half (1/2) day's pay; unless due to conditions over which he had not control, the Employer or his foreman could not give such notice.

SECTION 9. Any employee requested by the Employer or his foreman to report to any job shall work a minimum of four (4) hours or receive a minimum of four (4) hours pay if the work does not last four (4) hours; provided the Employer shall not be liable in cases of weather change or when conditions arise which prevent the employees from working

the full four hours.

SECTION 10. ODD HOURS. On jobs that cannot be performed during the regular workday, including heavy traffic areas such as offices, retail stores, shopping centers or factories, in such cases work may be performed at the regular hourly rate. All other work rules, guaranteed payment and other provisions of this Agreement shall apply when such work is being performed, and before starting any such project prior notification must be made to the District Council #3 business office. All such work in excess of scheduled eight hours daily shall be at the appropriate overtime rate. This section shall not apply to any project where work is being performed under International Agreement, Project Agreement, Maintenance Agreement, etc.

## ARTICLE XII
## WORK RULES

SECTION 1.   No journeyman shall have the authority to tell any other journeyman what to do while on the job unless he is the designated foreman and being paid as such.

SECTION 2.   Where rollers are used for the application of materials, or for stippling or leveling materials are brushed on, they shall not be over nine (9) inches in width.

SECTION 3.      Brushes used for the application of water paints or rubber base materials shall not be larger than one and one-half (1-1/2) inches by eight (8) inches.

SECTION 4.   The Employer shall be responsible for furnishing adequate safety equipment to each employee who shall be responsible for returning the equipment in as good a condition as when he received it excepting normal depreciation, wear and tear. All such equipment shall be returned upon termination of the employee using it or upon completion of the work for which it was needed, whichever occurs sooner. Any such equipment lost or damaged due to the employee's negligence shall be replaced by the contractor and cost of replacement shall be deducted from the responsible employee's wages.

SECTION 5.   Where it is rule for employees to report at the shop every morning before starting to work they shall not leave the shop to go to the job before start of the work shift.

SECTION 6.   Under the Social Security Laws of the United States, any man employing one or more men automatically becomes an employer. Such journeymen desiring to become an employer shall give notice to Union and prove that he has satisfied the requirements of the Social Security Board and possesses an employer's number and Certificate of Insurance.

SECTION 7.  The employee shall be permitted five (5) minutes at noon and fifteen (15) minutes (spray clean up shall be thirty (30) minutes at the end of the day to clean the employer's equipment and the journeymen's person.  The employee shall not leave the job before the end of the clean-up period.

SECTION 8.  No journeyman shall be allowed to use brushes over 4 ½ inches wide in oil or flat wall paint.  It shall be considered a grievance if journeymen are asked to violate this section and discharged because of their refusal and same will be handled at the discretion of the local union.  This shall not apply to liquids containing no pigments.

SECTION 9.  Shop Steward:  The Company agrees to the right of the Union to select Shop and Job Stewards.  The Shop Steward shall be selected from among the employees of the Company and shall be a working Steward. The first employee on the job who is covered by this agreement may call the Union Hall so that a Steward may be selected by the Union. The Steward shall be an agent of the Union in the absence of the Business Representative.  The duty of the Steward shall be to enforce the provisions of the Agreement.  No Company shall be without a Shop Steward.  The Union shall advise the Company the name of the  Stewards in writing.  The Steward shall not be discriminated against.  Any grievant will accompany the Steward to see the Employer about complaints.

SECTION 10.  First Aid Kit:  Every employer shall furnish cleaning rags and maintain a first aid kit on all job sites and maintain safe equipment and conditions.

SECTION 11.  Power Tools and Equipment:  The Company agrees to furnish the hand tools, all power tools, special equipment, and similar type expendable items, except stilts, banjo, drill motors, dust brushes, broad knives, putty knives and tapers pans, where use is required by the Company.  Employees shall endeavor at all times to protect and take care of Company equipment regarding damage and theft.  No employee shall be permitted to use any of his own power equipment unless it meets the applicable safety standards.  All equipment and supplies, etc., furnished by the Employer shall remain the property of that Employer and must be returned to the Employer upon termination of employment.  The issuance of tools, equipment and supplies may be documented.

SECTION 12.  Hoists:  No employee shall ride any hoist or elevator unless designated as a personnel carrying hoist approved by certificate of inspection from the recognized governmental certifying authority.

SECTION 13.  Dangerous and Toxic Materials:  When an employee shall be required to use any toxic or dangerous material that could possible be injurious to ones health in any manner, the employee shall be given written material safety data sheets (MSDS's) containing notification of such a hazard.  If substitute containers are used for toxic or hazardous substances, the new container shall be labeled or marked or tagged.

SECTION 14. Piecework:  Piecework is an acceptable method of payment of wages provided the other terms of this agreement are satisfied.  Piecework pay must be arranged on terms agreeable to both the employee and the Employer prior to beginning of the work.  Employees working under piecework arrangement will not receive any less than their normal hourly wage rate.  Fringes shall be paid on a basis of actual hours worked which is consistent with the other terms of this contract.

## ARTICLE XIII
## PREBID CONFERENCE

The Union and signatory Contractor, at the request of either party, will hold a pre-bid conference for the purpose of considering and making agreed to adjustments of wages and working conditions for individual projects where the overall circumstances and working conditions related to such projects are mutually deemed to be warranted.

## ARTICLE XIV
## UNION REPRESENTATIVES

SECTION 1.  Shop Visitations:  Authorized Representatives of the Union shall be allowed to visit the shops for the purpose of administering the contract after first notifying the Employer.

SECTION 2. Job site Visitations:  The representative of the Union shall be allowed access to any building where Employees represented by it are, or were employed provided that said representatives do not hinder, slow, or otherwise adversely affect the progress of the job and it is within the authority of the Company to grant access.

SECTION 3. Payroll Inspection:  A qualified representative of the Union shall have the right to examine the Company's payroll records at any time, and only records necessary to determine the accuracy of the payroll upon reasonable notice and request to the Employer pertaining to the employees covered under this contract, after first notifying the acting Company manager.

Employer's payroll stub shall itemize the employee's gross wages, net wages, federal and state withholdings, overtime pay, lead pay, travel and mileage allowance, and dues deduction.  If the employee works outside the territorial jurisdiction of this Agreement under a different rate of pay, the rate shall be shown.

## ARTICLE XV
## SUCCESSOR CLAUSE

The Employer agrees that there shall be no sale, transfer, or assignment of the business unless the purchaser, transferee or assignee agrees to accept, abide by and be bound by all the terms and provisions of this contract. The Employer further agrees that there shall be no sale, transfer or assignment of this business unless the purchaser, transferee or assignee agrees to keep in its employ the employees covered hereby, subject to the provisions of this contract. When the purchaser, transferee or assignee accepts the contract and agrees to be bound by the terms thereof and signs a statement accordingly or countersigns the contract, the seller shall be relieved of all the obligations he may have assumed under the terms of the contract.

## ARTICLE XVI
## PICKETING - NO STRIKE – NO LOCKOUT

Section 1. The employees covered by this agreement shall, during the life of this agreement, have the right to respect any legal picket line validly established by any bona fide labor organization and the Union party to this agreement has the right to withdraw employees subject to the agreement whenever the Employer party to this agreement is involved in a legitimate primary labor dispute with any bona fide labor organization.

Section 2. The Union and its officers, agents and members agree that, while this Agreement is in effect, they will not initiate, authorize, condone, or promote any strikes, sympathy strikes, sit-downs, slow-downs, stay-ins, boycotts, secondary boycotts, picketing of any nature whatsoever, however peaceful, mass absenteeism, cessation of work, mass refusal to perform any part of duty, or any other actions which would impede, interrupt, disrupt, or interfere with the normal conduct of the Company's business or any of its operations. Neither the violation of any provision of this Agreement nor the commission of any act constituting an unfair labor practice or otherwise made unlawful by any federal, state or local law shall excuse employees, the Union, or the Company from their obligations under the provisions of the Article.

Section 3. The Company shall, at its sole option, be entitled to institute litigation for the purpose of assessing damages, securing specific performance, or other mandatory relief, and this right shall be an alternative to the grievance procedure.

Section 4. If one or more employees, as agents or members of the Union, participate in a strike, slow-down, or work stoppage of any kind in violation of this Agreement and fail to return to work in 24 hours, such employees or employee shall be subject to discharge, without warning notice, or to other disciplinary action by the Company, ( and(and such employees or employee shall not be entitled to recourse to or the benefit of any other provisions of this Agreement). Provided, however, an employee shall be entitled to only one 24-hour grace period. Thereafter disciplinary action, including discharge, can be imposed immediately.

Section 5.    The Company agrees that, while this Agreement is in effect, it will not order, authorize, or ratify a lockout.  The term "lockout", as used herein, shall not include a stoppage of operations, in whole or in part, for business reasons.

## ARTICLE XVII
## REFFERALS

SECTION 1.  The employer shall have the right to determine the number of employees they need from time to time and the right and privilege to select such referrals as they may deem qualified for such duties as are to be performed and shall have the right and privilege to increase or reduce the number of employees at any time.

SECTION 2.  The union shall establish and maintain an open and non-discriminatory employment list for employment of all workmen of this particular trade regardless of Union Membership.

SECTION 3.  Whenever desiring to employ workmen, the employer shall call upon the union or its business representative, for any such workmen as they may from time to time need, and the Union or its Business Representative shall furnish the employers who are complying with the same wages, hours, fringe benefits and working conditions as set forth in this agreement, the required number of qualified and competent workmen needed by the employer.

SECTION 4.  The union or its business Representative will furnish each such required competent workmen, in the order entered on the aforesaid list, except as qualified hereafter, to the employers by use of a written referral, which shall be presented to the workmen dispatched, and will furnish such workmen from the Union open listing in the manner and order following:

### GROUP A

The employer may call for workmen by name if such workmen are properly registered and who have been laid off or terminated in the area covered by this agreement within the past one hundred twenty (120) days by the Contractor signatory to this agreement, now desiring to re-employ the same workmen, provided said workmen are available for such employment; or GROUP B.

### GROUP B

All applicants who have worked at their respective crafts within the past five (5) years by a contractor signatory to this agreement.

### GROUP C

All other applicants who are available for employment and are not working at their craft and have re-registered for employment each workweek on Monday between the hours of 8:00 a.m. and 12:00 noon.

Midwest Drywall Co., Inc. - Final Agreement 6/16/00                                    18

SECTION 5.  Reasonable advance but not less than Twenty-four (24) hours, will be given by the Employer to the Union, or its Business Representative.  Upon ordering such workmen, and in the event that within Forty-eight (48) hours after such notice, the Union or its Business Representative is unable to furnish such workmen, the Employer may procure workmen from any other source or sources.  If Employers are required to obtain workers from other sources, such workmen shall also obtain a written referral from the Union Office and the Union shall be obligated to issue the workmen the required written referral after obtaining the workmens name, Social Security Account Number, etc... for the purpose of record keeping.

SECTION 6.  The Employer shall have the right to reject any referral sent to him.

**ARTICLE XVIII**
**SAVINGS CLAUSE**

If any Article or section of this Agreement should be held invalid by operation of law or by any tribunal of competent jurisdiction, or if compliance with or enforcement of any Article or Section should be restrained by such tribunal pending a final determination as to its validity, the remainder of this Agreement or the application of such Article or Section to persons or circumstances other than those as to which it has been held invalid or as to which compliance with or enforcement of has been restrained, shall not be affected thereby.

**ARTICLE XIX**
**ADMINISTRATIVE DUES**

SECTION 1.  Every employer signatory to this agreement hereby agrees to check off from the wages of each employee covered under the terms of this agreement, employed by such Employer during the term of this agreement, Administrative Dues as set out in the Union's By-Laws and to remit said amount to the Union in the following manner.

SECTION 2.  For each payroll period, the Employer will deduct from the wages of each employee the amount specified herein; three (3)% of gross pay as provided in the By-Laws for all hours worked during said payroll period.

SECTION 3.  On or before the 15th day of each month, the Employer will remit to the Union the entire amount of Administrative Dues due and owing as to each employee for the month previous.

SECTION 4.  At the time of the employment of any employee, the Employer will submit to each such employee for his voluntary signature a dues deduction authorization card in duplicate, one copy of which is retained by the Employer and other returned to the

Union, the form to be supplied such Employer by the Union.

SECTION 5. The report form to be sent to the Union Office each month shall list all employees covered by the agreement including those employees who have not signed a dues deduction authorization card listing the number of hour worked by each employee during the pay period and include each employee's social security number.

SECTION 6. The Union will deliver to the Employer a copy of the By-Laws and by signing this agreement the Employer acknowledges receipt of a copy of the By-Laws.

## ARTICLE XX
## GRIEVANCES AND ARBITRATION

Grievances or complaints of an employee against the Employer with respect to the interpretation or application of this Agreement shall be handled as follows:

A. Grievances.

Step 1. An employee having a complaint shall orally present his request for adjustment to his supervisor.

Step 2. In the event the complaint or controversy is not resolved under Step 1, then the employee involved may file a grievance, which shall be in writing and state in detail the fact complained of and the provisions of the Agreement, which are deemed to have been violated. No grievance shall be filed or processed based on facts or events, which have occurred more than five (5) days before the grievance if filed. Grievances shall be deemed filed when delivered to the employee's supervisor or an Employer officer, either personally or by certified mail, return receipt requested.

Step 3. The Grievant, together with representative of the Union and the Employer, shall then meet and attempt to resolve the grievance as expeditiously as possible; provided, the grievance shall be deemed resolved to the satisfaction of all parties unless written demand for arbitration is served by the Union in the same manner as a grievance is filed and within ten (10) days after the grievance has been filed as set forth above, unless extended by mutual written consent of the parties.

B.    Arbitration

Arbitration shall proceed before an arbiter selected by the parties. Each grievance shall be arbited separately and by different arbiters unless the parties agree to the contrary. If the parties have failed to agree upon a selection of an arbiter within ten (10) days after demand for arbitration is served, then request may be made by either party within twenty (20) days after demand for arbitration is served, of the Federal Mediation and Conciliation Service to designate the names of seven (7) person qualified, impartial and

able to serve as arbiters. The Union shall strike three (3) names from the panel of proposed arbiters and submit such three (3) names to the Employer within ten (10) days after the Union has received the Panel. The Employer shall then strike three (3) names and submit the same to the Union within ten (10) days after the Employer has received the names stricken by the Union. The remaining name on the panel of arbiters shall act as arbiter of the dispute. In the event the fifth arbiter is unable or unwilling to serve and the parties cannot agree on another arbiter, then the above procedure shall be repeated until an arbiter is selected.

The arbiter shall hear the matter in dispute as soon as possible. The arbiter shall render his decision as expeditiously as possible and the same shall be final and binding upon both parties, subject to the limitations of such arbiter as set forth elsewhere in this Agreement.

Each party shall bear its own expenses in preparing and presenting its case and the fees and expenses of the arbitration hearing and the arbiter, including costs of court reporter and transcript, shall be borne equally by the parties.

The arbiter shall have no authority to add to, subtract from, modify, change or alter any of the terms of this Agreement, and the arbiter's award shall be rendered within the scope of his authority.

Any award shall be limited to the actual net wages lost by the grievant since the filing of his grievance, less such other compensation, including wages, commissions, worker's compensation, and unemployment compensation which he may have received or which may be due him for the award period.

In the event grievances or arbitrations are not filed or processed in the manner or within the times set forth above, they shall be forever barred.

## ARTICLE XXI
## MEDICAL AND DENTAL INSURANCE

Section 1. MEDICAL AND DENTAL INSURANCE. The Employer agrees to make available during the term of this contract a comprehensive major medical plan, which is comparable to the existing plan available August 21, 1996. The cost to the employee during the term of the contract will not exceed $3.00 (Three Dollars) per week to provide single coverage for medical and dental insurance. The cost to the employee during the term of the contract will not exceed $20.00 (Twenty Dollars) per week to provide medical and dental coverage for the employee, employee's spouse, and eligible dependents. Employees will be required to complete enrollment cards and meet underwriting requirements to receive coverage.

Section 2. GROUP TERM LIFE INSURANCE BENEFIT. The Employer agrees to provide a group life insurance benefit of not less than $10,000 on all active employees

less than 65 years old and an additional group life insurance benefit of not less than $5,000 on all dependents of active employees less than 65 years old. The Employer will provide benefits of at least 50% of the above amounts to age 70 and no coverage after age 70. Employees will be required to complete enrollment cards and meet underwriting requirements to receive coverage.

Section 3. NATIONAL HEALTH/MEDICAL INSURANCE. In the event that a federal or state law is passed which requires any of the benefits provided under this article, the Employer, at its sole discretion may reopen negotiations in regarding wages and fringes.

Section 4. 401(k) PROFIT SHARING PLAN. The Employer agrees to provide a qualified profit sharing benefit plan which will accept the voluntary contributions of active employees which is comparable to the existing plan available January 1, 2000. Employees will be required to complete enrollment forms and meet eligibility requirements to participate in plan.

## ARTICLE XXII
## WAGE AND FRINGE SURETY BOND

Section 1. Each newly signatory or habitually delinquent Employer employing employees under this Agreement and making contributions under this Agreement to the Fringe Benefit programs contained within this Agreement shall be required to secure and maintain with District Council #3 of the I.U.P.A.T. a wage and fringe benefit surety bond subject to the amount required by this Article. Said surety bond shall be used as a guaranty of payment of wages, individual savings amounts, and fringe benefit contributions called for in this Collective Bargaining Agreement.

Section 2. For definition, a newly signatory Employer shall be defined as an Employer bound to this agreement for less than one (1) year, effective October 1, 1999. A habitually delinquent Employer will be defined as having been more than thirty (30) days late in remitting individual savings and fringe benefit monies, or having any company check for wages or fringes returned for insufficient funds twice in a twelve (12) month period. Delays in remitting and/or crediting fringe and individual savings account monies due to bank or administrative or postal processing delays shall not be included in the thirty (30) day late period.

Section 3. This Article will not apply to contractors signed to an International Agreement with the International Union of Painters and Allied Trades and maintaining a similar bond with the I.U.P.A.T.

The amount of the wage and fringes surety bond will be determined as follows:

| | |
|---|---|
| 2 - 5 employees | $10,000.00 |
| 5 - 10 employees | $20,000.00 |
| 10 employees or more | $40,000.00 |

An employee will be defined as anyone who works more than thirty-nine (39) hours in a one (1) month (30 day) time frame.

## ARTICLE XXIII
## SIGNING BONUS

The Employer agrees to pay each employee covered under this agreement One Hundred Dollars ($100.00) as a bonus on a separate check after the execution of this agreement and on or before July 1, 2000.

## ARTICLE XXIV
## DURATION

THIS AGREEMENT shall be in full force and effect from 12:01 a.m. June 17, 2000 until 11:59 p.m. April 30, 2003, and shall remain in full force and effect from year to year thereafter unless either party shall desire a change in any its terms, in which case a written notice of a desire to make some changes must be served upon the other party at least sixty (60) days before the expiration date of this Agreement.

Signed this 17th day of June, 2000.

FOR THE EMPLOYER                          FOR THE UNION:
Midwest Drywall Co., Inc                  IUPAT DISTRICT COUNCIL #3


_____          _____
Steven A. Nienke, President              Michael D. Hunt
                                         Business Manager/Secretary Treasurer

## Agreement to Amend the Collective Bargaining Agreement

This Agreement made and entered into this _31st_ day of October, 2000 by and between the International Union of Painters and Allied Trades, AFL-CIO, District Council #3, Local Union No. 76, herein after called the "Union" and Midwest Drywall Co., Inc., herein after called the "Employer" and/or any other contractor who wishes to operate under this Agreement and attaches his signature hereto.

**WHEREAS,** Union and Employer are party to a collective Bargaining Agreement dated the 17th day of June, 2000, herein after called the "Agreement"; and

**WHEREAS,** Union and Employer recognize the need to make changes to the Agreement regarding Apprenticeship wage rates, percentages and jurisdictional language in an effort to facilitate the recent merger of Local Union 76 Joint Apprenticeship Training and Trust Fund with District Council #3 Painters Apprenticeship Health and Safety Training Fund, and to remain in conformance to the Apprenticeship Standards Registered with the State of Kansas and State of Missouri. The Union and Employer further recognize the need to make these changes to provide similar wage rate percentages with respect to the Apprenticeship Standards of District Council #3 Painters Apprenticeship Health and Safety Training Fund.

**NOW, THERFORE,** Union and Employer agree the following Amendment shall be added to the Agreement.

Effective October _31_, 2000, the Union and Employer agree to the following wage rates and percentages for all Apprentices working under the jurisdiction of the Agreement in the following counties of Kansas: Barber, Barton, Butler, Clark, Cominanche, Cowley, Edwards, Finney, Ford, Grant, Gray, Greenwood, Harper, Harvey, Haskell, Hodgeman, Kearney, Kingman, Kiowa, Lane, Marion, McPherson, Mead, Ness, Pratt, Pawnee, Reno, Rice, Rush, Scott, Sedgwick, Seward, Stafford, Stevens, Sumner, Wichita.

### Apprentice Wage Rates: Based on percentage of Journeyman Wage

|  |  | Effective Dates | | |
|---|---|---|---|---|
|  |  | **5/15/2000** | **5/1/2001** | **5/1/2002** |
| 1st 90 days | 55% | 7.78 | 8.06 | 8.39 |
| 1st 6 Months | 60% | 8.49 | 8.79 | 9.15 |
| 2nd 6 Months | 65% | 9.20 | 9.52 | 9.91 |
| 3rd 6 Months | 70% | 9.91 | 10.26 | 10.68 |
| 4th 6 Months | 75% | 10.61 | 10.98 | 11.44 |
| 5th 6 Months | 85% | 12.02 | 12.45 | 12.96 |
| 6th 6 Months | 90% | 12.74 | 13.19 | 13.73 |
|  | 100% | 14.15 | 14.65 | 15.25 |

FOR THE EMPLOYER:
MIDWEST DRYWALL CO., INC.

Steve Nienke
President

Denis H. Dieker
Chief Financial Officer

FOR THE UNION:
INTERNATIONAL UNION OF
PAINTERS AND ALLIED TRADES
DISTRICT COUNCIL #3
LOCAL UNION NO. 76

Michael D. Hunt Sr.
Business Manager/Secretary Treasurer